**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LINDA JANN LEWIS, MADISON LEE, ELLEN SWEETS, BENNY ALEXANDER, GEORGE MORGAN, VOTO LATINO, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, and TEXAS ALLIANCE FOR RETIRED AMERICANS,<br><br>           Plaintiffs,<br><br>vs.<br><br>RUTH HUGHS, in her official capacity as Texas Secretary of State,<br><br>           Defendant. | Civil Action No. **5:20-cv-00577**<br><br>Related to *Gloria et al. v. Hughs et al.*, No. 5:20-cv-00527 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs LINDA JANN LEWIS, MADISON LEE, LINDA SWEETS, BENNY ALEXANDER, GEORGE MORGAN, VOTO LATINO, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, and TEXAS ALLIANCE FOR RETIRED AMERICANS (together, "Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendant RUTH HUGHS, in her official capacity as Texas Secretary of State, and allege as follows:

### NATURE OF THE CASE

1. "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted). In light of the present, unprecedented global health crisis, at least four provisions of the

Texas Election Code will severely burden Texans' right to exercise their right to vote in the coming November general election (the "November Election"). Should these provisions remain in effect come November, many Texans will suffer the loss of their right to vote, "a right they will *never* be able to recover," *Stringer v. Whitley*, 942 F.3d 715, 726 (5th Cir. 2019) (Ho, J., concurring), because they will either be effectively barred from casting their ballots or their ballots will not be counted.

2.      The severe and unjustifiable risk of disenfranchisement of hundreds of thousands of Texans arises in the context of the current global public health crisis. A novel coronavirus, SARS-CoV-2, is spreading throughout the country, infecting hundreds of thousands with the disease known as COVID-19. In Texas alone, at least 35,390 cases of COVID-19 have been reported, and that number is only growing. Experts predict the pandemic will last 18 to 24 months, with a resurgence in the fall—just in time for the November Election—that the Director of the Centers for Disease Control and Prevention warns will be "be even more difficult than the one we just went through." Zack Budryk, *CDC director warns second wave of coronavirus might be 'more difficult'*, The Hill (Apr. 21, 2020), https://thehill.com/policy/healthcare/493973-cdc-director-warns-second-wave-of-coronavirus-might-be-more-difficult.

3.      Texas has not yet reached its "peak" of infections. Last week alone, the state reported more than 7,000 new cases and 221 deaths—an increase of 24 percent and 33 percent over the prior week, respectively—and it saw the highest single day jump in coronavirus cases since the outbreak began. As Governor Abbott begins taking steps to "reopen" Texas in the coming weeks, experts have predicted that the rate of infections will continue to increase, likely at a quickening pace, as mitigation efforts previously in place are lifted. All of this is to say that the most vulnerable Texans, including the elderly and those with pre-existing health conditions—

groups that account for as much of one third to one half of Texas's population—will still need to be practicing self-isolating and social distancing come November. Many Americans who are not among the most vulnerable will likely also continue to do the same to avoid becoming the unwitting spreaders of this highly contagious and often fatal disease.

4.      Recognizing the serious health risks posed by holding elections in Texas in the manner that they have historically been held—*i.e.*, with very limited mail-in voting, such that most voters have had to cast their ballots in person at what have often been crowded polling places with long lines—Texas's Director of Elections ordered counties to postpone any local elections on April 2, to avoid subjecting voters to the risk of contracting or spreading COVID-19. Consistent with the experience of jurisdictions that have held elections since the pandemic began., county election administrators in Texas anticipate a significant increase in eligible voters who—faced with the unconscionable choice between maintaining their safety and the safety of those around them, and exercising their fundamental right to vote—will choose to vote by mail. This is consistent with the results of a recent Pew Research study, which found that 66% of Americans are uncomfortable going to a polling place in light of the COVID-19, as well as with CDC guidance: recognizing the difficulties in and risks posed by conducting elections where the majority of voters cast their ballots in person during the COVID-19 crisis, the CDC has recommended that jurisdictions encourage mail voting and reduce methods of voting that lead to direct contact between or among voters or poll workers. Other federal, state, and local officials have increasingly come to the same realization. Congress, for example, has authorized $400 million to help states transition to voting-by-mail.

5.      It remains to be seen whether Texas will agree—or will ultimately be required by judicial order—to protect the health of the citizenry and their ability to exercise their fundamental

rights by allowing broader absentee voting than in years past. As of this filing, several cases remain pending in the state and federal courts seeking to ensure that voters have safe access to the ballot in coming Texas elections. At the same time, the State's Attorney General has repeatedly publicly threatened voters with criminal prosecution, should they apply for a mail-in ballot because of fears about contracting or spreading COVID-19. But beyond the constitutional and moral infirmities with Texas's present stance on who may access mail-in voting, multiple provisions of the law that governs that process (collectively, "Vote By Mail Restrictions") independently and collectively pose direct and severe burdens on the right to vote, either by unduly burdening the process, or by unjustifiably raising the risk that substantial numbers of valid ballots of entirely lawful, eligible voters will be rejected and not counted by the State in the coming November Election.

6.      This lawsuit challenges the constitutionality of those provisions in the context of the current crisis. They include: (1) the requirement that voters pay for the postage to return their early voting ballots by mail ("Postage Tax"), Tex. Elec. Code § 86.002; (2) the requirement that returned ballots be postmarked no later than 7:00 p.m. on election day and received by the county at the address designated on the ballot carrier envelope no later than 5:00 p.m. on the day after the election to be counted ("Ballot Receipt Deadline"), *id.* § 86.007; (3) the requirement that voters must submit two handwriting samples that "match"—a standard determined by election officials— in order to have their early voting ballots counted ("Signature Match Requirement"), *id.* § 87.027; and (4) the criminalization of a person assisting a voter in returning a marked mail ballot ("Voter Assistance Ban"), *id.* § 86.006.

7.      In order to ensure that Texas voters—including the individual Plaintiffs, as well as the members and constituents of the Organizational Plaintiffs—will not be unconstitutionally denied their right to vote or have that right unduly burdened as a result of the unconstitutional

application of the Vote By Mail Restrictions in the midst of this unprecedented crisis, Plaintiffs seek a preliminary injunction from this Court enjoining: (1) the Postage Tax, to ensure that lawful, eligible voters are not disenfranchised as a result of their inability to procure postage to return their mail-in ballots; (2) the Ballot Receipt Deadline, to ensure that lawful, eligible voters are not disenfranchised provided that their ballots are put in the mail on or before election day and received before the canvass of the election; (3) the Signature Match Requirement, to ensure that lawful, eligible voters are not disenfranchised as a result of inaccurate signature "matching" by persons unqualified to accurately evaluate the authenticity of signatures and with no opportunity to cure a mis-flagged mismatch to save their ballot from being rejected; and (4) the Voter Assistance Ban, to ensure that voters in need of assistance in delivering their marked vote-by-mail ballots receive that assistance.[1]

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

9.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

10.     This Court has personal jurisdiction over the Defendant, the Texas Secretary of State, who is sued in her official capacity only.

---

[1] The term "postmark" is used to reference any type of marking applied by the USPS including bar codes or other tracking marks indicating that a ballot was mailed on or before election day. If there is no postmark on a particular ballot, but it arrives within the relevant time frame, it should be presumed to have been mailed on or before Election Day, unless there is clear and convincing evidence to the contrary.

11.     Venue is proper in the U.S. District Court in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

12.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

13.     Plaintiff LINDA JANN LEWIS is a 73-year-old African-American citizen who resides and is registered to vote in Waco, Texas. Ms. Lewis is a member of the Texas Conference of the NAACP. Although Ms. Lewis has been able to cast a mail ballot because of her age for nearly a decade, she generally votes in person due to her concerns that voting by mail raises the risk that her ballot will not be counted. Ms. Lewis also suffers from a disability called kerataconus that affects her vision. To improve the impairments caused by kerataconus, Ms. Lewis has had two cornea surgeries, four cataract surgeries, and most recently, a tissue transplant in her right eye. Despite these procedures, Ms. Lewis still suffers from impaired vision, and the changes in her vision have affected her signature over time. Although Ms. Lewis would prefer to cast her ballot in person on election day, she recognizes that her age and disability place her at high risk for severe complications if she is infected with COVID-19 and thus, she plans to vote by mail for her safety and the safety of others in her community while the pandemic continues. Ms. Lewis is concerned that her ballot may be rejected because of the Signature Match Requirement and potential variations in her signature caused by her disability. In addition, Ms. Lewis is concerned about her ability to obtain the postage necessary to mail her ballot. As a result of her disability, it is not safe for Ms. Lewis to drive. Ms. Lewis understands that the U.S. Postal Service ("USPS") no longer processes mail in Waco, and thus any mail she sends must first be processed in Austin or Fort Worth before it is delivered to its final destination. Ms. Lewis has concerns that her ballot may be

delayed, both in being sent to her and in being returned to the county board of elections, and that she may need to personally deliver her ballot to ensure that it arrives on time.

14.     Plaintiff MADISON LEE is a 23-year-old citizen and resident of and registered voter in Austin, Texas. Ms. Lee was diagnosed as a young child with an aggressive form of Juvenile Rheumatoid Arthritis, an autoimmune disease that affects her hands and other parts of her body, causes her daily pain, and has resulted in a decrease of her physical abilities. As a young adult, Ms. Lee lost her ability to write without pain or difficulty. Ms. Lee has generally voted in person in previous elections, but she recognizes that her autoimmune disease places her at high risk for severe complications if she is infected with COVID-19 and thus, she plans to cast a mail ballot for her safety and the safety of others in her community while the pandemic continues. Ms. Lee is concerned that her ballot may be rejected because of the Signature Match Requirement and potential variations in her signature caused by her disability. Ms. Lee also has concerns that her ballot may be delayed, both in being sent to her and in being returned to the county board of elections, and that she may need to personally deliver her ballot to ensure that it arrives on time.

15.     Plaintiff ELLEN SWEETS is a 79-year-old African-American citizen and resident of and registered voter in Austin, Texas. Although Ms. Sweets has been eligible to vote by mail because of her age for over a decade, she generally votes in person due to her concerns that voting by mail raises the risk that her ballot will not be counted. Ms. Sweets also suffers from severe asthma and hip impairments that have limited her mobility. She has been instructed by her doctor not to leave her place of residence during the COVID-19 pandemic, and in accordance with her doctor's instruction, has not left her apartment since early February. She intends to shelter in place for the duration of the pandemic. Ms. Sweets recognizes that her severe asthma places her at high risk for severe complications if she is infected with COVID-19 and thus, she plans to cast a

mail ballot for her safety and the safety of others in her community while the pandemic continues. Ms. Sweets has concerns that her ballot may be delayed, both in being sent to her and in being returned to the county board of elections, and that she may need to personally deliver her ballot to ensure that it arrives on time. Ms. Sweets does not have family in Austin and lives alone. Ms. Sweets would like to ask a friend or acquaintance to pick up her marked, sealed mail-in ballot and deliver it to the county for her; however, she knows that the Voter Assistance Ban criminalizes this and she is unwilling to put others at risk of prosecution. Ms. Sweets is also concerned about the risk that her ballot may not be counted due to the Signature Match Requirement and potential variations in her signature.

16. Plaintiff BENNY ("BEN") ALEXANDER is a 66-year-old African-American citizen and resident of and registered voter in Bexar County located in San Antonio, Texas. Reverend Alexander is the pastor of New Way Bible Fellowship Church in San Antonio. Although Reverend Alexander is able to vote by mail because of his age, he has generally voted in person due to his concern that voting by mail raises the risk that his ballot will not be counted. In addition to being eligible to vote by mail because of his age, Reverend Alexander suffers from congestive heart failure, diabetes, and high blood pressure. Reverend Alexander survived a massive heart attack in the past, and he has both a defibrillator and pacemaker to reduce his risk of suffering a second heart attack in the future. Reverend Alexander recognizes that his age and these underlying health conditions place him at a high risk for severe complications if he is infected with COVID-19 and thus he plans to cast a mail ballot for his safety while the pandemic continues. Reverend Alexander is concerned that his ballot may be rejected because of the Signature Match Requirement. Reverend Alexander also has concerns that his ballot may be delayed, both in being

sent to him and in being returned to the county board of elections, and that he may need to personally deliver his ballot to ensure that it arrives on time.

17.     Plaintiff GEORGE ("EDDIE") MORGAN is a 63-year-old citizen and resident of and registered voter in Dallas, Texas. Mr. Morgan is a member of the Texas Alliance for Retired Americans. For as long as he can remember, he has had trouble with respiratory illness; starting when he was a young child and through adulthood, he was regularly hospitalized for pneumonia and suffered from chronic bronchitis. In 1982, Mr. Morgan was diagnosed with Mounier-Kuhn syndrome, a genetic lung disorder resulting in frequent respiratory tract infections and low lung function. Mr. Morgan was a geriatric nurse for thirty years, but when he contracted pneumonia from one of his patients, his primary care physician told him he was too ill to work. His condition requires him to do antibiotic breathing treatments three times a day, and he also uses inhalers throughout the day. Because his Mounier-Kuhn syndrome prevents him from working, he receives Social Security Disability Insurance, which just barely covers his monthly essentials (such as utilities, telephone service, and doctors' copays) and is often not sufficient. Mr. Morgan also has debt from prior hospitalizations that he cannot pay down. He receives $19 dollars a week in food stamps, which is not enough to cover his meals, so he also receives food from food banks. And, after more than a year on the waitlist, Mr. Morgan was recently notified that he would receive Meals on Wheels, though he did not receive his first scheduled meal deliveries likely of an inability of volunteers to do deliveries during the pandemic.

18.     Because of his Mounier-Kuhn syndrome, Mr. Morgan already has low lung function; he is therefore likely to develop serious respiratory complications if he contracts COVID-19. In addition, because his condition leaves him immunocompromised, his body struggles to fight even common illnesses like pneumonia, let alone the disease caused by the novel coronavirus.

Thus, since the emergence of this global health crisis, Mr. Morgan has been in strict isolation by doctor's orders, and he intends to be isolated until his doctors tell him there is no risk of infection from COVID-19. Beyond his monthly trip to the hospital to receive antibodies for pneumonia (as his condition prevents his body from developing those naturally), Mr. Morgan has stayed in his apartment alone since March 12. His sister brings him groceries once a week, and he hopes to receive food from Meals on Wheels soon. In light of his condition, his senior housing community has arranged for him to take the trash out and do his laundry late in the evening so that he can avoid his neighbors. Though Mr. Morgan has, in the past, been uncertain about whether his condition qualifies him to vote by mail, he understands that he is now qualified to do so because, with the risk of contracting COVID-19, his condition "prevents [him] from appearing at the polling place on election day without a likelihood . . . of injuring [his] health." He has, therefore, applied to vote by mail for the November General Election, and recently spoke with the Dallas County election administrator, who told him that his application would be accepted.

19.     As the precinct chair for Precinct 1071, Mr. Morgan is passionate about the election process and committed to participating in it. He fears that, despite being eligible to vote by mail, the Vote By Mail Restrictions will make it hard from him to guarantee that the county receives and counts his marked mail-in ballot. He is concerned that he will not have a stamp available to return his marked ballot, as is required by the Postage Tax. Mr. Morgan cannot make a trip to the post office to buy stamps for fear of contracting COVID-19, and he does not currently have access to a reliable computer, so he would not be able to order postage online. Even if he was able to do so, he understands that he would have to purchase an entire book of stamps for $11, which he cannot afford to do. To avoid these issues in November, Mr. Morgan would like to ask a friend or acquaintance to pick up his marked, sealed mail-in ballot and deliver it to the county

for him; however, he knows that the Voter Assistance Ban criminalizes this and he is unwilling to put others at risk of prosecution. Mr. Morgan is also concerned about the Ballot Collection Deadline. He knows that the USPS is experiencing financial issues and severe delays and believes it will be overburdened by an influx of mail near the election. He therefore believes that even if he mails his ballot with time to spare, there is a significant chance his ballot will arrive after the deadline and therefore not be counted. Mr. Morgan also fears that, assuming he can acquire a stamp and his mail-in ballot arrives in time, it will be rejected. Because his physical condition varies day-by-day, there are some days when he has no problem writing and somedays when he struggles to write. He is concerned that fluctuations in his penmanship between his vote by mail application and his ballot will result in his mail-in ballot being rejected and he will not have an opportunity to cure because of the Signature Match Requirement.

20.      Plaintiff VOTO LATINO brings this action on its own and on behalf of its constituents and supporters. Voto Latino is a Section 501(c)(4) nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinxs are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle, including the nearly 5.6 million eligible Latinx voters in Texas. Voto Latino considers eligible Latinx voters in Texas to be the core of its constituency. Voto Latino has seven local chapters of volunteers in Texas, including a chapter in San Antonio. Since 2010, Voto Latino has been mobilizing Latinx voters in Texas through statewide voter registration initiatives as well as peer-to-peer and digital voter education and get-out-the-vote campaigns. In 2018, Voto Latino directly registered 15% of all new registered voters in Texas, and 77% of those voters turned out to vote.

21.     As part of Voto Latino's voter education and get-out-the-vote campaigns, the organization educates voters on, among other things, when and how to cast ballots by mail. In 2020, Voto Latino anticipates making expenditures in the millions of dollars to educate, register, mobilize, and turn out Latinx voters across the United States, including in Texas. Voto Latino has had to raise over $1 million to educate voters on how to vote by mail in the upcoming elections. Both individually and collectively, Texas's Vote By Mail Restrictions directly harm Voto Latino by frustrating its mission of enfranchising and turning out Latinx voters in Texas because they burden and disenfranchise the very voters that Voto Latino seeks to support. In the context of COVID-19, the burdens on Voto Latino's core constituency are even more severe, and the resources Voto Latino will need to divert from its voter registration efforts and digital advertisement budget to combat the burdens imposed by these laws—at minimum over $100,000, as well as the time and energy of its staff and volunteers in its seven Texas chapters—are even more substantial. The Postage Tax, for instance, disproportionately disadvantages Latinx voters in Texas, because Latinx voters are more likely to live in poverty and less likely to have access to transportation than other populations. The Postage Tax is an impediment to Voto Latino's mission of turning out Latinx voters in Texas. Similarly, the Ballot Receipt Deadline requires Voto Latino to divert additional resources to significant outreach prior to Election Day to educate voters on the deadline and ensure that voters are able to mail or drop off their ballots in time. As a result of the Vote By Mail Restrictions, Voto Latino has had to—and will continue to—expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states or its own registration and GOTV efforts in Texas to combat the effects that Texas's Vote By Mail Restrictions have on its core constituency. The time and resources diverted to these efforts are resources that Voto Latino would otherwise spend on its voter registration, digital

advertisement, and GOTV programs. Because of the special circumstances surrounding COVID-19, Voto Latino intends to engage in voter assistance programs. These programs would, but do not currently, include voter education and awareness campaigns and returning mail ballots for those electors who require assistance under certain circumstances. Voto Latino cannot further these activities because of Texas's Voter Assistance Ban.

22. Plaintiff TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") brings this action on its own and on behalf of its members and constituents. The NAACP is a nonpartisan, nonprofit organization founded in 1909. The first Texas branches of the NAACP were formed in 1915, and the Texas State Conference was formally organized in 1937. The Texas State Conference of the NAACP's primary office is located in Austin, but the organization has over 100 units statewide, including in San Antonio. A large portion of the organization's more than 10,000 members are Texas residents who are registered to vote in Texas. The NAACP's membership consists largely of African Americans, and it considers its constituents and supporters to be people of color and/or members of other underrepresented and vulnerable populations, such as those with disabilities. The NAACP's members and constituents are more likely than other populations to live in poverty, work in essential jobs that require more frequent exposure to the public, and suffer from underlying conditions that put them at risk of becoming more seriously ill from COVID-19. Recently, the NAACP has held three virtual town halls to educate the public about the disease and how to recognize symptoms and quarantine in difficult circumstances, and to educate minority-owned businesses about the economic resources available to provide financial assistance to businesses in the wake of the pandemic.

23.     The NAACP's mission is to secure the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons. To achieve its mission, the NAACP engages in voter education and registration activities such as Project VIER ("Voter Information, Education, and Registration") in churches, neighborhoods, and on college campuses across the state to reach voters and help them to register and eventually, vote. Project VIER was created in 2015 to celebrate the 100-year anniversary of the Voting Rights Act. The Postage Tax, Ballot Receipt Deadline, and Signature Match Requirement frustrate the NAACP's mission and cause the NAACP to divert resources from other programs and initiatives in order to assist the NAACP's members and constituents specifically, and Texas voters generally, with overcoming the burdens imposed on them by these laws. In the context of COVID-19, these burdens are even more severe, and the resources that NAACP will need to divert from its other programs in order to combat burdens imposed by these laws are even more substantial. For example, the Postage Tax disproportionately disadvantages African-American voters in Texas, because African-American voters are more likely to live in poverty and less likely to have access to transportation than other populations. The Postage Tax, Ballot Receipt Deadline, and Signature Match Requirement are impediments to the NAACP's mission of securing political equality for African-American voters in Texas.

24.     Many of the NAACP's members and constituents have never voted by mail due to various concerns, including that voting by mail raises the risk that their ballots will not be counted. Additionally, given the history of voting-related discrimination in Texas, the NAACP's African-American members and constituents associate a historical significance with going to the polls and physically casting a ballot at the voting booth in person. However, given the threat of COVID-19, many of the NAACP's members and constituents will vote by mail to protect their

physical health and the health of others in their communities. As voters who will cast ballots by mail for the first time, the NAACP's members and constituents are far more likely to be unfamiliar with the process for casting a ballot by mail. Accordingly, the NAACP will need to educate voters about voting by mail as an alternative to voting in person. The NAACP believes that the State of Texas has failed to put forth adequate safety measures for the upcoming July and November elections, meaning that its members and constituents are likely to face health hazards if they vote in person. The NAACP must divert additional time and resources to educate its members and constituents to make sure that they are able to obtain the postage necessary to mail their ballots; that they are aware of the Ballot Receipt Deadline and will be able to mail their ballots in time for them to be received timely by their county elections officials; and to make sure they are aware of the Signature Match Requirement and the need to contact county elections officials to ensure that their ballots have not been rejected on the basis of signature mismatch. The NAACP understands that the Vote By Mail Restrictions are unclear and confusing to voters. The NAACP understands that it will be important to have all information necessary to properly advise voters, and will spend a significant amount of time determining the applicable law and its requirements in order to communicate that information to voters. The time and resources diverted to these efforts are resources that the NAACP would otherwise spend on its core registration and civic engagement activities for the broader community.

25.     The TEXAS ALLIANCE FOR RETIRED AMERICANS (the "Alliance") is incorporated in Texas as a 501(c)(4) nonprofit, social welfare organization under the Internal Revenue Code. The Alliance has 145,038 members, composed of retirees from public and private sector unions, community organizations, and individual activists. It is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic

justice and full civil rights that retirees have earned after a lifetime of work. The Postage Tax, Ballot Receipt Deadline, Signature Match Requirement, and Voter Assistance Ban frustrate the Alliance's mission because they threaten to deprive and in some cases successfully deprive individual members of the right to vote and to have their votes counted, threaten the electoral prospects of its endorsed candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and makes it more difficult for the Alliance and its members to associate to effectively further their shared political purposes. The Alliance and its individual members spend resources on voter registration, phone banking, and GOTV activities, as well as activities aimed at expanding the Alliance itself, such as recruiting new members, opening new chapters, and making presentations to members' groups and seniors' groups. Since the emergence of the global health crisis, the Alliance has diverted resources from furthering its other activities to educate people on how to successfully vote by mail. For example, the Alliance has committed to calling 1,400 Texans over the age of 65 in Texas House District 100 to educate them on voting by mail. The Alliance understands that many more people will be voting by mail in November's election, and it plans to continue its voter education efforts to ensure that Texans are aware of the Vote By Mail Restrictions. If not for the Vote By Mail Restrictions, the Alliance would be investing those resources into voter registration, phone banking, and GOTV activities.

26.     Defendant Ruth Hughs is the Secretary of State of Texas and is named as a Defendant in her official capacity. She is the State's chief elections officer and, as such, is responsible for the administration and implementation of election laws in Texas, including the Vote by Mail Restrictions at issue in this complaint. *See* Tex. Elec. Code § 31.001(a). The Secretary acted under color of state law at all times relevant to this action.

## FACTUAL ALLEGATIONS

27.     COVID-19 will make it dangerous and more difficult for Texans to cast their ballots in person in November. To avoid exposure to the virus, many Texas citizens will seek to vote by mail out of necessity. The parameters of who exactly will be eligible to do so are still uncertain, but mere *eligibility* to vote by mail will not protect Texans' against their right to do so being unconstitutionally burdened or, in many cases, effectively denied, by the Challenged Provisions. Plaintiffs bring this action to protect against that threat, which is imminent and certain, absent Court action to protect Texans' exercise of the most fundamental right.

### A.     COVID-19's Impact on In-Person Voting

28.     Virtually all aspects of life in our country today are affected by the unprecedented COVID-19 pandemic. Schools and businesses are closed; a majority of people in the country are sheltering in their homes; more than 30 million people have lost their jobs; and approximately 79,522 people have lost their lives.

29.     In Texas, the virus has already infected 35,390 people and resulted in 973 deaths. Those numbers are expected to increase, with a likely resurgence anticipated in the fall, just as the state's citizens present at polling locations to vote.

30.     On April 2, a state-wide stay-at-home order took effect in Texas, requiring residents to maintain social distancing and avoid providing or obtaining all non-essential services in order to combat the virus's spread.

31.     While it is unclear whether there will be a statewide stay-at-home order in November, the threat posed by the pandemic is expected to continue for at least another 18 to 24 months, requiring that self-isolation and social distancing remain the norm, in order to protect the millions of Americans (and Texans) who are among the populations most vulnerable to the virus's worst complications.

32.     Thus, Governor Abbott has acknowledged, even as he moves to "re-open" the state by easing certain restrictions that have been in place to stem the spread of the virus, "every scientific and medical report shows that when you have a reopening . . . it will actually lead to an increase and spread."

33.     Every jurisdiction that has held an election since the crisis began has experienced enormous difficulties in safely offering in person voting. Recognizing that Texas will prove no exception, county elections administrators have expressed serious concerns about holding the November Election in the same manner as Texas has held elections in the past.

34.     Texas elections officials are already reporting concerns for retaining poll workers, the majority of which are over the age of 65 and therefore advised to shelter in place because of their vulnerability to severe complications with COVID-19.

35.     Dr. Catherine Troisi, an infectious disease epidemiologist with the University of Texas Health Science Center at Houston, recently said that Texas election workers would be at risk because of their prolonged presence at polling places.

36.     Elections officials have also recognized that, as they begin to prepare for in person voting, they will find themselves confronted with serious venue problems. This is because venues that have typically served as polling locations in the past—e.g., senior centers, schools, and churches—are likely to be unwilling to do so in upcoming elections because of the attendant public health risks. Meanwhile, other venues that could serve as polling locations are too small to accommodate the large number of expected voters while still maintaining social distancing.

37.     A lack of poll workers to staff polling locations and a lack of venues to host polling locations will result in a decrease in open polling locations. This, in turn, will result in long lines that will make it difficult, if not impossible, for some people to vote.

38.     One Texas election official, Fort Bend County election administrator John Oldham, anticipates that voting lines "will easily stretch out across 10 blocks" if voters are social distancing in an effort to avoid risking contracting the virus. *See* Alexa Ura, *Drive-thrus and free pencils: Texas plans for July elections with in-person voting*, Texas Tribune (Apr. 20, 2020), https://www.texastribune.org/2020/04/20/despite-coronavirus-texas-plans-july-elections-person-voting/.

39.     For the poll workers who are willing to staff polling places on Election Day, and the few locations that open their doors to the public for this purpose, county election officials anticipate struggling to provide sufficient sanitary supplies and protective equipment to keep voters and election workers safe during in-person voting. This may prove especially problematic for those counties employing touchscreen voting machines, which may require sanitizing after every voter to avoid voters passing the virus through contaminated surfaces.

40.     All in all, voters who are forced to vote in person in the November Election will likely have to wait in unconscionably long lines, in close proximity to other voters for an extended period of time, and interact with poll workers who are not using protective equipment, in order to exercise their right to vote.

41.     As the Bexar County elections administrator, Jacque Callanen, said of elections grave challenges in light of COVID-19, "It just keeps going on and on." *Id.*

42.     County election officials' fears are well founded: the recent presidential primary election in Wisconsin illustrates the disaster that awaits a state when it refuses to accommodate necessary changes to election administration in light of this unprecedented crisis. Like in Texas, "the extent of the risk of holding [the] election ha[d] become increasingly clear" well before election day." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL

1638374, at *1 (W.D. Wis. Apr. 2, 2020). It was understood that there would be "(1) a dramatic shortfall in the number of voters on election day as compared to recent primaries . . ., (2) a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State, or (3) a failure to achieve sufficient in-person voting to have a meaningful election with an increase in the spread of COVID-19." *Id.* Cities in Wisconsin were forced to close polling locations. The result was crowds, long lines, and excessive wait times in the middle of a global pandemic whose abatement requires social distancing and spending as little time as possible outside of the home.

43.     Tragically, though unsurprisingly, reports of COVID-19 cases resulting from voters who turned out to vote in Wisconsin's election have emerged. Already, Wisconsin health officials have identified over 60 individuals who were infected with the disease while participating in April's election. Many of these individuals are located in Milwaukee, where a lack of both poll workers and willing venues caused 18,803 voters to cast their ballots in only five polling locations, compared to the 200 polling locations the city had planned to operate before the threat of COVID-19. That averages out to 3,761 voters per polling location.

44.     Without significant changes to its electoral process, Texas will fare no better. If anything, it is reasonable to assume that the problems encountered in Wisconsin in its primary will be far worse in Texas in the coming November Election.

45.     For example, in the 2018 general election, 131,705 people voted in 302 polling locations in Bexar County. Even with 302 polling locations, those voters waited in lines one-hundred-people long.

46.     Assuming that Bexar County is forced to close polling locations at the same rate as Milwaukee and that the County sees the same number of voters on November 3, 2020, as it did

on November 6, 2018, we can anticipate that 131,705 people will cast their ballots at only eight voting locations in the County on November 3rd. That averages out to 16,463 voters per polling location, compared to Milwaukee's 3,761 voters per polling location.

47.    Voter turnout is likely to be higher in the presidential election than in the 2018 mid-term election; thus, these estimates are likely conservative.

48.    A significant portion of Bexar County's residents moreover, are at higher risk of tragic outcomes should they contract the virus. For example, a reported 14% of Bexar County adults are diabetic and 16% are family caregivers to elderly or disabled relatives. Forcing these voters to vote in person in the November Election could very well prove fatal to them or their loved ones.

**B.    Vote by Mail in Texas**

49.    The solution is obvious: all Texans should be given the choice to cast their ballots by mail.

50.    Voting by mail is not a novel idea, of course. Since 2000, more than a quarter of a billion votes have been cast in the United States via ballots received by voters at home, including 27% of the 118 million votes cast in the 2018 general election.

51.    But these large numbers belie large discrepancies between states as to who can vote by mail. Each state has its own laws governing a voter's eligibility, and Texas's election code restricts eligibility for mail-in voting to a small minority of the State's eligible voting population.

52.    The Texas Election Code provides that a voter can early vote by mail only if the voter (1) will be absent from their county of residence during early in-person voting and on election day, Tex. Elec. Code § 82.001; (2) has "a sickness or physical condition (including expected or likely confinement for childbirth on election day) that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the

voter's health," *id.* § 82.002(a), (3) is 65 years of age or older, *id.* § 82.003, or (4) is confined in jail but is otherwise entitled to vote, *id.* § 82.004.

53.    As a result, only about 6% of Texans vote by mail in any given election.

54.    In light of the public-health and disenfranchisement risks COVID-19 presents, Texas (like other states that restrict voting by mail) has been called to forego enforcing these requirements and extend the opportunity to vote by mail to all voters.

55.    As Fort Bend County's election administrator John Oldham put it: "Unless we can get another method of voting—ballot by mail being the only one—*we're going to be Wisconsin 10 times over*." Alexa Ura, *Drive-thrus and free pencils: Texas plans for July elections with in-person voting*, Texas Tribune, Apr. 20, 2020; *see also supra* ¶ 38.

56.    The calls to expand voting by mail have come from both sides of the aisle: 65% of Republicans support the expansion of voting by mail to protect voters from COVID-19; four out of five Americans believe states should give all voters the option to vote by mail without an excuse during the November election; the Republican National Committee urged its voters to vote by mail to "protect [themselves] from large crowds on Election Day," *see* Amy Gardner and Elise Viebeck, *GOP pushes voting by mail - with restrictions - while Trump attacks it as 'corrupt,'* Washington Post, (Apr. 13, 2020), https://www.washingtonpost.com/politics/gop-pushes-voting-by-mail--with-restrictions--as-trump-attacks-it-as-corrupt/2020/04/12/526057a4-7bf8-11ea-a130-df573469f094_story.html; and Utah Director of Elections Justin Lee said, "Being a very red state, we haven't seen anything [about voting by mail] that helps one party over another at all. We've heard less concern about voter fraud than about whether every ballot that should get counted does get counted," David Weigel, *The Trailer: The fear and politics around expanding voting by mail*, Washington Post, (Apr. 2, 2020), https://www.washingtonpost.com/politics/paloma/the-

trailer/2020/04/02/the-trailer-the-fear-and-politics-around-expanding-voting-by-mail/5e84980e602ff10d49ada414/.

57.     Texas, however, has resisted these calls, staunchly insisting that vote by mail should be limited to a small fraction of the state's voters, and rejecting calls that the statutory text should be interpreted to permit voters who fear contracting the virus to vote absentee under the exception for disability.

58.     As a result, several lawsuits have been filed, in both state and federal court, seeking judicial intervention to require Texas to ensure that vote by mail is broadly accessible during the crisis.

59.     As a result, the 201st Judicial District in Travis County recently issued a preliminary injunction that interprets the definition of "disability" in Tex. Elec. Code § 82.002 to plainly encompass voters who lack immunity to COVID-19. The order specifically enjoins the state from "rejecting any mail ballot applications received from registered voters who use the disability category of eligibility as a result of the COVID-19 pandemic for the reason that the applications were submitted based on the disability category." *Texas Democratic Party v. Debeauvoir*, No. D-1-GN-20-001610 (Tex. 201st Dist. Apr. 17, 2020) (order granting preliminary injunction).

60.     The State (but not defendant DeBeauvoir, the Travis County Clerk) appealed, and in the weeks since, Texas Attorney General Paxton has publicly taken the position that, so long as the appeal is pending, the order has no effect, and has threatened voters, voter assistance organizations, county judges, and county election officials with potentially criminal consequences, should they proceed as if the state court's order remains in place.

**C.       Vote By Mail Restrictions in Light of COVID-19**

61.      Even if all registered voters are eligible to vote by mail in Texas in the November Election, that would not be sufficient to prevent the serious risk of disenfranchisement and threats to public health that will occur if the Vote By Mail Restrictions remain in place in the pandemic.

62.      Tellingly, Wisconsin allows any registered voter to vote by mail, with or without an excuse; but even with universal eligibility to vote by mail, Wisconsin's April election was a disaster for both public health and voting rights because many voters were unable to have their mail-in ballots counted, and those who voted in person risked their health to do so.

63.      Thus, beyond universal *eligibility*, Texas must also ensure that every voter has the *ability* to vote by mail to ensure their ballots are counted.

64.      The Vote By Mail Restrictions serve to impede and in some cases entirely deny access to vote-by-mail in Texas, particularly to those voters who come from disadvantaged communities, the poor, the elderly, and other vulnerable populations. Many of these individuals have historically relied on in-person voting, which, as discussed above, will be severely restricted in upcoming elections.

65.      In order to ensure that all citizens have reasonable and equal access to the electoral process, Texas must remove unnecessary restrictions on voting by mail that will otherwise deny its citizens their fundamental right to vote. These Vote By Mail Restrictions include the Postage Tax, the Ballot Receipt Deadline, the Signature Match Requirement, and the Voter Assistance Ban.

## Postage Tax

66.      Texas's Postage Tax requires voters to pay for the postage to return their marked mail-in ballot to their county of residence. *See* Tex. Elec. Code § 86.002. This requirement threatens to disenfranchise Texans in November, as it presents several practical problems that are, for some, insurmountable.

67.     First, through the Postage Tax, Texas effectively imposes a monetary cost on voters whose only option to vote safely is to cast a vote by mail.

68.     The severity of the burdens imposed by the Postage Tax are significantly exacerbated under the present circumstances, when many Texans are suffering from the devastating economic impact of COVID-19, and it requires voters who do not have ready access to postage to subject themselves to public health risks in order to visit a post office or return their ballots in-person.

69.     Many Texans do not have stamps at home. The volume of mail sent through the USPS has declined 43% since 2001. Because many now pay their bills online, stamps are no longer a household staple.

70.     Before the current global health crisis, a voter could go to the post office to buy a single stamp; today, given that many voters who request an absentee ballot will be doing so because they have underlying conditions that put them at higher risk for severe complications from COVID-19, such voters are far less likely to be willing to leave their homes to purchase stamps because of the severe threat to their health that doing so could pose.

71.     While there are some services that allow voters to print postage online, these services also require a printer, scale, and paid subscription. A voter can order stamps online on the USPS website, however, they take five to seven days to be delivered under normal circumstances, are not sold individually, must be purchased on a sheet of stamps that costs a minimum of $11.00, and require the purchaser to pay for shipping and handling of the stamps themselves.

72.     It is also not always clear how much postage a voter may need in order to return their ballot. Depending on the number of races at issue in a given jurisdictions, it may require more than one First-Class stamp to cover the return postage.

73.      Though the cost of a First-Class stamp or two may seem trivial to some, there are over 1.3 million people presently unemployed in Texas because of the pandemic, and many of them are in a position where they must conserve all of their resources in order to survive.

74.      This is not hyperbole; it is the reality for many Americans who find themselves suddenly destitute in the current crisis. Washington County resident Summer Mossbarger, for example, is an unemployed, disabled army veteran who picks up free lunch from a local public school to feed her six children and herself eats nothing all day. Manny Fernandez, *Coronavirus and Poverty: A Mother Skips Meals So Her Children Can Eat*, New York Times, Mar. 20, 2020, https://www.nytimes.com/2020/03/20/us/coronavirus-poverty-school-lunch.html. If Ms. Mossbarger skips meals so her children can eat, there is little doubt about how she would choose between feeding her children and a buying a stamp to vote. The disenfranchisement of people like Ms. Mossbarger is not simply an injury to their constitutional rights; it is also an injury to our nation's democracy, which often fails to protect those who cannot advocate for their interests by casting a vote.

75.      It is thus no surprise that removing the barrier to voting caused by postage costs enfranchises more voters. Studies have shown that sending absentee ballots in postage-prepaid envelopes markedly increases mail voting turnout. For example, when King County, Washington initiated prepaid postage pilot programs during the 2017 and 2018 primary elections, voters returned their absentee ballots via USPS at higher rates when they received return envelopes with postage prepaid. In the 2016 general election, 48% of the test group of voters returned their absentee ballots via USPS. In 2017, *81%* of those voters did. This was not a function of shifting in person voting to absentee voting—providing prepaid postage made voters more likely to *vote*. In the 2017 primary, turnout rose 10%. In the 2018 primary, it rose 6%. Following these pilot

programs, King County sent all absentee ballots with postage-prepaid return envelopes. And shortly after that, the Governor and Secretary of State of Washington funded prepaid postage for every county in the state.

76.     Because many Texans will be unable or unwilling to vote in person in November, those who are eligible will apply to vote by mail. However, the Postage Tax will stand in the way of many of these voters successfully sending their ballots in to be counted, imposing unconstitutional burdens that will, in many cases, result in their disenfranchisement.

### Ballot Receipt Deadline

77.     Texas's Ballot Receipt Deadline—which requires ballots to be postmarked by 7:00 p.m. on election day and received by the county by 5:00 p.m. the day after the election, Tex. Elec. Code § 86.007—also threatens voters' ability to vote in the November Election.

78.     The Ballot Receipt Deadline is misleading even in the most orderly of times. The deadline suggests to voters that it is possible to mail a ballot at 7:00 p.m. on election day such that the county receives it by 5:00 p.m. the next day. But the USPS advises that First-Class mail typically takes approximately *three and a half days* to arrive at its destination even under *normal* circumstances. The USPS has also recommended—in a pre-COVID-19 world—that jurisdictions tell their citizens to mail their ballots *at least a week before* ballots are due because of increased mail demands around the time of an election.

79.     Even assuming that the USPS will operate as efficiently this November as it does when it is not under the strain of a global pandemic, the reality is that ballots mailed by 7:00 p.m. on election day will likely arrive at their destination after the Ballot Receipt Deadline, disenfranchising countless voters as a result.

80.     Nor are these normal times. The COVID-19 crisis is already leading to an increase in postal delays. Furthermore, the coming election, in which more voters will turn to voting by

mail to avoid exposing themselves to the virus, is likely to coincide with a budgetary crisis the USPS is facing due to COVID-19—a crisis that threatens to shutter the entire agency.

81.     USPS is also operating with significantly reduced staff as more and more fall victim to the virus themselves. As of mid-April, nearly 500 postal workers across the country have tested positive for COVID-19, 19 have died, and more than 6,000 are in self-quarantine because of exposure.

82.     The USPS's budget and personnel struggles have harsh implications for Texans' voting rights. In the past, when the USPS has faced a budget crisis, it has responded by closing processing centers. Moving forward, it is likely that the USPS will need to make cuts to routes, processing centers, or staff, any of which is likely to increase mail processing delays.

83.     This all means that, as the USPS attempts to deliver an unprecedented number of vote-by-mail ballots across the country—both from county elections officials to voters, and then back again—the system will be under increasing pressure, causing increased delays and, ultimately, an increase in the number of ballots that are not timely returned before the Ballot Receipt Deadline and are thus not counted.

84.     Again, Wisconsin serves as an ominous warning. In its recent primary election, the USPS struggled to deliver vote-by-mail ballots to voters, with some ballots delayed and others never arriving.

85.     In response, both of Wisconsin's U.S. Senators wrote to the Inspector General for the USPS seeking an investigation into "absentee ballots not being delivered in a timely manner" and the USPS's failure to deliver in this regard. There were similar delays returning ballots to election officials.

86.     In total, approximately 108,000 absentee ballots were received by elections officials in Wisconsin after election day but before April 13th. These ballots would have been rejected but for the Supreme Court's decision to extend the deadline in light of the pandemic, meaning that each of the voters who had cast those ballots would have been disenfranchised by Wisconsin's arbitrarily early ballot receipt deadline without that judicial intervention.

87.     The delay of election officials in delivering properly requested absentee ballots to voters—whether due to election officials processing a large volume of absentee ballot applications or the USPS struggling to deliver absentee ballots to voters—will impede voters' ability to timely return their absentee ballots through no fault of the voter.

88.     Texas voters who traditionally vote in person who will now attempt to vote by mail are particularly likely to be disenfranchised by the Ballot Receipt Deadline.

89.     Voters who have not previously utilized vote by mail are much less likely to know that they need to send in a ballot not just so that it postmarked on election day, but so that it arrives by 5:00 p.m. the day after the election.

90.     It is unremarkable that these voters would be more likely to cast their vote-by-mail ballots later given that they are also likely to be less familiar with the voting by mail, including the Ballot Receipt Deadline. And it is not unreasonable for them to think that their ballots can be mailed later in the election cycle as long as they are postmarked by Election Day, as many other deadlines in Texas voters' lives—including voter registration deadlines—are postmark deadlines. *See, e.g.*, Tex. Elec. Code § 13.143(d) (voter registration applications deemed "to be submitted to the registrar on the date it is placed with postage prepaid and properly addressed in the United States mail"); Tex. Tax Code § 1.08 (provision rendering property owner's submission of

payments timely where the payment is postmarked by a required due date); 26 U.S.C. § 7502 ("Timely mailing [of annual federal tax filings] treated as timely filing and paying").

91.     Regardless of whether ballots mailed on election day arrive at their destination four days after they were mailed, a week after, or even longer, those ballots will not be counted because of Texas's Ballot Receipt Deadline. This would squarely conflict with the holding in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020), in which all nine Justices unanimously agreed that it was appropriate to extend Wisconsin's Ballot Receipt Deadline by an additional six days, with the 5-4 disagreement being over whether those ballots had to be postmarked by election day itself. *Compare id.* at 1206-08 *with id*. at 1211 (Ginsburg, J., dissenting) ("If a voter already in line by the poll's closing time can still vote, why should Wisconsin's absentee voters, already in line to receive ballots, be denied the franchise?").

92.     Ultimately, if Texas's current Ballot Receipt Deadline is enforced, hundreds of thousands of ballots are likely to be rejected, resulting in the disenfranchisement of hundreds of thousands of Texas voters. That turns not on these voters' actions, but on the vagaries of a postal service operating under a budget crisis during a global pandemic.

93.     Texas has no meaningful need for its day-after election day deadline and nothing that can justify the severe burdens on voters during these unprecedented times. Indeed, the Secretary advises county election administrators that they need not count these ballots until *six days after election day at the earliest*. In its 30th Annual Election Law Seminar, in a presentation entitled "Early Voting by Mail," Genevieve Gill, a staff attorney with the Texas Secretary of State, instructed early voting boards not to count early mail-in ballots received the day after the election until they convene to count mail-in ballots received from overseas, which are not due until the fifth day after the election. Genevieve Gill, *Early Voting by Mail*, Texas Secretary of State - Elections

Division Law Seminar, Nov. 2018, https://www.sos.texas.gov/elections/forms/seminar/2018/30th/presentation-files/Early-Voting-by-Mail-(ABBM).ppsx.

94.     This means that mail-in ballots that arrive at 5:00 pm the day after the election will be put in a box to be counted five days later at the earliest. And while those ballots sit in their box waiting to be counted, mail-in ballots postmarked by election day will be set aside, never be counted, because they arrived minutes, hours, or days after the State's artificial and arbitrary deadline.

95.     Because the Ballot Receipt Deadline will arbitrarily exclude ballots mailed on or before election day from being counted, resulting in the complete disenfranchisement of countless lawful, eligible voters, it imposes a severe burden on Texas that cannot be constitutionally justified under the current circumstances.

### Signature Match Requirement

96.     Texas's Signature Match Requirement requires county officials to verify each mail-in voter's signature by comparing it with the voter's signature on the vote-by-mail application and, if needed or available, other signatures from the voter over the previous six years. Tex. Elec. Code § 87.027. This requirement imposes unsustainable burdens on eligible voters' right to vote for several reasons.

97.     First, the county officials that verify signatures are untrained and have no expertise in forensic handwriting. The Secretary herself recognizes that these officials "are not handwriting experts." *Early Voting Ballot Board & Signature Verification Committee - Handbook for Election Judges and Clerks 2020*, The Office of the Texas Secretary of State, Elections Division, https://www.sos.state.tx.us/elections/forms/ballot-board-handbook.pdf. But the State provides neither uniform standards nor meaningful training to these non-experts tasked with determining whether a vote will count or not.

98.     Rather, election officials are told that "[e]ven if unsure [they] must make a decision whether to accept or reject a signature." *Id.* at 37. How? They should just "use their best judgment . . . to verify if these signatures are the same." *Id.* The Secretary does not clarify how a group of untrained non-experts who are unsure of a signature's authenticity should decide one way or the other.

99.     But even if there were some discernible standard used to decide *whether* two signatures were the same—which there is not—signatures matching is at best a highly dubious and challenging art, for the simple fact that signatures change all the time for any number of reasons. People break their dominant hand, change their name, or develop a tremor. In fact, some of the voters currently eligible to vote by mail—such as the elderly and the disabled—are the same voters whose signatures are most likely to change because of evolving physical abilities.

100.     Experts have consistently found that signature matching is difficult to do accurately even under the most ideal circumstances—when the person undertaking it is highly skilled, has ample time to make comparisons, and ample and timely exemplars of a person's signature written under similar conditions. Amateur signature matchers, they find, are highly likely to misidentify as a mismatch entirely valid signatures, and they do so at alarming rates.

101.     As such, voters are subject to disenfranchisement based on the untrained guesses of overworked elections officials with no expertise in an already dubious art, using the entirely standardless and arbitrary guidance of applying their "best judgment," where their mistake results in the total denial of the most fundamental right.

102.     The lack of training and uniform standards, moreover, guarantees that voters will be treated differently on entirely arbitrary grounds, depending on who happens to review their signature. This arbitrary disparate treatment will result in higher levels of disenfranchisement in

different counties—indeed, even within single jurisdictions—based on factors entirely outside of the voters' control. Recent studies also suggest that there are differential patterns of rejected mail-in ballots across racial and ethnic groups, which causes a disparate impact on non-White voters' ability to have their mail-in ballots counted.

103.    Adding to the problem, Texas provides voters with no opportunity to cure election officials' mistaken determinations that two signatures do not "match." Unlike many states, Texas provides no process whatsoever for a voter to cure a signature mismatch. Rather, the county need only notify the voter of their mail-in ballot's rejection due to signature mismatch within 10 days *after* the election, at which point such notification is meaningless. *Id.* § 87.0431.

104.    Thus, the Signature Match Requirement guarantees that untrained election administrators will mistakenly and arbitrarily reject ballots from qualified voters who complied with every requirement of Texas law, disenfranchising countless entirely lawful, eligible voters with no opportunity for the voters to correct the error.

## Voter Assistance Ban

105.    Texas's failure to safeguard the rights of voters affected by mail service disruptions is compounded by the fact that Texas law imposes a Voter Assistance Ban that criminalizes third parties from assisting voters in *mailing* their mail-in ballots except in narrow circumstances, such as when the third party is closely related to the voter or lives with the voter, or if the voter is disabled, and criminalizes their parties from assisting voters in *delivering* mail ballots to the county without exception. Tex. Elec. Code § 86.006.

106.    Thus, to avoid the uncertainty of mail delivery, voters who are able to submit their ballots in person will be forced to leave their homes to personally deliver their ballots, subjecting themselves to health risks.

107.    The burden is heavier on poor, minority, and rural voters who generally have less access to postal services, are less likely to have access to personal and reliable transportation, and are less able to bear the costs of waiting in long lines to vote or exposing themselves to health risks in order to submit a mail ballot in person. Voters in rural communities, moreover, face longer travel distances to their county board of elections office and even less reliable mail service.

108.    Texas ranks third among the 50 states by the size of its population over the age of 65 and the burdens imposed by the Voter Assistance Ban will be heavily felt among them, particularly in the current health crisis. Seniors, especially those living in community homes or nursing homes, are particularly vulnerable to the current health risks and have expressed concern that they have no reliable way to deliver their ballots to the proper polling site; they cannot trust that the ballot will be delivered on time through the postal service, and they cannot personally deliver the ballot due to health concerns. Indeed, many senior living centers have forbidden their residents to leave.

109.    The burden caused by the prohibition on third party ballot collection is made worse by the current pandemic, which will cause many Texans who have not previously voted by mail do so for the first time. Many such voters will require assistance in returning their ballots to the appropriate election officials.

110.    The criminalization of voter assistance deters good Samaritans from assisting those who are unable to deliver their ballots themselves. The Voter Assistance Ban therefore presents an undue burden on voters generally and will operate to disenfranchise a large swath of Texas's eligible voters during the current pandemic by resulting in these voters' ballots not being counted.

111.　　Those who cannot submit their mail-in ballots in person will either have to rely on the overextended USPS or may simply be deterred from submitting their mail-in ballots altogether. This will result in hundreds of thousands of lawful, eligible Texas voters being effectively disenfranchised.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**U.S. Const. amends. 1, 14; 42 U.S.C. § 1983**
**Undue Burden on the Right to Vote**
**(All Vote by Mail Requirements)**

112.　　Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

113.　　Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

114.　　The Postage Tax's burden on the right to vote is severe. At best, it requires Texans—millions of whom are vulnerable to severe complications from COVID-19 or have vulnerable loved ones—to pay to vote by mail so that they can avoid exposing themselves to the virus while exercising their right to vote. At worst, it disenfranchises the millions of Texans who cannot risk exposure to COVID-19 but who also cannot obtain postage to mail their ballots.

115.    The Secretary can offer no justification that outweighs the significance of the burden under the current circumstances.

116.    The Ballot Receipt Deadline will arbitrarily disenfranchise countless Texas voters for reasons outside their control. It is axiomatic that, "[t]he right to vote includes the right to have the ballot counted." *Reynolds*, 377 U.S. at 555 n.29 (citation and quotation omitted). In light of the barriers to in-person voting posed by COVID-19 and the potential expansion of vote-by-mail eligibility, the number of Texans voting by mail will increase dramatically in upcoming elections. The millions of mail-in ballots that will be cast in Texas's November Election will be subject to the vagaries of the USPS, an agency facing grave difficulties because of the ongoing global pandemic. For this reason, Plaintiffs and countless other Texans face an impermissible risk of arbitrary disenfranchisement, in violation of their constitutional rights.

117.    The justification that the Secretary surely will proffer—that allowing mail-in ballots to arrive late will impose significant administrative costs on counties and the state in processing those ballots—is meritless in light of the fact that it instructs counties to wait until the sixth day after the election to county mail-in ballots along with overseas ballots. Moreover, any administrative costs are dwarfed by the constitutional injury to the Texans completely disenfranchised because USPS did not timely deliver a ballot timely mailed by the voter.

118.    The Signature Match Requirement subjects Texans who vote by mail to an arbitrary and error-prone verification process that can result in the rejection of their ballots without notice or an opportunity to cure. Texas does not promulgate a clear, uniform set of standards that would allow non-handwriting experts to discern whether the same person signed two different documents. If, for one of many common reasons, a voter's signature on their ballot is determined to look different from the signature on their vote-by-mail application or other signatures on file

over the previous six years, their ballot will be rejected. The voter will only be informed 10 days *after* the election. Unbeknownst to them, after making every effort to exercise their right to vote, they will be disenfranchised in that election.

119.     The Secretary has no valid interest served by the Signature Match Requirement. If there is any administrative burden implicated by the Signature Match Requirement, it is that unqualified county election officials use their "best judgment" to verify signatures. The administrative burden of notifying voters of signature mismatch is no different before the election than it is after the election, when counties are now required to notify voters that their ballots were rejected. And the opportunity to cure is not a significant burden, as evidenced by the many other states that present the opportunity to voters. Furthermore, the Signature Match Requirement does not serve an interest in fraud that could not otherwise be achieved without the disenfranchisement of countless Texas voters. This is not a controversial conclusion: courts have found similar signature-verification laws impose an unjustifiably severe burden on the right to vote even before the global pandemic made it necessary for many to vote by mail. *See, e.g.*, *Democratic Exec. Comm. v. Lee*, 915 F. 3d 1312, 1321-26 (11th Cir. 2019); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016).

120.     The Voter Assistance Ban imposes a severe burden on the right to vote because it will effectively disenfranchise voters who require assistance in returning their mail-in ballots. Because many Texans will be casting mail-in ballots for the first time come November and are therefore unfamiliar with the process, and because of unpredictable USPS delivery, some voters will find it necessary to drop off their mail-in ballots directly to the county. However, many of these voters will not be able to do so in light of the public health crisis, nor will they be able to receive assistance by way of a third party collecting and returning their ballots because the Voter

Assistance Ban makes that collection a felony. These voters will have to send their mail-in ballots in on Election Day knowing full well that those ballots are unlikely to arrive in time to be counted. The State's interest in enforcing the Voter Assistance Ban cannot justify disenfranchising voters who require assistance to timely deliver their ballots to the state. And other Texas laws already criminalize any exercise of undue influence or voting fraud that might be captured by the Voter Assistance Ban.

121.    In short, the Challenged Provisions are not supported by a state interest that is sufficient to justify the resulting burdens on the right to vote, and thus, these laws violate the First and Fourteenth Amendments.

### SECOND CLAIM FOR RELIEF

**U.S. Const. amend. 14; 42 U.S.C. § 1983**
**Violation of Equal Protection**
**(Ballot Receipt Deadline and Signature Match Requirement)**

122.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

123.    The Equal Protection Clause protects "the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 105 (2000). The Ballot Receipt Deadline, as applied, treats Texans different depending on where they live: the rate of ballots rejected because those ballots were received late differs between counties. This is because the levels of strictness with which counties enforce the Ballot Receipt Deadline vary.

124.    The disparate treatment of voters is particularly troubling in light of the fact that Defendant instructs counties to wait to count early mail-in ballots until 6 days after the election *at the earliest.* The discrimination on the basis of geography resulting from the Ballot Receipt Deadline severely burdens voters who are effectively disenfranchised because their counties of

residence reject their mail-in ballots for arriving late, while ballots arriving at the same time in another county continue to be counted.

The Signature Match Requirement, by failing to require a uniform standard by which counties should verify signatures on mail-in ballots, leads to "the value of one person's vote over that of another." *See Bush*, 531 U.S. at 104-05. Because there is no functional standard, different counties have different procedures for verifying signatures that result in more stringent standards for signature verification in some counties and less stringent standards in others. The Requirement also discriminates on the basis of age and disability, as young voters, elderly voters, and disabled voters are more likely to have changing signatures that result in mismatch and their ballots being set aside. This discrimination results in a severe burden: the disenfranchisement of voters whose mail-in ballots are rejected. As discussed above, the state has no compelling, let alone rational, interest in treating similarly situated voters differently.

### THIRD CLAIM FOR RELIEF

**U.S. Const. amend. 14; 42 U.S.C. § 1983**
**Violation of Procedural Due Process**
**(Signature Match Requirement and Voter Assistance Ban)**

125.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

126.    Before depriving an individual of a liberty interest—such as the right to have their vote counted, *Reynolds*, 377 U.S. at 555 n.29—the state must provide the individual with notice and the opportunity to be heard. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).

127.    The Signature Match Requirement violates Plaintiffs' right to procedural due process by threatening to set Texas voters' mail-in ballots aside, not to be counted, on signature-

verification grounds, without providing voters notice of their signature mismatch and the opportunity to cure. Indeed, several courts have found that signature-verification laws that impose amorphous verification standards and fail to provide voters with the opportunity to cure violate procedural due process. *See, e.g.*, *LULAC v. Pate*, No. CVCV056403, 2019 WL 6358335, at *15-*17 (Ia. Dist. Ct. Sept. 30, 2019); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338-40 (N.D. Ga. 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 218 (D.N.H. 2018).

## FOURTH CLAIM FOR RELIEF

### U.S. Const. amends. 14, 24; 42 U.S.C. § 1983
### Violation of Prohibition on Poll Tax
### (Postage Tax)

128.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

129.    The Twenty-Fourth Amendment to the United States Constitution provides that: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV § 1.

130.    The Equal Protection Clause of the Fourteenth Amendment provides: "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

131.    Both amendments prohibit the government from imposing a poll tax. *See Harman v. Forssenius*, 380 U.S. 528 (1965); *Harper v. Va. State Bd. of Elect*., 383 U.S. 663 (1966).

132.    During the COVID-19 public health crisis, the only safe way for many Texas voters to cast their ballots will be by mail. Indeed, the CDC recommends for voters who are legally

permitted to cast their ballots by mail to do so. But if voters must spend money to safely exercise their right to vote—whether in the form of paying a fee or paying for postage—they are subject to a poll tax.

133.    Based on the foregoing, the Secretary's enforcement of the Postage Tax has burdened and deprived and will continue to burden and deprive voters like Ms. Lewis, Mr. Morgan, as well as the members and constituents of Plaintiffs Voto Latino, the NAACP, and the Alliance, of their right to vote in federal elections, secured to them by the Fourteenth and Twenty-Fourth Amendments to the United States Constitution and protected by 42 U.S.C. § 1983.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A. Declare that the Ballot Receipt Deadline, Postage Tax, Signature Verification Provision, and Voter Assistance Ban are unconstitutional;

B. Preliminarily and permanently enjoin Defendant, and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, requiring them to provide prepaid postage on the ballot carrier envelopes used to return the marked mail-in ballots to the counties;

C. Preliminarily and permanently enjoin Defendant, and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting vote-by-mail ballots if those ballots are postmarked by 7:00 p.m. on election day and received by the county election administrator before it canvases the election;

D. Preliminarily and permanently enjoin Defendant, and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting mail-in ballots on signature verification grounds, or preliminarily and

permanently enjoin Defendant, and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, such that they are required to provide voters the opportunity to cure any issues with signature verification before their ballots are rejected;

E.  Preliminarily and permanently enjoin Defendant, and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to the Voter Assistance Ban; and

F.  Grant such other or further relief as the Court deems just and proper.

Dated:  May 11, 2020                           Respectfully submitted,

/s/ Skyler Howton
Skyler M. Howton, TX# 24077907
PERKINS COIE LLP
500 North Akard St., Suite 3300
Dallas, TX 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
showton@perkinscoie.com

Marc E. Elias*
Aria C. Branch*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
abranch@perkinscoie.com

Kevin J. Hamilton*
William B. Stafford*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000

khamilton@perkinscoie.com
wstafford@perkinscoie.com

Gillian Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Century City, California 90067
Telephone: (310) 788-9900
Facsimile: (310) 788-3399
gkuhlmann@perkinscoie.com

Sarah Langberg Schirack*
PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
Telephone: (907) 279-8561
Facsimile: (907) 276-3108
sschirack@perkinscoie.com

*Attorneys for Plaintiffs*

*\*Pro hac vice applications forthcoming*