**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

LINDA JANN LEWIS; MADISON LEE;
ELLEN SWEETS; BENNY ALEXANDER;
GEORGE MORGAN, VOTO LATINO,
TEXAS STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE;
and TEXAS ALLIANCE OF RETIRED
AMERICANS,

     *Plaintiffs*,

v.

RUTH HUGHS, in her official capacity as
the Texas Secretary of State,

     *Defendant*.

CIVIL ACTION NO. 5:20-cv-00577-OLG

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS OR, IN THE
ALERNATIVE, FOR A MORE DEFINITE STATEMENT**

TABLE OF CONTENTS

Table of Contents ...................................................................................................................ii

Introduction...........................................................................................................................1

Argument ...............................................................................................................................2

   I.    Sovereign Immunity Bars Plaintiffs' Claims...........................................................2

   II.    Plaintiffs Lack Standing.........................................................................................4

      A.    Injury in Fact.................................................................................................4

      B.    Causation and Redressability ........................................................................9

      C.    Organizational Plaintiffs Lack Statutory Standing .......................................10

   III.    Plaintiffs Fail to State a Claim. .............................................................................11

      A.    Plaintiffs' Right to Vote Is Not Implicated by a Non-Existent "Postage Tax." ..............11

      B.    The Deadline for Returning Ballots Is Reasonable and Constitutional............................16

      C.    Failing to Verify Signatures Would Invite Election Fraud....................................20

      D.    Ballot Harvesting Is Not a Constitutional Right ...................................................25

Conclusion ............................................................................................................................27

## INTRODUCTION

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). And no one disputes that Texas elections must be administered fairly, run in an orderly manner, and convenient for voters. The Legislature has carefully balanced those important interests in the Texas Election Code. Seeking to upset that balance, Plaintiffs ask this Court to strike down four commonsense provisions that have been widely adopted by other States.

First, Plaintiffs complain about a "postage tax," but there is no such thing. Everyone can vote without buying postage, much less paying a tax to the State. Second, Plaintiffs challenge the deadline for returning mail-in ballots. Texas's deadline is already more lenient than most States' deadlines. Pushing it back further would endanger local officials' abilities to timely process and count votes. Third, Plaintiffs seek to prevent local officials from verifying the signatures accompanying mail-in ballots. Signature verification is a common anti-fraud tool. Failing to verify signatures would invite election tampering. Fourth, Plaintiffs complain that Texas law limits who can handle a voter's mail-in ballot. This type of law, which is common to many States, prevents a form of election tampering commonly known as ballot harvesting. Plaintiffs seek to expand Texas's already-generous list to include practically anyone, which would eliminate the anti-fraud benefits of the rule.

These four regulations are well within Texas's constitutional power. *E.g.*, U.S. CONST. art. I, § 4, cl. 1. Plaintiffs allege these regulations are inconvenient, but "[e]very decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016). The law is clear, however, that plaintiffs cannot "make an unjustified leap from *the disparate inconveniences* that voters face when

voting to *the denial or abridgment of the right to vote.*" *Id.* at 600–01. Moreover, any inconvenience is more than outweighed by Texas's obligation to prohibit "all undue influence in elections from power, bribery, tumult, or other improper practice." Tex. Const. art. VI, § 2(c). Texas is constitutionally bound to enforce such "regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box." Tex. Const. art. VI, § 4. That is why Plaintiffs' claims should be dismissed.

But the Court need not reach the merits because Plaintiffs' claims suffer from threshold jurisdictional and procedural defects. Sovereign immunity bars their claims because the Secretary does not enforce the laws being challenged. Moreover, Plaintiffs lack standing because any prediction that these laws will affect their ballots is speculative.

**ARGUMENT**

## I.    Sovereign Immunity Bars Plaintiffs' Claims

Sovereign immunity precludes claims against state officials unless the *Ex parte Young* exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). Consequently, *Ex parte Young* applies only when the defendant enforces the challenged statute. *See Ex parte Young*, 209 U.S. 123, 157 (1908); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (a proper defendant has both "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

The Secretary does not implement the four aspects of Texas law that Plaintiffs challenge. Local officials do. The four injunctions Plaintiffs request in their prayer for relief make this plain. First, Plaintiffs request an injunction "requiring . . . prepaid postage on the ballot carrier envelopes used to return the marked mail-in ballots to the counties." ECF 1 at 41. The Secretary does not provide ballot

2

carrier envelopes—local officials do. *See* Tex. Elec. Code § 86.002(a). Second, Plaintiffs seek an injunction prohibiting "rejecting vote-by-mail ballots if those ballots are postmarked by 7:00 p.m. on election day and received by the county election administrator before it canvases the election." ECF 1 at 41. The Secretary does not reject (or accept) vote-by-mail ballots—local officials do. *See* Tex. Elec. Code § 86.011(a), (c). Third, Plaintiffs pray for an injunction either prohibiting "rejecting mail-in ballots on signature verification grounds" or requiring that voters be provided "the opportunity to cure any issues with signature verification before their ballots are rejected." ECF 1 at 41–42. The Secretary is not responsible for accepting vote-by-mail ballots or providing notice—local officials are. *See* Tex. Elec. Code § 87.041(a) ("The early voting ballot board shall open each jacket envelope for an early voting ballot voted by mail and determine whether to accept the voter's ballot."); *id.* § 87.0431(a) (providing "the presiding judge of the early voting ballot board shall deliver written notice of the reason for the rejection of a ballot to the voter"); *id.* § 87.027 (a signature verification committee can be established by the county). Fourth, Plaintiffs ask for an injunction prohibiting "implementing, enforcing, or giving any effect to the Voter Assistance Ban." ECF 1 at 42. Plaintiffs complain that Texas law "criminalizes" certain conduct. *Id.* ¶ 105. The Secretary does not prosecute criminal offenses—local officials do. *See, e.g.*, Tex. Gov't Code § 44.115.

Plaintiffs do not identify any enforcement action the Secretary could take. Instead, they cite the Secretary's title, "chief elections officer," ECF 1 ¶ 26 (citing Tex. Elec. Code § 31.001(a)). But that title is not "a delegation of authority to care for any breakdown in the election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972). The Secretary does not oversee the local officials who *do* enforce the challenged provisions. Local officials do not report to the Secretary. They are elected or appointed locally, and they are not bound by the Secretary's advice. *In re Stalder*, 540 S.W.3d 215, 218 n.9 (Tex. App.—Hous. [1st Dist.] 2018, no pet.) (expressing doubt that a local party chair is bound by the "assistance and advice" provided by the Secretary of State when administering party primary); *see*

3

*also United States v. State of Texas*, 445 F. Supp. 1245, 1261 (S.D. Tex. 1978) ("[this county official] has, for a number of years (in the face of advice from the Secretary of State) continued to apply . . . an erroneous rule of law."), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979); *Ballas v. Symm*, 351 F. Supp. 876, 888 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) (observing that "the Secretary's opinions are unenforceable at law and are not binding.").[1]

Even if the Secretary could coerce local officials, a federal court could not order her to do so. The *Ex parte Young* exception is limited to injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. It does not authorize injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) (noting sovereign immunity applies "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign"). Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971).

## II.     Plaintiffs Lack Standing

### A.     Injury in Fact

#### 1.     Individual Plaintiffs Allege Speculative Possible Future Injuries, Not Certainly Impending Ones

The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs have not plausibly alleged such an injury here.

Plaintiffs do not allege they *will be* prevented from voting. Instead, they allege they *may* have trouble voting. Plaintiffs are "*concerned* that [their] ballot[s] *may* be rejected because of the Signature

---

[1] Thus, a recent dispute about the interpretation of the Election Code was resolved, not when the Secretary issued advice to local officials, but when the Attorney General filed a petition for a writ of mandamus against local officials charged with approving or rejecting mail-in ballot applications under the Election Code. *See In re State of Texas*, No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020).

Match Requirement." ECF 1 ¶¶ 13, 14, 16 (emphases added); *see also id.* ¶¶ 15, 19. They are similarly "*concerned* about [their] ability to obtain the postage necessary to mail [their] ballot[s]." *Id.* ¶ 13 (emphasis added); *see also id.* ¶ 19 ("concerned that he will not have a stamp available"). They have "*concerns* that [their] ballot[s] *may* be delayed." *Id.* ¶¶ 13, 14, 15, 16 (emphases added); *see also id.* ¶ 19 ("concerned about the Ballot Collection Deadline"). Plaintiffs allude to a "risk of prosecution" for ballot harvesting without even suggesting the risk is substantial. *Id.* ¶¶ 15, 19.

Plaintiffs do not allege that these possible future events are certainly impending. Nor could they. In the 2018 elections, only 1.4 percent of mail-in ballots were rejected nationwide.[2] And Plaintiffs do not allege that rate is higher in Texas. If rejection of mail-in ballots is relatively rare—and Plaintiffs do not allege otherwise—it forecloses any inference Plaintiffs' ballots are likely to be rejected, let alone that such rejection is certainly impending. But even if rejection of mail-in ballots were more common, "general data . . . does not establish a substantial risk that Plaintiffs themselves will" be injured. *Stringer v. Whitley*, 942 F.3d 715, 722 (5th Cir. 2019). "Plaintiff-specific [allegations are] needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans." *Id.*

In fact, Plaintiffs' own allegations undermine any inference that they face imminent injuries from the enforcement of the challenged provisions. Plaintiffs claim that untimely ballots are accepted in some counties but rejected in others. *See* ECF 1 ¶ 124. They never allege that their ballots will be rejected, or even that they vote in counties that reject untimely ballots. Thus, one cannot conclude that application of the ballot-receipt deadline to Plaintiffs is "*certainly impending*" without stacking speculation on top of speculation. *Clapper*, 568 U.S. at 409.

---

[2] U.S. Election Assistance Commission, Election Administration and Voting Survey: 2018 Comprehensive Report at 14, https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

### 2. Organizational Plaintiffs Lack Associational Standing

To assert associational standing on behalf of their members, a plaintiff must have "members" within the meaning of the associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). That requires members who "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014). Organizational Plaintiffs have not alleged facts showing they have such members. They say they have "members and constituents," ECF 1 ¶ 133, but they do not allege that those individuals "participate in and guide the organization's efforts," *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994), much less that members "alone finance [their] activities, including the costs of this lawsuit," *Hunt*, 432 U.S. at 344.[3]

Even if Voto Latino has members, it lacks associational standing because it has not "identif[ied] members who have suffered the requisite harm" to establish injuries in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member"); *e.g.*, *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008).

The NAACP and the Texas Alliance for Retired Americans both identify Individual Plaintiffs as members, but as explained above, none of the Individual Plaintiffs alleges a certainly impending injury. Accordingly, even if these Individual Plaintiffs qualified as "members" for purposes of associational standing, they lack Article III standing the Organizational Plaintiffs could assert. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

---

[3] Indeed, publicly available information suggests otherwise. *See* National Redistricting Foundation, *Lewis v. Hughs*, https://redistrictingfoundation.org/lewis-v-hughs ("The NRF is supporting a group of individual voter-plaintiffs and organizations in a new lawsuit challenging Texas's absentee voting restrictions.").

### 3.   None of the Organizational Plaintiffs Has Standing in Its Own Right

No Organizational Plaintiff can satisfy injury-in-fact, causation, and redressability in its own right. *See City of Kyle*, 626 F.3d at 237 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61(1992)). That an organization has an "interest in a problem . . . is not sufficient" for standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Organizational Plaintiffs claim to be injured on the theory that the challenged laws frustrate their missions. Each of their missions relates to voter turnout. *See* ECF 1 ¶ 21 ("mission of enfranchising and turning out Latinx voters in Texas."); *id.* ¶ 23 (mission includes "voter education and registration activities . . . to reach voters and help them to register and eventually, vote"); *id.* ¶ 25 (mission includes "voter registration, phone banking, and [get out the vote] activities"). The "abstract social interest in maximizing voter turnout . .  cannot confer Article III standing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014). And an interest in increasing turnout for particular groups is akin to a "generalized partisan preference[]," which the Supreme Court held insufficient to establish Article III standing. *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Plaintiff the Texas Alliance for Retired Americans is transparent about this parallel. It bases its standing on the allegation that the challenged statutes "threaten the electoral prospects of its endorsed candidates." ECF 1 ¶ 25. "An organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized partisan preference[]' that federal courts are 'not responsible for vindicating.'" *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1206 (11th Cir. 2020) (quoting *Gill*, 138 S. Ct. at 1933).

Even if they asserted cognizable legal interests, Organizational Plaintiffs would still have to plausibly allege that the challenged statutes make their "*activities* more difficult" and that there is "a direct conflict between the defendant's conduct and [their] *mission*." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). They have not done so here.

Organizational Plaintiffs do not plausibly allege that their voter registration and turnout activities are "more difficult." The challenged statutes do not regulate Organizational Plaintiffs. They regulate voters. Thus, they cannot make Organizational Plaintiffs' activities more difficult. Organizational standing requires that the challenged statute not just conceivably, but "perceptibly," impair a plaintiff's activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). At most, the challenged statutes might make Organizational Plaintiffs' activities less efficacious. But even that is not plausibly alleged. Plaintiffs do not show that the challenged provisions cause the rejection of a significant number of ballots.

Organizational Plaintiffs also have not alleged a "direct conflict" between the challenged statutes and their missions. *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. The most Plaintiffs' claim is that the statutes *may* make their missions more difficult to achieve. Perhaps that alleges an indirect conflict in which implementation of the challenged statutes "is but an intermediate step" in a speculative chain of events that decreases voter turnout. *Common Cause v. Biden*, 909 F. Supp. 2d 9, 22 n.8 (D.D.C. 2012) (holding an "intermediate step" does not support standing), *aff'd on other grounds*, 748 F.3d 1280 (D.C. Cir. 2014). But the challenged statutes are not necessarily inconsistent with Plaintiffs' missions, so there is no direct conflict.

Plaintiffs also claim to be injured because they have diverted resources to respond to the challenged statutes. *See* ECF 1 ¶¶ 21, 23–25. But "[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. A plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *Clapper*, 568 U.S. at 402. A diversion of resources is not a cognizable injury in fact unless the plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

Here, Plaintiffs have not plausibly alleged that the challenged statutes perceptibly impair their missions, so diverting resources cannot support standing. In other words, Plaintiffs have not plausibly alleged that their "expenditure of funds is truly necessary" rather than "unnecessary alarmism constituting a self-inflicted injury." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

## B.      Causation and Redressability

Plaintiffs lack standing to sue the Secretary because her actions do not cause their alleged injuries. Whether a mail-in ballot is rejected or counted depends on the actions of local election officials, not the Secretary. And whether anyone is prosecuted for violating the ban on ballot harvesting depends on the actions of local prosecutors, not the Secretary. As a result, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (quotation and alterations omitted). They are "the result of the independent action of some third party not before the court." *Id.* (quotation and alterations omitted). The question is not whether the challenged statutes cause Plaintiffs' injuries, but whether *the Secretary* causes their injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing because courts should not "confuse[] the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants"). As the Eleventh Circuit recently explained, a plaintiff does not have standing to sue a Secretary of State for the actions of local officials. *See Jacobson*, 2020 WL 2049076, at *9 (holding that the plaintiffs lacked standing because state "law tasks [local officials], independently of the Secretary, with printing the names of candidates on ballots").

In addition, an injunction against the Secretary would not redress Plaintiffs' supposed injuries. The Secretary does not enforce the challenged provisions, so enjoining her from such enforcement

9

would be meaningless. An injunction against the Secretary would not prevent local officials from continuing to enforce the challenged provisions, as the Election Code requires.[4]

### C.    Organizational Plaintiffs Lack Statutory Standing

Finally, even if Organizational Plaintiffs had Article III standing, their claims would violate the rule against third-party standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 nn.3–4 (2014). Section 1983 provides a cause of action only when the plaintiff suffers "the deprivation of any rights." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates . . . the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties," but it omits the "exceptions" that occasionally overrode the prudential doctrine. David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" under § 1983 because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

---

[4] Although *OCA-Greater Houston v. Texas* found standing to sue the Secretary, its reasoning does not apply here. 867 F.3d 604 (5th Cir. 2017). It was limited to claims of "facial invalidity." *Id.* at 613. Here, Plaintiffs bring as-applied challenges. *See, e.g.*, ECF 1 ¶¶ 7, 123. Moreover, *OCA* distinguished *Okpalobi* on the ground that *Okpalobi* involved a challenge to a statute enforced by a private right of action. *See* 867 F.3d at 613. But like the law at issue in *Okpalobi*, the statutes challenged here are enforced against local officials through a private right of action. *See* Tex. Elec. Code §§ 221.003(a), 232.002. So *OCA-Greater Houston*'s only ground for distinction is no distinction here, and *Okpalobi* controls. In any event, the extent of the Secretary's power must be determined on a case-by-case basis. As a result, *OCA*'s ruling on that issue cannot extend beyond the record and briefing before that court. To the extent it does, the Secretary preserves the argument that it was wrongly decided.

Organizational Plaintiffs' claims are based on rights related to voting. But Organizational Plaintiffs do not have a right to vote. As a result, they necessarily assert the rights of third parties and cannot sue under Section 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45.

But even if this were an issue of prudential rather than statutory standing, Plaintiffs have not alleged any prudential exception to the bar on third-party standing. They do not have "a 'close' relationship with" voters, and voters do not face any "hindrance" to protecting their "own interests," as the involvement of the Individual Plaintiffs proves. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

## III.    Plaintiffs Fail to State a Claim

Finally, even if Plaintiffs could overcome these jurisdictional flaws, their case must be dismissed because they fail to plead facts plausibly alleging any violation of their constitutional rights. Plaintiffs challenge four specific aspects of Texas's mail-in ballot framework: (1) the (supposed) need to buy a stamp, (2) the deadline for returning mail-in ballots, (3) a signature verification requirement, and (4) limits on who many handle ballot envelopes. Because these commonsense procedures do not impinge upon the right to vote and are justified by the State's needs to conduct orderly and fair elections, Plaintiffs' claims fail as a matter of law.

### A.    Plaintiffs' Right to Vote Is Not Implicated by a Non-Existent "Postage Tax"

Plaintiffs allege the supposed need to buy a postage stamp to mail their ballots impinges on their right to vote and imposes a poll tax. That claim fails for at least three independent reasons. There is no "postage tax." Even if there were a "postage tax," this Court would lack jurisdiction to enjoin collection of that tax. And such a tax would not abridge the fundamental right to vote.

**1.** There is no "postage tax." Texas law does not require anyone to pay postage, much less a tax, in order to vote. First, any Texas voter who finds voting by mail inconvenient is free to vote in person. *See* Tex. Elec. Code §§ 11.001, 82.005. Thus, even if postage were a barrier to voting *by mail*, it would not be a barrier to *voting*. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) (distinguishing "the right to vote" from the "claimed right to receive absentee ballots.").

Second, voters who wish to vote "by mail" need not use the postal service to return their ballots. A ballot can be returned by any of three methods: "mail," "common or contract carrier," and "in-person delivery by the voter who voted the ballot." Tex. Elec. Code § 86.006(a). Plaintiffs' allegations do not address these alternative methods of returning mail-in ballots.

Third, postage is not a barrier to voting by mail. United States Postal Service policy is that "[s]hort-paid and unpaid absentee balloting materials must never be returned to the voter for additional postage."[5] USPS has instructed its employees emphatically:

> *Employees need to be aware that absentee balloting materials are handled differently than other unpaid or short-paid mailpieces.* **ABSENTEE BALLOTING MATERIALS ARE NOT TO BE RETURNED FOR ADDITIONAL POSTAGE OR DETAINED!** The postage is collected from the election office. Any delay of absentee ballots is a violation of Postal Service policy.[6]

Fourth, the costs of everyday activities are not "taxes" attributable to the Secretary. For example, a voter may need to buy gasoline or bus fare to get to a polling place, but such everyday expenses are not taxes on voting. They are simply facts of life. So too with postage. The cost of stamps is attributable to the federal government's control over the postal service, not the Secretary.

Fifth, even on Plaintiffs' theory, Texas law does not require a voter to pay postage. At least one State does require voters to pay the cost of postage themselves. *See* N.C. Gen. Stat. § 163-231(b)(1)

---

[5] USPS, Requirements and Tips for Handling Official Election Mail and Political Campaign Mail, https://about.usps.com/postal-bulletin/2014/pb22391/html/cover_003.htm.
[6] USPS, Additional Information for Employees, https://about.usps.com/postal-bulletin/2008/html/pb22239/html/ElectMailkit_012.html.

(requiring transmission of ballot by mail to be "at the voter's expense"). But Plaintiffs do not allege Texas law prohibits local governments or private groups from providing envelopes with pre-paid postage. The State simply has not appropriated money to bear the cost itself. Thus, Plaintiffs' claim should be dismissed because there is no "postage tax."

**2.** Even if a requirement to buy a stamp could be considered a "tax," Congress has precluded this Court from enjoining it. "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Plaintiffs have not identified any impediment to seeking a remedy in state court. Nor could they. Federal courts "must construe narrowly the 'plain, speedy and efficient' exception to the Tax Injunction Act." *California v. Grace Brethren Church*, 457 U.S. 393, 413 (1982). Here, Plaintiffs have "a 'plain,' 'speedy,' and 'efficient' remedy because Texas courts would permit [them] to assert [their] federal claims." *McQueen v. Bullock*, 907 F.2d 1544, 1547 (5th Cir. 1990). And in any event, any postage is not paid to the Secretary, so it is not clear how the Court could fashion an injunction that would prevent its collection.

**3.** Assuming Plaintiffs could overcome these hurdles, their claims would still fail as a matter of law. Declining to subsidize postage for mail-in ballots is common and does not implicate, let alone abridge, the right to vote. Numerous States do not pay for voters' stamps.[7] Only "16 states have statutes requiring local election officials to provide return postage for mailed ballots."[8] Plaintiffs' contention that 34 States are violating the Constitution by failing to subsidize postage is implausible.

The Constitution does not include a freestanding right to vote in whatever manner Plaintiffs deem most convenient. That dooms Plaintiffs' *Anderson-Burdick* claim. Considering a challenge to the

---

[7] *See, e.g.*, Colo. Rev. Stat. § 1-7.5-107(4)(b)(II); Fla. Stat. § 101.65; Mich. Comp. Laws § 168.764a; Miss. Code. § 23-15-631(1)(c); N.C. Gen. Stat. § 163-231(b)(1); N.D. Cent. Code § 16.1-07-08(1).
[8] National Conference of State Legislatures, *States With Postage-Paid Election Mail* (Apr. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-12-states-with-postage-paid-election-mail.aspx.

limited availability of absentee ballots, the Supreme Court distinguished "the right to vote" from the "claimed right to receive absentee ballots." *McDonald*, 394 U.S. at 807. The plaintiffs' inability to vote by mail did not implicate the right to vote because it did not "preclude[] [the plaintiffs] from voting" via other methods. *Id.* at 808. Here, the so-called "postage tax" does not prevent anyone from voting. *See McDonald*, 394 U.S. at 807. Plaintiffs may avoid postage by voting in other ways. *See id.* at 808. "That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required." *Crawford*, 553 U.S. at 209 (Scalia, J., concurring in the judgment).

Even if the right to vote were implicated, the burden would be *de minimis*. The cost of first-class postage is just 55 cents.[9] Plaintiffs characterize the burden as "severe" by conflating the *burden of complying* and the *consequence of not complying*. Under *Anderson-Burdick*, the former matters; the latter does not. *See Crawford*, 553 U.S. at 198 (lead opinion) (analyzing the burden on voters of obtaining identification rather than the consequence of attempting to vote without identification); *id.* at 209 (Scalia, J., concurring in the judgment) (same). In any event, voters face no consequences from omitting postage—the postal service delivers ballots lacking stamps.

Moreover, to the extent a particular voter has trouble obtaining a stamp, that does not establish that the law imposes heavy burdens. On the contrary, it establishes "no more than the different impacts of the single burden that the law uniformly imposes on all voters." *Id.* at 205 (Scalia, J., concurring in the judgment). But the Supreme Court has always analyzed "the magnitude of burdens . . . categorically and [has] not consider[ed] the peculiar circumstances of individual voters or candidates." *Id.* at 206.

The State's interests more than justify this supposed burden. The State has a strong interest in its budget and fiscal responsibility. Although 55 cents is a small amount of money for each voter,

---

[9] USPS, First-Class Mail, https://www.usps.com/ship/first-class-mail.htm.

paying postage for all mail-in ballots would cost the State hundreds of thousands of dollars in postage expenses for the upcoming general election. *Cf. Black Voters Matter Fund v. Raffensperger*, No. 1:20-cv-1489, 2020 WL 2079240, at *3 (N.D. Ga. Apr. 30, 2020) (denying a motion for a preliminary injunction and noting that "[t]he Secretary of State's Office estimated the cost for prepaying postage would 'range between $450,000 and $4.2 million' for this election at a time of other significant state fiscal concerns."). Also, setting up a system to provide postage-paid mail-in ballots would entail administrative costs and divert government resources from other important tasks during a time when the State's resources are already stretched. These are weighty interests. "Protecting the public fisc ranks high among the aims of any legitimate government." *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1227 (6th Cir. 1997).

More fundamentally, constitutional provisions designed to safeguard negative liberty cannot be read to require governmental subsidies. A constitutional right to be free from governmental interference does not create "a constitutional entitlement to the financial resources to avail [one]self of the full range of protected choices." *Harris v. McRae*, 448 U.S. 297, 316 (1980). A government "need not remove [obstacles] not of its own creation," including "[i]ndigency." *Id.* Here, the Secretary is not responsible for the cost of a stamp, much less anyone's inability to procure one.

**4.** Plaintiffs' poll tax claim fails because Texas does not have a poll tax. Even the most expansive definitions of "poll tax" require that it be "deliberately imposed by the State." *Veasey v. Perry*, 135 S. Ct. 9, 12 (2014) (Ginsburg, J., dissenting). Plaintiffs do not allege that the cost of a stamp is "deliberately imposed by the State." And voters buying stamps do not contribute to the state treasury. As the Fifth Circuit has explained "[t]he indirect cost on" certain voters "does not constitute a poll tax." *Veasey v. Abbott*, 830 F.3d 216, 266 (5th Cir. 2016) (en banc).

Moreover, a poll tax claim requires that the defendant have acted with "willful intent." *Bruce v. City of Colo. Springs*, 971 P.2d 679, 684–85 (Colo. App. 1998) (rejecting a poll tax claim). Thus, "even if

a voter was prevented from exercising his or her right to vote because of the lack of a stamp, such action does not constitute an unconstitutional poll tax in the absence of a willful intent to deprive the voter of the right by imposing such requirement." *Id.* at 685. Because Plaintiffs have not alleged any such intent here, their claim fails.

### B.    The Deadline for Returning Ballots Is Reasonable and Constitutional

Equally without merit is Plaintiffs' claim that their rights are impinged by the imposition of reasonable deadlines for delivery of mail-in ballots. Texas law has long provided that "a marked ballot voted by mail must arrive . . . before the time the polls are required to close on election day." Tex. Elec. Code § 86.007(a)(1). In 2017, the Legislature created an exception. HB 1151 relaxed the ballot-receipt deadline by allowing a mail-in ballot postmarked "not later than 7 p.m. at the location of the election on election day" to be counted if it arrives "not later than 5 p.m. on the day after election day." Tex. Elec. Code § 86.007(a)(2).

Nationwide, counting ballots that arrive after Election Day is relatively rare. "The most common state deadline for election officials to receive absentee or mail ballots is on Election Day when the polls close."[10] More than 30 States refuse to accept ballots arriving after that point. But some States have even earlier deadlines. *See, e.g.*, Ala. Code § 17-11-18(a). Indeed, the other two States in this Circuit require most mail-in ballots to arrive the day *before* Election Day. *See* La. Stat. § 18:1308(C); Miss. Code. § 23-15-637.

Texas's ballot-receipt deadline is relatively lenient, but it serves an important purpose. It gives local officials time to process and count ballots. Before a ballot can be counted, local officials must "determine whether to accept" it. Tex. Elec. Code § 87.041(a). In doing so, local officials assess seven criteria, such as whether "the voter is registered to vote." *Id.* § 87.041(b). They can determine whether

---

[10] National Conference of State Legislatures, *Receipt and Postmark Deadlines for Absentee Ballots* (May 14, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx.

to accept a mail-in ballot "at any time after the ballots are delivered." *Id.* § 87.0241(a). That means in Texas, as in "many states, processing of absentee ballots can begin before they are actually counted." That "permit[s] election officials to do a lot of the work ahead of time," meaning "the counting process on Election Day (and election results reporting) are quicker."[11] The ballot-return deadline ensures that local officials have time to determine the legitimacy of ballots cast by mail.

The ballot-return deadline also allows local officials to begin counting mail-in ballots earlier. Local officials may count mail-in ballots as soon as "the polls open on election day" or, in populous counties, at "the end of the period for early voting by personal appearance." Tex. Elec. Code § 87.0241(b). Mail-in ballots "that are received by 7:00 p.m. on Election Day" (the traditional deadline) will "be counted on election night."[12] Texas's approach makes sense. Elections must end at some point, so there must be a ballot-receipt deadline.

Plaintiffs bring two challenges to the ballot-receipt deadline: an *Anderson-Burdick* claim and an equal protection claim. ECF 1 ¶¶ 116–17, 124. Neither can succeed. As discussed above, Plaintiffs' *Anderson-Burdick* claim fails because limits on voting by mail do not implicate the right to vote. Moreover, Plaintiffs' *Anderson-Burdick* claim rests on Plaintiffs' mistaken impression that "Texas has no meaningful need for its" ballot-receipt deadline because mail-in ballots "will be put in a box to be counted five days later at the earliest." ECF 1 ¶¶ 93–94. But as explained above, mail-in ballots do not simply "sit in their box waiting to be counted." ECF 1 ¶ 94. On the contrary, local officials process them to ensure they reflect a lawful vote. Plaintiffs do not acknowledge, let alone rebut, Texas's weighty interest in facilitating that process. Also, mail-in ballots can be counted well before Plaintiffs suggest. *See* ECF 1 ¶ 117. As addressed above, most (if not all) mail-in ballots must be counted on

---

[11] National Conference of State Legislatures, When Absentee/Mail Ballot Processing and Counting Can Begin (Apr. 17, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-16-when-absentee-mail-ballot-processing-and-counting-can-begin.aspx.

[12] Texas Secretary of State, Election Advisory No. 2018-02 (Jan. 5, 2018), https://www.sos.state.tx.us/elections/laws/advisory2018-02.shtml (emphasis removed).

Election Day.[13] Thus, Texas has good reason for setting a ballot-receipt deadline. The sooner ballots are received, the sooner they can be processed and counted.

That is why a similar challenge to South Carolina's ballot-receipt deadline recently failed. South Carolina requires that mail-in ballots be received by 7:00 p.m. on Election Day, earlier than Texas requires. The court held that "South Carolina's generally applicable deadline for receipt of absentee ballots is constitutional because it imposes only a minimal burden, if any, on [the] Plaintiffs' right to vote." *Thomas v. Andino*, No. 3:20-cv-1552, 2020 WL 2617329, at *26 (D.S.C. May 25, 2020). "[V]oters who fail to get their vote in early cannot blame South Carolina law for their inability to vote; they must blame 'their own failure to take timely steps to effect their enrollment.'" *Id.* (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)); *see Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (upholding "Ohio's deadline of noon, three days before Election Day" for requesting a mail-in ballot because it "is nondiscriminatory").

Plaintiffs mischaracterize the Supreme Court's recent opinion in *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020). They claim the Court's "holding" was that "all nine Justices unanimously agreed that it was appropriate to extend Wisconsin's Ballot Receipt Deadline by an additional six days." ECF 1 ¶ 91. In reality, the Court did not consider that issue; the six-day extension was "not challenged in [the Supreme] Court" due to the limited scope of the emergency stay application. *RNC*, 140 S. Ct. at 1206; *see Thomas*, 2020 WL 2617329, at *27 n.27.

Plaintiffs also argue that some voters will not be aware of the deadline. *See* ECF 1 ¶ 89. Plaintiffs' fear is speculative and unfounded. "All citizens are presumptively charged with knowledge of the law." *Atkins v. Parker*, 472 U.S. 115, 130 (1985). "It is reasonable to expect a voter, who is voting

---

[13] Plaintiffs make much of the idea that ballots received after Election Day may not be counted until later, citing a PowerPoint presentation from one of the Secretary's staff attorneys. *See* ECF 1 ¶ 93. That is irrelevant. The ballot-receipt deadline allows earlier processing and earlier counting (if needed), but it also allows local officials to more quickly determine whether yet-to-be-counted mail-in ballots are numerous enough to affect the outcome of an election.

by absentee ballot, no matter the reason, to familiarize themselves with the rules governing that procedure—especially when those procedures are provided." *Thomas*, 2020 WL 2617329, at \*25 n.25.

Plaintiffs contend that "[t]he Ballot Receipt Deadline is misleading" because it "suggests to voters that it is possible to mail a ballot at 7:00 p.m. on election day such that the county receives it by 5:00 p.m. the next day." ECF 1 ¶ 78. Plaintiffs allege that "that First-Class mail typically takes" longer than that. *Id.* The statute does not suggest anything about delivery times, but even if it did, it would be immaterial. The ballot-receipt deadline is not tied to first-class mail. As discussed above, voters are permitted to use other, faster methods of delivery. Moreover, the difference between the ballot-postmark deadline and the ballot-receipt deadline is a product of HB 1151—a bill that the Texas legislature passed *unanimously*.[14] The Texas Democratic Party twice testified in its favor.[15] There is no reason to believe anyone is confused by the ballot-receipt deadline. And even if Plaintiffs had plausibly alleged such confusion, it would not amount to a "burden" under the *Anderson-Burdick* framework, much less a burden attributable to the Secretary.

Finally, Plaintiffs appear to complain that the mail takes too long. *See, e.g.*, ECF 1 ¶ 81. Of course, there is nothing the Secretary can do about "the vagaries of a postal service operating under a budget crisis during a global pandemic." *Id.* ¶ 92. But the State has provided voters with numerous options for voting that do not depend on the mail, including delivering a "mail-in" ballot through other means. *See, e.g.*, Tex. Elec. Code § 86.006.

Plaintiffs' equal protection claim has no merit. They argue that "[t]he Ballot Receipt Deadline, as applied, treats Texans different[ly] depending on where they live" because "the rate of ballots

---

[14] 85th Leg., Senate Journal, at 2598 (May 23, 2017), https://journals.senate.texas.gov/sjrnl/85r/pdf/85RSJ05-23-F.PDF#page=24 (showing HB 1151 passed the Senate with "Yeas 31" and "Nays 0"); 85th Leg., House Journal, at 3417–18 (May 12, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY70FINAL.PDF#page=15 (showing HB 1151 passed the House with "143 Yeas" and "0 Nays").
[15] Senate State Affairs Committee, Witness List for HB 1151 (May 19, 2017), https://capitol.texas.gov/tlodocs/85R/witlistbill/pdf/HB01151S.pdf#navpanes=0; House Elections Committee, Witness List for HB 1151 (Mar. 20, 2017), https://capitol.texas.gov/tlodocs/85R/witlistbill/pdf/HB01151H.pdf#navpanes=0.

rejected [based on the deadline] differs between counties." ECF 1 ¶ 123. That shows nothing. That different counties have different rejection rates may be "consistent with" Plaintiffs' theory that "the levels of strictness with which counties enforce the Ballot Receipt Deadline vary," but it is "just as much in line with" the alternative theory that the rates at which counties receive untimely ballots vary. *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Plaintiffs' theory is not plausible.

Even if Plaintiffs could plausibly allege that local officials apply the ballot-receipt deadline differently, it would not violate the Equal Protection Clause. Plaintiffs rely on *Bush v. Gore*, 531 U.S. 98 (2000), but the highly unusual circumstances giving rise to that case are not present here. *See id.* at 109 ("Our consideration is limited to the present circumstances . . . ."). The Court expressly distinguished situations in which "local entities" have "develop[ed] different systems for implementing elections." *Id.* The Court was concerned only with "a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." *Id.*

At best, Plaintiffs allege "discrimination on the basis of geography." ECF 1 ¶ 124. That triggers no more than rational-basis review. *See, e.g.*, *Phillips v. Snyder*, 836 F.3d 707, 719 (6th Cir. 2016); *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007); *Ingram v. United States*, 296 F. Supp. 3d 1076, 1083–84 (N.D. Iowa 2017), *aff'd on other grounds*, 932 F.3d 1084 (8th Cir. 2019). Of course, Texas's basis for delegating enforcement of the ballot-receipt deadline to local officials is more than merely rational. They are the ones who receive, process, and count the ballots. Plaintiffs do not allege otherwise, let alone plead facts that could plausibly entitle them to relief.

## C.   Failing to Verify Signatures Would Invite Election Fraud

Plaintiffs also do not plausibly allege how Texas's signature-verification requirement infringes their right to vote. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196 (plurality). The State "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. S.F. Cty. Democratic*

*Cent. Comm.*, 489 U.S. 214, 231 (1989). This concern is perhaps most compelling in the context of mail-in ballots. *See, e.g., Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (acknowledging "the State's compelling interest in preventing voter fraud"); *Veasey v. Abbott*, 830 F.3d 216, 307 n.46 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part) ("[T]he greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot"); *Crawford*, 553 U.S. at 225 (Souter, J., dissenting) ("absentee-ballot fraud . . . is a documented problem"); *Griffin v. Roupas*, 385 F.3d 1128, 1130–31 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting.").

Signature verification is "[t]he most common method to verify that absentee ballots are coming from the intended voter."[16] A wide variety of States follow this approach. *See, e.g.*, Haw. Rev. Stat. § 15-9(c)(2); Me. Rev. Stat. tit. 21-A, §§ 756, 759; N.J. Stat. § 19:63-17. So too in Texas, where an early voting ballot board ("EVBB") is created "in each election to process early voting results. *See* Tex. Elec. Code §§ 87.001, .002-.004, .021-.041. A mail-in ballot "may only be accepted if," among other things, "the carrier envelope certificate is properly executed [and] neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness." *Id.* § 87.041(b)(1)-(2).[17] In making this determination, the EVBB "may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar[.]" *Id.* § 87.041(e); *see also id.* § 87.041(f) (military and overseas voters).

Texas law further authorizes local officials to appoint a signature verification committee ("SVC"). *See* Tex. Elec Code § 87.027. The SVC "compare[s] the signature on" the envelope containing the mail-in ballot to "the signature on the voter's ballot application," *id.* § 87.027(i), and

---

[16] National Conference of State Legislatures, *Verification of Absentee Ballots* (Jan. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/verification-of-absentee-ballots.aspx.

[17] *See also* Tex. Elec. Code § 1.011(a) (providing that any signature required under the Election Code "may be signed for the person by a witness . . . if the person required to sign cannot do so because of a physical disability or illiteracy.").

"may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar." *Id.* With that information, the committee votes on "whether the signatures are those of the voter." *Id.* A ballot is accepted unless "a majority vote of the committee's membership" concludes the signatures do not match. *Id.* According to the handbook Plaintiffs cite in their complaint, "[t]he standard should be whether the two signatures could have been made by the same person."[18] Even then, however, the county EVBB can override a signature committee's decision to reject a ballot "by a majority vote of the board's membership." *Id.* § 87.027(j).

There are also opportunities for judicial review. "If a county election officer . . . determines a ballot was incorrectly rejected or accepted by the early voting ballot board before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." Tex. Elec. Code § 87.127(a). In addition, the improper rejection of mail-in ballots could support an election contest. *Cf. Reese v. Duncan*, 80 S.W.3d 650, 660–62 (Tex. App.—Dallas 2002, pet. denied) (affirming an order for a new election because mail-in ballots with mismatching signatures had been counted).

Plaintiffs' challenges all fail.

**1.** Plaintiffs complain that the signature-verification process violates the right to vote under *Anderson-Burdick*. *See* ECF 1 ¶ 118–19. As an initial matter, *Anderson-Burdick* is inapplicable for the same reasons explained above. *See McDonald*, 394 U.S. at 807 (distinguishing "the right to vote" from the "claimed right to receive absentee ballots"). But even if *Anderson-Burdick* applied, the signature-verification process is justified by the State's interest in preventing votes from being stolen. Neither of Plaintiffs' contrary theories can succeed.

---

[18] Texas Secretary of State, *Early Voting Ballot Board & Signature Verification Committee: Handbook for Election Judges and Clerks 2020* at 35, https://www.sos.state.tx.us/elections/forms/ballot-board-handbook.pdf, cited in ECF 1 ¶ 97; *see also id.* at 37.

First, Plaintiffs complain that the members of the SVC and the EVBB are not necessarily handwriting experts. *See* ECF 1 ¶ 97. But Plaintiffs do not allege anything about the members of any particular EVBB or SVC—indeed, those serving during the November 2020 election may not have been selected yet. *See* Tex. Elec. Code § 87.027(c). Regardless, determining "whether the two signatures could have been made by the same person" is well within the skills of a layman. For example, cashiers compare the signature on the back of a credit card to the signature on a receipt. And in any event, voters are well informed of the signature requirements. Tex. Elec. Code §§ 87.041(b)(2); 84.011(a)(4)(B), 87.041(e).

Thus, all an individual must do for their mail-in ballot to be counted is provide recognizable signatures, or, if they are unable to do that, have a witness sign the ballot application and carrier envelope. These burdens are no weightier than those for in-person voters, who must travel to a designated polling place on Election Day. The Supreme Court has held that similar laws, requiring nominal effort of everyone, are not severe burdens on the right to vote. *See, e.g.*, *Crawford*, 553 U.S. at 198 (plurality) (explaining "the inconvenience of" obtaining a photo ID "does not qualify as a substantial burden on the right to vote").

Second, Plaintiffs complain that "the county need only notify the voter of their mail-in ballot's rejection due to signature mismatch within 10 days *after* the election, at which point such notification is meaningless." ECF 1 ¶ 103 (citing Tex. Elec. Code § 87.0431). But Plaintiffs do not allege that local officials in fact take that long to provide notice. Nothing in state law prevents local officials from providing pre–Election Day notice to voters who submit their ballots prior to Election Day, and the Secretary has "recommend[ed] mailing notices of rejected ballots to affected voters as soon as possible."[19] Nothing in Plaintiffs' complaint suggests they will have their mail-in ballots rejected

---

[19] Texas Secretary of State, Election Advisory No. 2020-07 (Feb. 11, 2020), https://www.sos.texas.gov/ elections/laws/advisory2020-07.shtml (emphasis removed).

without such notice. Nor have they alleged that any burden from an alleged lack of notice will be felt "categorically" as opposed to in "the peculiar circumstances of individual voters." *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment).

Even if local officials provided *no* notice—which Plaintiffs do not allege—it would not violate *Anderson-Burdick*. In Oregon, "county elections officials do not notify voters after rejecting non-matching signatures" on referenda petitions. *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008). But the Ninth Circuit found that "the absence of notice and an opportunity to rehabilitate rejected signatures imposes only a minimal burden on plaintiffs' rights" in light of the review process local officials used. *Id.* That review process is very similar to Texas's. *See id.* (noting "that higher county elections authorities review all signatures that are initially rejected").

To the extent Plaintiffs argue all counties should be required, on pain of contempt of court, to notify each voter of a rejected ballot before Election Day, that has the potential to impose a significant burden on local officials. Flexibility is important. If there is a sharp increase in mail-in ballots in an upcoming election, requiring officials to provide pre–Election Day notice for all last-minute ballots may be unworkable. Plaintiffs do not allege otherwise.

Plaintiffs rely on a split decision denying a stay in a challenge to Florida's signature-verification requirements, *see* ECF 1 ¶ 119, but that decision is neither precedential nor persuasive. Indeed, the only reason it has not been vacated is because the Eleventh Circuit decided "the necessarily tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case." *Democratic Exec. Comm. of Fla. v. NRSC*, 950 F.3d 790, 795 (11th Cir. 2020).

**2.** Plaintiffs next allege that the signature-verification process violates the Equal Protection Clause. *See* ECF 1 ¶ 124. They rely once again on *Bush v. Gore*, but it does not apply here for the reasons explained above. And contrary to Plaintiffs' assertion, local election officials employ a uniform standard: "whether the signatures are those of the voter." Tex. Elec. Code §§ 87.027(i), 87.041(e). That

is akin to the Oregon law upheld in *Lemons*. "[C]ounty elections officials use a uniform standard: whether a referendum petition signature matches the [signer's previous] signature." *Lemons*, 538 F.3d at 1105. "[T]his standard is uniform and specific enough to ensure equal treatment of voters." *Id.*

Plaintiffs further contend the signature-verification process "discriminates on the basis of age and disability, as young voters, elderly voters, and disabled voters are more likely to have changing signatures." ECF 1 ¶ 124. But Plaintiffs do not even assert, let alone plausibly allege, discriminatory intent. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). The State's interests explained above provide more than a rational basis. Any voter who cannot provide a signature by reason of disability may have a witness sign on his behalf—and such ballots cannot be rejected based on signature mismatch. *See* Tex. Elec. Code § 87.041(b)(1)-(2), (e). Plaintiffs ignore these provisions entirely.

**3.** Plaintiffs also bring a due process claim. *See* ECF 1 ¶ 127. That claim cannot succeed in this Circuit. The Fifth Circuit has held that "the right to vote for a candidate for a state office . . . is not a denial of a right of property or liberty secured by the due process clause." *Johnson v. Hood*, 430 F.2d 610, 612 (5th Cir. 1970). The same reasoning applies to federal elections. The Ninth Circuit rejected a similar claim in *Lemons*, 538 F.3d at 1104–05. Here, as in Oregon, "the verification process is already weighted in favor of accepting questionable signatures, in part because only rejected signatures are subject to more than one level of review by county elections officials." *Id.* at 1105. Because Texas already has extensive procedural safeguards, "[t]he value of additional procedural safeguards . . . is negligible." *Id.*

## D.    Ballot Harvesting Is Not a Constitutional Right

Finally, there is no constitutional right for a voter to entrust his or her ballot to the person of his or her choosing. Plaintiffs claim Texas law "imposes a severe burden on the right to vote because it will effectively disenfranchise voters who require assistance in returning their mail-in ballots." ECF 1 ¶ 120. That is contradicted by the Election Code. Texas law authorizes six different categories of

people to assist a voter with delivering a mail-in ballot: (1) a family member, (2) someone "physically living in the same dwelling as the voter," (3) "an early voting clerk or a deputy early voting clerk," (4) an official assistant under Section 86.010, (5) a postal worker, or (6) "a common or contract carrier." Tex. Elec. Code § 86.006(f)(1)–(6).

Plaintiffs think that list is not sufficient, *see* ECF 1 ¶ 105–11, but Texas has good reason not to permit ballot harvesting by strangers. Allowing strangers to handle absentee ballots can fundamentally undermine the integrity of an election. For example, in a 2003 election:

> one of the candidates paid supporters to stand near polling places and encourage voters—especially those who were poor, infirm, or spoke little English—to vote absentee. The supporters asked the voters to contact them when they received their ballots; the supporters then "assisted" the voter in filling out the ballot.

*Crawford*, 553 U.S. at 195–96 n.13 (plurality) (describing *Pabey v. Pastrick*, 816 N.E.2d 1138, 1151 (Ind. 2004)). This fraud was so widespread that it was "impossible to determine the candidate who received the highest number of legal votes cast in the election." *Id.*

Many States have stricter limits than Texas does.[20] Indeed, in Alabama, no one is authorized to assist a voter with a mail-in ballot. *See* Ala. Code § 17-11-9.

In support of their *Anderson-Burdick* claim, Plaintiffs further allege that the limitation on ballot harvesting is unnecessary because "other Texas laws already criminalize any exercise of undue influence or voting fraud." ECF 1 ¶ 120. But States often adopt simple prophylactic rules to avoid the need for criminal prosecution. For example, a State may ban the *possession* of illegal drugs, even if the true evil to be avoided is the *use* of those drugs, because the two activities are related but the latter is

---

[20] *See, e.g.*, Ga. Code § 21-2-385 (listing only family members and "an individual residing in the household," unless the voter is disabled); Mass. Gen. Laws ch. 54, § 92(a) ("a family member"); Mich. Comp. Laws § 168.764a ("a member of the immediate family of the voter . . . or a person residing in the voter's household"); Mo. Stat. § 115.291(2) ("a relative of the voter who is within the second degree of consanguinity or affinity, by mail or registered carrier or by a team of deputy election authorities"); Ohio Rev. Code Ann. § 3509.05 (listing family members only); Nev. Rev. Stat. § 293.353(4) ("a member of the family of that voter"); N.H. Rev. Stat. § 657:17(II)(A) (listing family members only, for most voters); N.M. Stat. § 1-6-10.1(A) ("caregiver" or "immediate family"); N.C. Gen. Stat. § 163-231(b)(1) ("near relative or verifiable legal guardian").

more difficult to prove. Moreover, this minor limitation on voting by mail does not implicate the right to vote underlying. *Anderson-Burdick*. *See McDonald*, 394 U.S. at 807.

Plaintiffs' complaint suggests they intend to bring a due process challenge to the prohibition on ballot harvesting. *See* ECF 1 at 39 (describing the third cause of action as a "Violation of Procedural Due Process" based on the "Voter Assistance Ban"). But that section of the complaint does not include any allegations about the prohibition on ballot harvesting. *See id.* ¶¶ 125–27. To the extent Plaintiffs purport to bring a due process claim, it should be dismissed due to the lack of a protected liberty interest and because the procedures are adequate. *See Johnson*, 430 F.2d at 612. Alternatively, the Secretary moves for a more definite statement. The Secretary "cannot reasonably prepare a response" to such a claim, Fed. R. Civ. P. 12(e), because the complaint does not "provide[] sufficient notice," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

**CONCLUSION**

The Secretary respectfully requests that the Court dismiss Plaintiffs' Complaint.

Date: June 3, 2020

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

PATRICK K. SWEETEN
Associate Deputy for Special Litigation

JEFFREY C. MATEER
First Assistant Attorney General

*/s/William T. Thompson*
WILLIAM T. THOMPSON
Special Counsel

RYAN L. BANGERT
Deputy First Assistant Attorney General

KATHLEEN HUNKER
Special Counsel

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR THE TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 3, 2020, and that all counsel of record were served by CM/ECF.

*/s/William T. Thompson*
WILLIAM T. THOMPSON