**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LINDA JANN LEWIS, MADISON LEE, ELLEN SWEETS, BENNY ALEXANDER, GEORGE MORGAN, VOTO LATINO, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, and TEXAS ALLIANCE FOR RETIRED AMERICANS, <br><br> Plaintiffs, <br><br> vs. <br><br> RUTH HUGHS, in her official capacity as Texas Secretary of State, <br><br> Defendant. | Civil Action No. 5:20-cv-00577 <br><br> Related to *Gloria et al. v. Hughs et al.*, No. 5:20-cv-00527 <br><br> **HEARING REQUESTED** |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW IN SUPPORT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 1

      A.    The COVID-19 pandemic has caused a public health crisis in Texas. .................. 1

      B.    Texas' vote-by-mail laws will disenfranchise thousands of Texans. .................... 4

            1.    Postage Tax .......................................................................................... 4

            2.    Ballot Receipt Deadline ....................................................................... 6

            3.    Signature Match Requirement .............................................................. 8

            4.    Voter Assistance Ban .......................................................................... 13

III.  ARGUMENT ................................................................................................... 14

      A.    Plaintiffs are likely to succeed on the merits of their claims. ............................ 14

            1.    The Challenged Provisions unduly burden Plaintiffs' First and Fourteenth
                  Amendment rights. ............................................................................. 14

            2.    The Ballot Receipt Deadline and Signature Match Requirement violate
                  Plaintiffs' right to equal protection. .................................................... 23

            3.    The Signature Match Requirement violates Plaintiffs' right to due process.
                  ............................................................................................................ 25

            4.    The Postage Tax is an unconstitutional poll tax. ................................. 27

      B.    Plaintiffs will suffer irreparable injury absent an injunction. ............................ 29

      C.    The balance of the equities and the public interest favor an injunction. .............. 30

IV.   CONCLUSION ................................................................................................ 31

**TABLE OF AUTHORITIES**

**CASES**                                                                PAGE(S)

*Barrett v. Roberts*,
    551 F.2d 662 (5th Cir. 1977) ...................................................30

*Black Voters Matter Fund v. Raffensperger*,
    No. 1:20-CV-01489-AT, 2020 WL 2079240 (N.D. Ga. Apr. 30, 2020) .................28

*Buckley v. Am. Const'l Law Found.*,
    525 U.S. 182 (1999).................................................................22

*Burdick v. Takushi*,
    504 U.S. 428 (1992).................................................................15

*Bush v. Gore*,
    531 U.S. 98 (2000)...................................................23, 24, 25, 29

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) .....................................................14

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008).................................................................15

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ...............................................15, 23

*Democratic Nat'l Comm. v. Bostelmann*,
    No. 20-cv-249-wmc, 2020 WL 1638374 (W.D. Wis. Apr. 2, 2020).....................17

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
    No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30 ...............................17

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................29

*Fla. Democratic Party v. Detzner*,
    No. 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016)................19

*Fla. State Conference of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) (Barkett, J., concurring and dissenting in part)...26

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251 1268 (N.D. Ga. 2018) ..................................29, 30

*Goldberg v. Kelly*,
    397 U.S. 254 (1970).................................................................25

*Harman v. Forssenius*,
    380 U.S. 528 (1965).............................................................27, 28

**TABLE OF AUTHORITIES**

CASES                                                                                                           PAGE(S)

*Harper v. Va. State Bd. of Elections,*
 383 U.S. 663 (1966)........................................................................................27, 28

*Hernandez v. Woodard,*
 714 F. Supp. 963 (N.D. Ill. 1989) .................................................................22

*Hunter v. Hamilton Cty. Bd. of Elections,*
 635 F.3d 219 (6th Cir. 2011) ...........................................................20, 23, 26

*In re State,*
 No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020)..................................3

*Jauch v. Choctaw Cty.,*
 874 F.3d 425 (5th Cir. 2017) .........................................................................25

*Jones v. DeSantis,*
 410 F. Supp. 3d 1284 (N.D. Fla. 2019), *aff'd sub nom. Jones v. Governor of*
 *Fla.*, 950 F.3d 795 (11th Cir. 2020)........................................................27, 28

*League of Women Voters of Fla., Inc. v. Detzner,*
 314 F. Supp. 3d 1205 (N.D. Fla. 2018)....................................................15, 29, 30

*League of Women Voters of Fla. v. Browning,*
 863 F. Supp. 2d 1155 (N. D. Fla. 2012)....................................................22, 29

*League of Women Voters of N.C. v. North Carolina,*
 769 F.3d 224 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015) ...............20, 29

*League of Women Voters of Ohio v. Brunner,*
 548 F.3d 463 (6th Cir. 2008) .........................................................................24

*League of Women Voters v. Hargett,*
 400 F. Supp. 3d 706 (M.D. Tenn. 2019)........................................................22

*M.L.B. v. S.L.J.,*
 519 U.S. 102 (1996).......................................................................................27

*Martin v. Kemp,*
 341 F. Supp. 3d 1326 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v.*
 *Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec.
 11, 2018) ...............................................................................................25, 29

*Mathews v. Eldridge,*
 424 U.S. 319 (1976).......................................................................................25

*Ne. Ohio Coal. for Homeless v. Husted,*
 696 F.3d 580 (6th Cir. 2012) ............................................................... passim

**TABLE OF AUTHORITIES**

CASES                                                                                    PAGE(S)

*Norman v. Reed*,
    502 U.S. 279 (1992)...................................................................................15, 21

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ......................................................................29

*One Wis. Inst., Inc. v. Thomsen*,
    198 F. Supp. 3d 896 (W.D. Wis. 2016) ......................................................20

*Project Vote v. Blackwell*,
    455 F. Supp. 2d 694 (N.D. Ohio 2006)......................................................22

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
    762 F. Supp. 1354 (D. Ariz. 1990) .........................................................25, 26

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020)................................................................................18

*Reynolds v. Sims*,
    377 U.S. 533 (1964)..................................................................................14, 25

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202 (D.N.H. 2018).........................................................25, 27

*Stewart v. Blackwell*,
    444 F.3d 843 (6th Cir. 2006) ......................................................................20

*Taylor v. Louisiana*,
    419 U.S. 522 (1975)..................................................................................16, 30

*Tex. Democratic Party v. Abbott*,
    No. 20-50407, 2020 WL 2982937 (5th Cir. June 4, 2020).........................3

*Tex. Democratic Party v. Abbott*,
    No. CV SA-20-CA-438-FB, 2020 WL 2541971 (W.D. Tex. May 19, 2020) .............15, 29, 30

*United States v. Classic*,
    313 U.S. 299 (1941)....................................................................................19

STATUTES

52 U.S.C. § 10310(c)(1)......................................................................................19

Cal. Elec. Code § 3019 .......................................................................................21

Colo. Rev. Stat. § 1-7.5-107.3 ...........................................................................21

Elections Div. Law...............................................................................................7

## TABLE OF AUTHORITIES

**CASES**            **PAGE(S)**

Ill. Code § 5/19-8 ..............................................................................................21

Nev. Rev. Stat. § 293.333 ..................................................................................21

Ohio Rev Code § 3509.06 ..................................................................................21

Ore. Rev. Stat. § 254.431 ...................................................................................21

Tex. Elec. Code Ann. § 276.013 ..................................................................21, 23

Tex. Elec. Code § 67.003(c) .................................................................................7

Tex. Elec. Code § 67.012 ................................................................................7, 19

Tex. Elec. Code § 82.001 .....................................................................................3

Tex. Elec. Code §§ 82.001-82.004 .......................................................................3

Tex. Elec. Code § 82.003 .................................................................................3, 4

Tex. Elec. Code § 86.002(e) .................................................................................4

Tex. Elec. Code § 86.006 ..............................................................................13, 22

Tex. Elec. Code § 86.007 ...............................................................................6, 18

Tex. Elec. Code § 87.0431 ..................................................................................12

Utah Code § 20A-3-308(7) .................................................................................21

## OTHER AUTHORITIES

U.S. Const. amend. XIV, § 1 ..........................................................................23, 25

U.S. Const. amend. XXIV, § 1 ...........................................................................27

Wash. Admin. Code § 434-261-050 ....................................................................21

# I.     INTRODUCTION

The November 3, 2020 general election ("November election") is rapidly approaching and, despite months of measures taken to slow the spread of the novel coronavirus, the number of new COVID-19 cases in Texas is increasing at an alarming rate. As a result, voters who are eligible to vote by mail—many who are at high risk of severe complications from COVID-19—will do so, and in large numbers. But several provisions of Texas law threaten their ability to successfully vote by mail, including (1) the requirement that voters pay for postage to return mail-in ballots ("Postage Tax"); (2) the rejection of mail-in ballots received by elections administrators after 5:00 p.m. the day after the election, even if they were postmarked on or before election day ("Ballot Receipt Deadline"); (3) the rejection of mail-in ballots if untrained county officials determine—based on no standard other than their "best judgment"—that the voter's signature on the envelope does not match the signature on their vote-by-mail application, with no opportunity for the voter to cure a mistaken rejection ("Signature Match Requirement"); and (4) the criminalization of third party assistance of vulnerable voters ("Voter Assistance Ban" and, collectively, the "Challenged Provisions"). The Challenged Provisions are significant obstacles to mail voting under normal circumstances and have disenfranchised approximately 14,000 Texas voters in the past two general elections alone. If left in place in a global pandemic, they will disenfranchise several times that in November 2020.

Plaintiffs move for preliminary injunctive relief to protect their rights and the rights of millions of Texas voters who will vote in the November election.

# II.     BACKGROUND

## A.     The COVID-19 pandemic has caused a public health crisis in Texas.

The United States is in the midst of a global pandemic. The governor withdrew his stay-at-home order in early May, and there are now record-breaking numbers of confirmed COVID-19

infections and hospitalizations in Texas. *See* Ex. A, Expert Rep. of C. Troisi ¶ 15. On June 16, the 14-day average of cases in Texas showed a 63% increase. Ex. A ¶ 15. As of June 21, Texas has reported 111,601 cases and 2,182 known fatalities. *See* Ex. B, *Texas Case Counts - COVID-19*, Texas Dep't of State Health Servs. Coronavirus is not going to magically disappear. To the contrary, "we will surely see this increase in number of infected persons continue . . . as this very infectious virus is still prevalent, there is no vaccine, and no herd immunity." Ex. A ¶ 15. And it is highly likely that a "second wave" of this still-escalating pandemic will hit in the fall, during the heart of election season. *Id.* ¶ 16; *see also id.* ¶ 19.

This ongoing, severe threat to public health is poised to upend the November election. In the last decade, roughly 94% of Texas voters cast their general election ballots in person. *See* Ex. C, Expert Rep. of M. Herron & D. Smith ¶ 3. But now, due to the pandemic, Texas faces significant challenges in administering in-person elections: locations that typically serve as polling places are unavailable; hand sanitizer, masks, gloves, and other protective materials will be in short supply; and a substantial numbers of poll workers—most of whom are over 65—are unwilling to participate. *See* Ex. D, Alexa Ura, *Drive-thrus and free pencils: Texas plans for July elections with in-person voting*, Texas Tribune, Apr. 20, 2020; *see also* Ex. C ¶ 103 (noting in primary some polling locations did not timely open because of poll worker fears of coronavirus). The nation's preeminent public health agency—the Centers for Disease Control and Prevention ("CDC")— recommends that states avoid methods of voting that lead to direct contact with other voters and poll workers and rely on mail voting to reduce the spread of COVID-19. *See* Ex. E, *Recommendations for Election Polling Locations*, CDC, Mar. 27, 2020. Plaintiffs' expert witness, Dr. Catherine Troisi, agrees: Voting by mail prevents close interactions, and thus virus transmission, between voters who would otherwise wait in line and crowd into polling places in

close proximity to poll workers and other voters. Ex. A ¶ 20. It also eliminates possible spread through surfaces, such as voting machines. *Id.* By contrast, in-person voting puts voters and poll workers at risk (particularly given the virus's tendency to spread through asymptomatic carriers). *Id.*

Thus, in this time of crisis, mail voting is a critical necessity if voters are to have the opportunity to exercise their constitutional right to vote safely. Unlike states that provide no-excuse absentee voting (merely the CDC-recommended *baseline* for providing a safe voting environment during this pandemic), Texas only permits voters to vote by mail if they meet one of four legally recognized excuses. *See* Tex. Elec. Code §§ 82.001-82.004. The Secretary has fought hard to maintain that requirement, aggressively opposing efforts to protect voter safety by expanding eligibility to vote by mail or finding that voters susceptible to COVID-19 have a "disability" within the meaning of Texas law. *See In re State*, No. 20-0394, 2020 WL 2759629, at *1 (Tex. May 27, 2020); *see also Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *1 (5th Cir. June 4, 2020).[1]

Even if eligibility for voting by mail is not expanded for November—a question the Court need not decide here—Texas will see a significant increase in mail voting. Approximately 17% of voting age Texans, or roughly 3.6 million people, are 65 or older, and as such are eligible to vote by mail. *See* Ex. F, *Quick Facts - Texas*, United States Census Bureau. Approximately 64% of those 3.6 million people are expected to turn out in each general election. *See* Ex. G, *Percent*

---

[1] A voter can vote by mail only if they (1) will be absent from their county of residence during early in-person voting and on election day, Tex. Elec. Code § 82.001; (2) have "a sickness or physical condition" (including "expected or likely confinement for childbirth on election day") "that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health," *id.* § 82.002, (3) are 65 years of age or older, *id.* § 82.003, or (4) are confined in jail but is otherwise entitled to vote, *id.* § 82.004.

*Voting by Age, Gender, Educational Attainment, Race, and Family Income: November 2000 Presidential Election*, The Texas Politics Project. Accordingly, there are more than 2 million people in just one of the four eligible categories who are likely to vote in Texas's November election. *See* Tex. Elec. Code § 82.003.

Not only are these voters *eligible* to vote by mail, it is highly likely they will choose to do so in November, as individuals 65 and older are particularly vulnerable to severe complications from COVID-19. *See* Ex. A ¶ 9; *see also* Ex. C ¶ 8. States that have held primary elections since the onset of the pandemic have seen significant increases in mail voting. For example, in Florida's March presidential primary, 46.4% of the more than three million ballots cast were by mail, a vote-by-mail rate more than 50% higher than in the 2016 presidential primary. Ex. C ¶ 7. Similarly, in Georgia's June 9 primary, there were over 800,000 mail-in ballots cast, 20 times more than the roughly 37,000 mail-in ballots cast in the 2016 presidential primary. *Id.* ¶ 48. Likewise, the number of Texans who vote by mail in November will likely similarly be many times higher than the approximately 547,000 who did so in 2018. *See* Ex. C ¶¶ 48-50; *see also id.* ¶ 3; *see also* Ex. J, *Early Voting - November 2, 2018*, Texas Sec'y of State.

## B.    Texas' vote-by-mail laws will disenfranchise thousands of Texans.

Plaintiffs and other eligible Texas voters who will *cast* mail-in ballots for the first time will be unfamiliar with the hurdles they must overcome to succeed in having their ballots *counted*. *See* Ex. C ¶¶ 40-43. These hurdles include the Challenged Provisions, which have already disenfranchised thousands in previous elections, and will do the same in November if left in place.

### 1.    Postage Tax

Texas requires mail-in ballots to have sufficient postage to reach a voter's county elections office. *See* Tex. Elec. Code § 86.002(e). Thus, Texas's COVID-19-vulnerable voters—including Linda Jann Lewis and Madison Lee, as well as members and constituents of Voto Latino, NAACP,

and TARA—cannot return mail-in ballots if they cannot pay for postage. *See* Ex. K, Decl. of L.J. Lewis ¶ 7 ("I am also concerned about obtaining the necessary postage to mail my ballot in."); Ex. L, Decl. of M. Lee ¶ 6 (same); Ex. M, Decl. of M.T. Kumar ¶ 7; Ex. N, Decl. of G. Bledsoe ¶ 5; Ex. O, Decl. of J. Bryant ¶ 6. By failing to provide prepaid postage, the Secretary—Texas's chief elections officer with ultimate responsibility for administering elections in the state—requires voters to pay to vote by mail. *See* Ex. C ¶ 119.

The Postage Tax imposes burdens on voting that are exacerbated under the present circumstances. *See id.* ¶¶ 114-121. Many Texans are suffering from the devastating economic impact of COVID-19 and do not have expendable income. There are over 2.2 million Texans who are unemployed because of the pandemic, and many of them are in a position where they must conserve all their resources. And a lack of disposable income means the difference between having and not having postage. Ms. Lewis, for example, does not keep a supply of stamps in her home because of a lack of disposable income; she lives on less than a thousand dollars a month from Social Security and has six monthly recurring bills that require almost every dollar of that. *See* Ex. K ¶ 7. Ms. Lewis was delayed in her effort to apply to vote by mail in time for the July runoff because she did not have postage and had to wait for a friend to bring her stamps. *See id.* She is not alone: Voto Latino's, NAACP's, and TARA's members and constituents are disproportionately likely to be financially burdened by this requirement as well. *See* Ex. M ¶ 7; Ex. N ¶ 5; Ex. O ¶ 6; Ex. P, Decl. of G. Morgan ¶ 11; Ex. C ¶ 116.

The burden of the Postage Tax is exacerbated by the COVID-19 pandemic because it means that voters who wish to vote by mail must risk infection by going out to buy stamps or dropping their ballots off at the county elections office in person. Ex. C ¶ 119. Given that many voters—like Ms. Lewis and Ms. Lee—will vote by mail because they have underlying conditions

that put them at higher risk for severe complications from COVID-19, risking exposure to buy stamps or drop off their ballots is an untenable option.[2]

Studies have shown that sending mail-in ballots in postage-prepaid envelopes markedly increases voter turnout. For example, when King County, Washington initiated prepaid postage pilot programs during the 2017 and 2018 primary elections, voters returned their absentee ballots at higher rates when they received return envelopes with postage prepaid. *See* Ex. Q, *King County Prepaid Postage Pilot: Summary*; *see also* Ex. C ¶ 112 (discussing same). Unsurprisingly, when a state forces its voters to pay to vote, fewer people vote.

### 2. Ballot Receipt Deadline

Texas's Ballot Receipt Deadline requires domestic mail-in ballots to be postmarked by 7:00 p.m. on election day *and* received by the county by 5:00 p.m. the day after the election, which leads to the disenfranchisement of thousands of voters in every election. Tex. Elec. Code § 86.007. Not all voters face rejection on these grounds. Overseas mail-in ballots need not be received until five days after election day, and military mail-in ballots are counted provided they are received within six days after. *Id.* §§ 86.007, 101.057. The Secretary advises the counties not to count regular mail-in ballots received the day after the election (in compliance with the 5:00 p.m. deadline) until the early voting board convenes to count overseas mail-in ballots, which is *seven*

---

[2] *See, e.g.*, Ex. K ¶ 7 (health prevents her from making unnecessary trips; hasn't driven in five years because of vision impairment; Ex. L ¶ 6 ("[B]ecause of my condition, I try to avoid making unnecessary trips outside my home and . . . my family does not typically keep a supply of [stamps] at home"); Ex. O ¶ 6 ("For the countless TARA members who are immunocompromised or have a disability that prevents them from easily leaving the home, venturing out to acquire postage to mail their ballot or to deliver their ballot in person is at best, dangerous, and at worst, simply impossible."); *see also* Ex. P ¶ 11 ("[T[here are many people in the same position in Texas, who . . . will struggle to obtain the necessary postage to return their mail-in ballots . . . because they cannot risk their health by leaving their homes to purchase that postage. . . . [T]here are people in West Texas . . . who are 40 miles from the nearest post office."); Ex. C ¶ 53 ("VBM voters who have to visit a public space to procure postage or to deliver their ballots in person . . . will expose themselves to potential infection.").

*days* after the election at the earliest. Ex. R, Genevieve Gill, *Early Voting by Mail*, Texas Sec'y of State - Elections Div. Law Seminar, Nov. 2018. The county has up to fourteen days post-election to conduct its canvass. *See* Tex. Elec. Code § 67.003(c). The state does not complete its own canvass and certify the election results until 18 days after election day at the earliest. *Id.* § 67.012.

This all means that Texas bars counties from counting mail-in ballots mailed by election day even though they will not tabulate mail-in ballots received the day after the election until *seven days after the election* and need not canvass until *fourteen days after the election*. This results in disenfranchisement of thousands of voters every election. In the 2018 general election, for example, approximately 6,600 voters were disenfranchised because their ballots arrived after the deadline. Ex. C ¶¶ 3, 94-95. Had the deadline been extended to a week after the election, approximately 5,400 of those 6,600 voters would have avoided disenfranchisement. *Id.* ¶ 96.

Even in an election with a relatively small number of ballots cast by mail, the rate of uncounted mail-in ballots is unacceptable. But in this election, mail-in ballots will likely be requested in record numbers from overstrained county election officials and then returned through an overstrained postal service ("USPS"). This will result in an increase in the rate *and* number of mail-in ballots rejected, amounting to large-scale voter disenfranchisement. *See, e.g.*, Ex. C ¶¶ 51-52. There are two primary and interlocking reasons for this: *first*, elections administrators will be delayed in sending mail-in ballots in response to the influx of applications; and, *second*, the overburdened and understaffed USPS will fail to timely deliver ballots to voters and fail to return voted ballots to the counties before the Deadline.

To obtain a mail-in ballot, a voter must apply and state his or her eligibility. If approved, the county elections administrator will then send a ballot to the voter. Delays by county election officials in processing applications (particularly when those applications surge due to COVID-19)

lead to delays in voters receiving, marking, and returning those ballots. For example, Ms. Lee received her mail-in ballot for the March primary *two days* before election day. *See* Ex. L ¶ 7. No matter how promptly she cast her vote, secured postage, and returned her ballot, the risk the ballot would not be received by 5:00 p.m. the day after the election was high.

The problem is exacerbated because the COVID-19 crisis is causing postal delays due to an increase in mail and a reduction in available workers. *See* Ex. C ¶¶ 51-52, 106-108; Ex. S, Eric Katz, *These Federal Agencies Have Seen the Most COVID-19 Deaths*, Gov't Executive, May 21, 2020 (as of May 21, nearly 2,400 postal workers have tested positive for COVID-19, 60 have died, and 17,000 are in quarantine due to exposure). Additionally, some face another layer of postal service delay due to where they live. For example, Mr. Morgan's mail service was disrupted throughout March, April, and May because he lives in a senior housing community that did not allow USPS on the premises for fear of exposing residents to COVID-19. Ex. P ¶ 8.

### 3.    Signature Match Requirement

The Signature Match Requirement also disenfranchises a number of voters every election. Of course, Texas law does not purport to mandate that only those with good and consistent penmanship be allowed to vote; but at the same time, it (1) requires that counties verify the identity of those casting mail-in ballots through standardless signature verification by untrained laypeople, and (2) provides no mandatory process for voters whose mail-in ballots are wrongfully rejected to cure the election administrators' error. The unsurprising result is that upwards of 1,000 mail-in ballots are rejected in Texas in a general election. Ex. C ¶¶ 3, 136.

The first issue is that the process for verifying signatures is patently unreliable. The sum total of the process (or lack thereof) is the requirement that county election officials verify each mail-in voter's signature by comparing it with the signature on the voter's vote-by-mail application and, if needed or available, other signatures from the voter over the prior six years. But, as the

Secretary herself recognizes, election officials responsible for "matching" signatures "are not handwriting experts." Ex. T, *Early Voting Ballot Board & Signature Verification Committee - Handbook for Election Judges and Clerks 2020*, Sec'y of State, Elections Div. And the Secretary provides neither uniform standards nor meaningful training to these non-experts whose decisions result in ballot rejection. *See* Ex. U, Decl. of D. Jones ¶ 3 ("We do not use any forensic techniques to verify signatures and are not trained to do so."); *See* Ex. V, Decl. of B. Rojas ¶ 4 (same). Rather, the Secretary tells officials that "[e]ven if unsure [they] must make a decision whether to accept or reject a signature." *Id*. They should just "use their best judgment . . . to verify if these signatures are the same." Ex. T; *see also* Ex. V ¶ 4; Ex. U ¶ 4. The Secretary does not clarify how they are to do so. *See* Ex. W, Decl. of L. Mohammed ¶ 18 ("Neither the statutes governing the signature matching process nor State of Texas Early Voting Ballot Board & Signature Verification Committee Handbook for Election Judges and Clerks 2020 provide any guidance to elections officials on how to compare signatures.").

Even if the State promulgated and trained election officials on a single, uniform methodology of determining whether two signatures are the same, signature "matching" is not a reliable means of verifying that the same person signed two documents. Signatures change frequently for any number of reasons. People may injure their dominant hand, change their name, develop a tremor, or experience countless other things that either temporarily or permanently alter their signatures. *See* Ex. W ¶ 24 ("An individual's signatures may vary for myriad reasons, including age, health, native language, and writing conditions."); Ex. U ¶ 4; Ex. V ¶ 6. In fact,

some of the voters eligible to vote by mail—such as the elderly and disabled—are most likely to have changing signatures because of evolving physical abilities.[3]

Experts have consistently found that signature matching is difficult to do accurately even under *ideal* circumstances—when the person undertaking the review is highly skilled, has ample time to make comparisons, and has ample and timely exemplars of a person's signature written under similar conditions. *See* Ex. W ¶¶ 48-49. Amateur signature matchers are highly likely to reject valid signatures. *See* Ex. W ¶¶ 22-23. This is because of laypersons' "inability to distinguish between normal 'variations' in one individual's signatures as opposed to 'differences' resulting from multiple signers." Ex. W ¶ 24; *see also id.* ¶ 32. One study determined that a layperson is likely to reject authentic signatures 26.1% of the time. *Id.* ¶ 34.

As such, voters are subject to disenfranchisement based on determinations of officials who may be doing their level best, but who are overworked, have no expertise in an already temperamental art, and are applying the State's sole "guidance" of applying their "best judgment." *See, e.g.*, Ex. W ¶ 19. Their mistakes may be honest, but they result in the total denial of a

---

[3] *See, e.g.*, Ex. V ¶ 9 ("In my time on the Ballot Board, I have seen many signatures that seem to be from people who have aged or incurred a disability that affects their handwriting."); Ex. K ¶ 6 ("Due to my declining vision, my signature has changed over time."); Ex. X, Decl. of E. Sweets ¶ 7 ("On days when my asthma is very bad and I struggle to breathe I become easily fatigued, which I've noticed affects my handwriting."); Ex. L ¶ 8 ("On days when my arthritis is very bad, the legibility of my handwriting suffers."); Ex. Y, Decl. of B. Alexander ¶ 5 ("As I get older and on days when my congestive heart failure has me feeling weak and lightheaded, I've noticed my handwriting and signature changes."); Ex. P ¶ 7 ("Because I suffer from Mounier-Kuhn syndrome, my handwriting abilities fluctuate every day depending on my lung function that day."); Ex. Z, Decl. of J. Green ¶ 7 (must sign ballot using non-dominant hand because of paralysis in dominant hand); Ex. AA, Decl. of T. Tull ¶ 7 ("I have two styles of signature. One is a shortened signature that I sign quickly and the other is a more formal signature that I use for legal documents."); Ex. AB, Decl. of J. McAdoo ¶ 7 (Texas voter's ballot rejected for signature mismatch although voter did, in fact, sign application and ballot envelope); Ex. AC, Decl. of P. Hogan ¶ 7 (same).

fundamental right.[4] *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 594-95 (6th Cir. 2012) ("*NEOCH*") (finding severe burden in rejecting ballots cast in the right place but wrong precinct based on poll workers' honest misunderstandings about precinct locations).

Problematically, too, whether or not a ballot is rejected may turn simply on what county the ballot was cast in (or which officials are reviewing the ballot). *Compare* Ex. V ¶ 4 ("The Ballot Board has not been instructed that, if it is too close to call, we should presume the signatures are valid.") *with* Ex. U ¶ 4 ("We were instructed by the presiding judge of the Ballot Board to approve the signatures if they look close"). This is because the lack of training and uniform standards means that voters will be treated differently depending simply on who happens to review their signature. *See* Ex. V ¶ 6 ("[I]t is not uncommon for some members of the Ballot Board to conclude that signatures match while other members of the Ballot Board reach an opposite conclusion."); Ex. U ¶ 5 (same).

The rates of erroneous signature rejection are also higher for certain groups: writers who are illiterate, those for whom English is a second language, the elderly, the disabled, and those with health conditions resulting in less pen control. *See* Ex. W ¶ 42. The irony is that Texas limits the eligibility to vote by mail to voters who are most likely to have inconsistent signatures, and then requires that those vulnerable voters' ballots be rejected because of perceived "mismatched" signatures. In this case, each individual plaintiff, as well as many members and constituents of

---

[4] *See, e.g.*, Ex. V ¶ 5 (describing letter received by ballot board after election from voter whose ballot had been rejected for signature mismatch, explaining that he in fact had signed his absentee ballot envelope); Ex. Z ¶¶ 5-9 (66-year-old voter with paralyzed dominant hand received notice after 2018 election that ballot was not counted because of signature mismatch although she signed application and ballot); Ex. AB ¶¶ 5-8 (75-year-old voter received notice after 2018 election that mail-in ballot was not counted because of signature mismatch although she signed application and ballot); Ex. AA ¶¶ 5-8 (same, as to 72-year-old voter).

Voto Latino, NAACP, and TARA, must vote by mail because of health conditions and disabilities, but their ballots are more likely to be rejected because those same health conditions and disabilities lead county election officials to incorrectly find signature mismatch.[5]

The second problem with the Signature Match Requirement is that Texas does not provide voters with an opportunity to "cure" mistaken determinations that two signatures do not "match." *See, e.g.*, Ex. V ¶ 7 (acknowledging Dallas County has no cure process); Ex. U ¶ 6 (same, for Travis County). Texas law requires counties to notify voters of their ballot rejection 10 days *after* the election is over. Tex. Elec. Code § 87.0431; *see also* Ex. V ¶ 7; Ex. Z ¶ 7 (testifying she did not find out ballot was rejected until after election); Ex. AB ¶ 6 (same); Ex. AA ¶ 6. At that point, the notice is meaningless except for adding insult to injury: those voters with rejected signatures lost their opportunity to vote in that election forever.

In every Texas election, then, the Signature Match Requirement guarantees that untrained county election officials will mistakenly reject mail-in ballots from qualified voters who complied with every requirement of Texas law without providing those voters the opportunity to cure. Indeed, approximately 1,100 voters were disenfranchised for this reason in the 2018 general

---

[5] *See* Ex. Z ¶ 8 ("[I] have right-side paralysis, and I was right-handed. I use my left hand now for many things, including signing papers, but my signature never looks exactly the same."); Ex. K ¶ 6 ("Due to my declining vision, my signature has changed over time."); Ex. X ¶ 7 ("On days when my asthma is very bad and I struggle to breathe I become easily fatigued, which I've noticed affects my handwriting."); Ex. L ¶ 8 ("On days when my arthritis is very bad, the legibility of my handwriting suffers. . . . Also, because I am young, my signature has changed a lot even in the last six years."); Ex. Y ¶ 5 ("As I get older and on days when my congestive heart failure has me feeling weak and lightheaded, I've noticed my handwriting and signature changes."); Ex. P ¶ 7 ("[W]hen I am short of breath, I become shaky and fatigued, which makes my handwriting less legible."); Ex. M ¶ 7 (noting Voto Latino represents interests of countless Texans with literacy issues and for whom English is second language, and signatures of non-native English speakers are more likely to be rejected); Ex. K ¶ 6 (NAACP represents interests of black Texans that have disabilities and physical conditions, which increases the likelihood that their signatures will be rejected); Ex. O ¶ 5 (TARA represents interests of aging and disabled members and constituents whose likelihood of signature rejection is also higher than younger, able-bodied voters).

election. *See* Ex. C ¶¶ 3, 136. That figure is likely to be many times higher this November, with the number of voters opting to vote by mail likely to rise dramatically.

### 4.    Voter Assistance Ban

The hurdles to voting by mail—from the number of voters that the Ballot Receipt Deadline disenfranchises to the burdens the Postage Tax places on the poor and disabled—demonstrate that many voters need help returning their ballots. This need will be compounded in November, given the increased number of vulnerable voters likely to vote by mail. Yet the Voter Assistance Ban criminalizes third parties from assisting Texans in mailing their ballots except in narrow circumstances, such as when the third party is closely related to or lives with the voter, or if the voter is disabled; and it criminalizes third parties from assisting voters by hand-delivering their mail-in ballots without exception. Tex. Elec. Code § 86.006.

The Voter Assistance Ban will make it so that many vulnerable Texans can only vote in November if they are willing to leave their homes and subject themselves to the very health risks they are trying to avoid in voting by mail. *See, e.g.*, Ex. L ¶ 7; Ex. K ¶ 10; Ex. X ¶ 8; Ex. Y ¶ 7; Ex. P ¶ 9; Ex. O ¶ 6; Ex. M ¶ 7; Ex. N ¶ 4. This is particularly true for poor and minority voters who generally have less access to postal services, are less likely to have easy access to reliable transportation, and are less able to bear the costs of waiting in long lines to vote. *See, e.g.*, Ex. K ¶ 10; Ex. P ¶ 9; Ex. O ¶ 6; Ex. M ¶ 7; Ex. N ¶ 4. This is also true for older Texans, especially those in senior community homes or nursing homes, who are particularly vulnerable to the virus and have no reliable way to deliver their ballots themselves; they cannot trust that the ballot will be delivered on time through USPS, and they cannot personally deliver it due to health concerns. *See, e.g.*, Ex. P ¶ 8 (describing mail delivery disruption in senior community due to pandemic); Ex. X ¶ 8 (immobile voter who has been instructed to shelter in place cannot return ballot personally and cannot ask a trusted friend to do so because of Voter Assistance Ban); Ex. U ¶ 7 (describing call

from elderly voter who did not have postage or approved individual to assist in mailing ballot). The burden on these groups is made worse by the fact that the pandemic will result in many Texans who have not previously voted by mail to do so for the first time. Ex. C ¶ 41. Many such voters will require assistance in navigating the vote by mail system, which will be completely new to them. *See id.* ¶ 143.

The criminalization of voter assistance therefore contributes to the disenfranchisement of voters who, but for the Ban, could rely on others to return their ballots to county election officials to avoid the cost, delay, and uncertainty of the mail system. *See* Ex. C ¶¶ 125-127.

## III.   ARGUMENT

Plaintiffs are entitled to preliminary relief because: (1) they are likely to succeed on the merits; (2) there is a substantial threat of irreparable injury if a permanent injunction is not issued; (3) the harm outweighs any injury to the Secretary because of an injunction; and (4) an injunction is in the public interest. *See, e.g.*, *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

**A.   Plaintiffs are likely to succeed on the merits of their claims.**

**1.   The Challenged Provisions unduly burden Plaintiffs' First and Fourteenth Amendment rights.**

"There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted). The Challenged Provisions impose multiple barriers to casting a mail-in ballot that are unjustifiable, particularly during the present unprecedented public health crisis.

Plaintiffs' undue burden claims are properly analyzed under the *Anderson-Burdick* balancing test. This test requires courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward

by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). This inquiry is highly fact-specific and may not be undertaken by rote. Rather, the court applies a "flexible standard." *Id*. "If the burden on the right to vote is severe," which disenfranchisement certainly is, "a court will apply strict scrutiny. The classification created by the state must promote a compelling governmental interest and be narrowly tailored to achieve this interest if it is to survive strict scrutiny." *Tex. Democratic Party v. Abbott*, No. CV SA-20-CA-438-FB, 2020 WL 2541971, at *31 (W.D. Tex. May 19, 2020) ("*TDP*"); *see also Norman v. Reed*, 502 U.S. 279, 280 (1992); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019) ("It is a 'basic truth that even one disenfranchised voter—let alone several thousand—is too many'" (quoting *League of Women Voters of N.C. v. North Carolina* ("*LOWV NC*"), 769 F.3d 224, 244 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015)). But even less severe burdens remain subject to balancing: "However slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288-89). In evaluating the burden, the Court must focus not only on that imposed on the general electorate, but also on those directly affected. *Id*. at 201. In other words, a law's disparate impact is a relevant consideration in the *Anderson-Burdick* analysis. *See, e.g.*, *Crawford*, 553 U.S. at 203; *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216-20 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*.").

An *Anderson-Burdick* analysis demonstrates that each of the Challenged Provisions separately and cumulatively inflicts undue burdens on Plaintiffs' and countless other Texans' voting rights that cannot be justified by any sufficiently weighty countervailing state interest.

### a.   Postage Tax

The Postage Tax will impose a financial cost on voters' ability to cast their mail-in ballots, effectively disenfranchising those voters for whom mail-in voting will be the only safe way for them to participate in the November election. *See* Ex. K ¶ 7; Ex. L ¶ 6; Ex. M ¶ 7; Ex. N ¶ 5; Ex. O ¶ 6. The Postage Tax will also force voters to risk their health by exposing themselves to the public to obtain stamps at the post office or some other location. *See* Ex. K ¶ 7; Ex. L ¶ 6; Ex. M ¶ 7; Ex. N ¶ 5; Ex. O ¶ 6; *see generally supra* at II.B.1. This will lead to the disenfranchisement of countless eligible Texas voters in November's general election.[6]

By contrast, the State has no adequate justification for failing to pre-pay postage for such ballots. Voters are not required to pay to vote in person. The State's failure to pre-pay postage to make the same true for voters who must cast their votes by mail is purely a matter of cost and administrative convenience, which cannot outweigh the severe burden caused by the Postage Tax. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975); *see also NEOCH*, 696 F.3d at 597 (holding law rejecting ballots cast in wrong precinct but correct polling place solely because of poll worker error imposed "substantial" burdens on voters). Because the Postage Tax will severely burden Texas's most vulnerable voters and cannot be justified by a sufficiently weighty countervailing state interest, Plaintiffs are likely to succeed in challenging this law on the merits.

---

[6] That voters may receive prepaid postage from their county, a friend, or some other entity is irrelevant. Just as the state could not impose a direct in-person poll tax and then avoid constitutional scrutiny by allowing third parties to help pay it, neither could it impose an indirect vote-by-mail tax and then avoid constitutional scrutiny by allowing third parties to help pay it.

### b.     Ballot Receipt Deadline

Even before the onset of the pandemic, the Ballot Receipt Deadline severely burdened the right to vote by disenfranchising thousands of eligible voters who mailed their ballots on or before election day because their ballots were not received by 5:00 p.m. the day after the election. *See* Ex. C ¶ 89. For those voters who, due to increased demand of mail-in ballots and strains on USPS, do not receive a ballot until shortly before election day, or whose ballots take longer than expected to arrive, the punishment is swift and severe: total disenfranchisement. *See* Y ¶ 7. Further the Deadline is disproportionately likely to disenfranchise minority, elderly, and disabled voters—the very voters who must rely on mail voting to exercise the franchise without risking their health. *See, e.g.*, Ex. X ¶ 8; Ex. Y ¶ 7; Ex. O ¶ 6. The number of voters disenfranchised by the Deadline is all but certain to increase as election administrators and USPS are crushed under a surge of requests for mail ballots. *See* Ex. C ¶¶ 51-52. Plaintiffs experts, Drs. Michael Herron and Daniel Smith, estimate that the Ballot Receipt Deadline will disenfranchise thousands of voters in the November general election. *See* Ex. C ¶¶ 147-152. Approximately 82% of those voters would have their votes counted if the deadline were extended to seven days after the election. *See id.* ¶ 96.

Wisconsin's recent experience is telling. Last month, a Wisconsin federal court extended the deadline for receipt of absentee ballots because voters were at risk of being disenfranchised by Wisconsin's election day receipt deadline. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at *5, *12, n.14 (W.D. Wis. Apr. 2, 2020). The court concluded that "the state's general interest in the . . . deadline is not so compelling as to overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by" its enforcement. *Id.* at *17. The Seventh Circuit affirmed. *See* Order, *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30. Shortly thereafter, the Supreme Court, evaluating the extension under *Anderson-Burdick*, agreed it was appropriate to require the state to

count ballots mailed by election day. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020). The Wisconsin receipt deadline rejected by the Supreme Court is not meaningfully different than the deadline at issue here: neither ensure that mail ballots cast by election day will be counted, and both ensure the disenfranchisement of thousands.[7]

The Secretary can provide no adequate justification for discarding these mail-in ballots. *See NEOCH*, 696 F.3d at 597 (finding likely constitutional violation after state failed to identify "precise interests" justifying "substantial burden" when ballots were rejected due to no fault of the voter). Texas already accepts overseas and military ballots that are mailed on or before election day and arrive within five and six days of the election, respectively. *See* Tex. Elec. Code § 86.007; *id.* § 101.057. Given that these will not be processed until after their deadlines, the Secretary even advises county election administrators to wait until *seven* days after election day *at the earliest* to tabulate domestic mail-in ballots. *See* Ex. R.  Because domestic mail-in ballots are treated the same as military and overseas ballots for counting purposes, all Texas voters should be entitled to the same rules as overseas and military voters, particularly during a global pandemic when stateside voters face many of the same hurdles overseas and military voters do in returning their ballots. Moreover, because Texas need not finalize its election results until 33 days after the election, *see* Tex. Elec. Code § 67.012, extending the deadline would not hinder the Secretary's ability to finalize election results.

---

[7] Requiring counties to set aside ballots postmarked on or before election day would squarely conflict with the Supreme Court's holding in *Republican National Committee*. All nine Justices unanimously agreed that it was appropriate to extend Wisconsin's election day ballot *receipt* deadline by an additional six days, with the 5-4 disagreement being over whether those ballots had to be *sent* by election day. *Compare id.* at 1206-08 with *id.* at 1211 (Ginsburg, J., dissenting) ("If a voter already in line by the poll's closing time can still vote, why should Wisconsin's absentee voters, already in line to receive ballots, be denied the franchise?").

### c.      Signature Match Requirement

As explained above, the Signature Match Requirement results in the disenfranchisement of lawful voters who properly cast their mail-in ballots—fully qualified American citizens who literally did everything right. It thus places a severe burden on the right to vote. That Texas does not give voters an opportunity to cure suspected signature mismatch only exacerbates this burden. *See* Ex. V ¶ 4; Ex. U ¶ 4; Ex. W ¶ 18.

The Supreme Court has made clear that "[o]bviously included" within the right to vote "is the right of qualified voters within a state to cast their ballots and *have them counted*." *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added); s*ee also, e.g.*, *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS , 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."); 52 U.S.C. § 10310(c)(1) (defining right to vote as including "casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast"). The Signature Match Requirement will lead to thousands of valid votes being rejected in November simply because of penmanship. *See* Ex. C ¶¶ 3, 133-138. At the risk of stating the obvious, there is no such "penmanship" requirement in the Constitution.

Texas's Signature Match Requirement imposes particularly severe burdens on the right to vote because it is likely to result in the erroneous rejection of ballots cast by valid voters. The Secretary imposes no standard for matching signatures other than "do your best to decide if they're the same," and does not provide standard training on how to accurately compare signatures to election officials, making it all-but-certain that they will do so using inconsistent metrics and disparate guesswork. *See* Ex. W ¶¶ 22-23; Ex. V; Ex. U; *supra* at II.B.3.

The burden on voters is exacerbated because ballots are rejected based on purported signature matches with no required notice to the voter of rejection until after the election and thus

no uniform opportunity to "cure" mistaken mismatches by verifying that they did, in fact, cast the ballot in question. *See supra* at II.B.3. This makes it all but certain that *thousands* of voters will be disenfranchised by no fault of their own. In 2018, approximately 1,100 Texas voters were disenfranchised by the Signature Match Requirement. Ex. C ¶¶ 3, 136. With voting by mail on the rise, that number will dramatically increase this coming November.

"[E]ven one disenfranchised voter—let alone several thousand—is too many[.]" *LOWV NC*, 769 F.3d at 244; *see also One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 903 (W.D. Wis. 2016) (finding severe burden where about 100 otherwise qualified voters were disenfranchised because of voter ID law). Courts have further found that the burden on the right to vote is more severe when it is a result of government error or is otherwise out of the voter's control. *See NEOCH*, 696 F.3d at 593-94 (relying on fact that majority of provisional ballot right-place/wrong-precinct votes—which are not counted—are attributable to poll-worker error to establish that burden on voters is substantial); *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 238 (6th Cir. 2011) (granting preliminary injunction on equal protection grounds where voters did not "bear . . . responsibility for the rejection of their ballots"); *Stewart v. Blackwell*, 444 F.3d 843, 860-61 (6th Cir. 2006) (fact that technological burden exacted by voting machines "not within the control of the voters" makes burden more substantial). Such is the case here. All the more problematic is the fact that there will be disproportionate rates of rejections for signature mismatch reasons based on age, disability, and ethnicity. *See* Ex. W ¶ 42; *see also* Ex. M ¶ 7; Ex. K ¶ 6; Ex. O ¶ 5.

There is no countervailing government interest that is "sufficiently weighty" to justify the burden imposed by the signature matching process, nor is this process narrowly tailored to meet any such interest. *See Norman*, 502 U.S. at 288-89. To the extent that the Secretary advances an

interest in preventing voter fraud, it is not furthered by comparing signatures pursuant to an arbitrary, error-prone process that results in the categorical disqualification of lawfully cast ballots. *See, e.g.*, Ex. V ¶ 7; Ex. U ¶ 6. Moreover, the interest in preventing voter fraud is already served by other criminal penalties for election fraud in Texas. *See, e.g.*, Tex. Elec. Code Ann. § 276.013 ("A person commits an offense if the person knowingly or intentionally makes any effort to . . . cause any intentionally misleading statement, representation, or information to be provided . . . on . . . any other official election-related form or document."); *id.* § 64.012 (criminalizing "knowingly vot[ing] or attempt[ing] to vote a ballot belonging to another person, or by impersonating another person; or knowingly mark[ing] or attempt[ing] to mark any portion of another person's ballot without the consent of that person, or without specific direction from that person how to mark the ballot"). But, even if the Signature Match Requirement marginally served some interest in preventing voter fraud that those other laws do not, that marginal benefit is greatly outweighed by the severe burden of disenfranchisement. This is particularly true given Texas' failure to provide disenfranchised voters with the remedy of curing a flagged signature mismatch by verifying that they cast the mail-in ballot in question, which is a routine safeguard employed in multiple other states. *See, e.g.*, Cal. Elec. Code § 3019; Colo. Rev. Stat. § 1-7.5-107.3; 10 Ill. Code § 5/19-8; Nev. Rev. Stat. § 293.333; Ohio Rev Code § 3509.06; Ore. Rev. Stat. § 254.431; Utah Code § 20A-3-308(7); Wash. Admin. Code § 434-261-050.

### d.    **Voter Assistance Ban**

The Voter Assistance Ban also fails the *Anderson-Burdick* balancing test. The Ban puts a severe burden on Texas voters, particularly those who may not have any other viable means of returning their mail-in ballot. It does so by criminalizing third parties from assisting voters in *mailing* their mail-in ballots except in narrow circumstances, and by criminalizing third parties

from assisting voters in personally *delivering* marked mail-in ballots with no exceptions. Tex. Elec. Code § 86.006. This ban does not serve any state interest not already served by existing Texas law.

Most Texans who will vote by mail this November—those over 65 and those with disabilities making them more susceptible to severe complications from COVID-19—will have no other way to safely cast their ballot. *See, e.g.*, Ex. L ¶ 7; Ex. K ¶ 10; Ex. X ¶ 8; Ex. Y ¶ 7; Ex. P ¶ 9; Ex. O ¶ 6; Ex. M ¶ 7; Ex. N ¶ 4; Ex. U ¶ 7. Many will not have access to postage, will lack easy access to reliable transportation to get to a polling place, and may not have family member who can assist them in mailing their ballots. Because they may not be able to return their ballots in a timely manner through no fault of their own, many of these vulnerable voters will be disenfranchised in November. *See* Ex. C ¶ 128-130. Additionally, individuals and organizations that seek to encourage voter participation by delivering otherwise-undeliverable ballots are completely deprived of their right to do so. *See, e.g.*, Ex. M ¶ 10. These irreparable injuries constitute a severe burden on the rights to vote and associate for political purposes. *See, e.g.*, *Buckley v. Am. Const'l Law Found.*, 525 U.S. 182, 186 (1999); *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N. D. Fla. 2012); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006); *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) ("Where groups, formal or informal, seek to advance their goals through the electoral process, [restrictive] regulations . . . impair their ability effectively to organize and make their voices heard.").

The State will presumably argue that its interest is in preventing fraud by those who might handle others' ballots. But the Voter Assistance Ban is overkill, as the Texas election code already criminalizes election fraud. *See, e.g.*, Tex. Elec. Code Ann. § 276.013 ("A person commits an

offense if the person knowingly or intentionally makes any effort to . . . cause any intentionally misleading statement, representation, or information to be provided . . . on . . . any other official election-related form or document."); *id.* § 64.012 (criminalizing "knowingly vot[ing] or attempt[ing] to vote a ballot belonging to another person, or by impersonating another person; or knowingly mark[ing] or attempt[ing] to mark any portion of another person's ballot without the consent of that person, or without specific direction from that person how to mark the ballot").

Crucially, the Challenged Provisions do not operate in a vacuum; instead, they build upon each other, cumulatively burdening Texas voters. The time spent obtaining postage, for example, makes it more likely that a voter will mail their ballot later and, therefore, that their ballot will be rejected for arriving late. Likewise, voters unable to obtain postage are more likely to need assistance and without such assistance are at risk that their ballot may not arrive on time.

### 2. The Ballot Receipt Deadline and Signature Match Requirement violate Plaintiffs' right to equal protection.

Texas cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *see also, e.g.*, *Lee*, 915 F.3d at 1346 (finding that rejecting ballots for signature mismatch would result in "virtually disenfranchising those who would have voted (or cured) but for the inconvenience imposed by the preexisting rules, [which] would deprive those would-be voters of the equal protection of the laws"); *Hunter*, 635 F.3d at 235 ("The lack of specific standards for reviewing provisional ballots can otherwise result in "unequal evaluation of ballots" in violation of equal protection (citing *Bush*, 531 U.S. at 109)). Both the Ballot Receipt Deadline and the Signature Match Requirement subject voters to unfair, unequal, and disparate treatment and Plaintiffs are likely to succeed on this claim as well.

Because the speed at which county election administrators are able to mail ballots to voters and the availability of reliable mail services and the speed at which they operate varies across Texas, voters may be disenfranchised as a result of the Ballot Receipt Deadline depending on where they live. Ex. C ¶¶ 98-99.

The Signature Match Requirement also arbitrarily leads to different rates of mail-in ballot rejection. The statutory scheme accordingly ensures that the metrics used for comparing signatures are not standard across counties. *See* Ex. V ¶ 6; Ex. U ¶ 5. Additionally, the Signature Match Requirement disproportionality burdens disabled and elderly voters, whose signatures change over time because of their physical abilities. *See* Ex. W ¶ 42. Equal protection requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters" based on which county or local jurisdiction they live in. *Bush*, 531 U.S. at 106-07; *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) ("If true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where they live in violation of the Equal Protection Clause."). The Signature Match Requirement's lack of *any* process for verifying signatures on mail-in ballots or providing voters an opportunity to cure perceived mismatch leads to arbitrary standards within the state and the disparate treatment of certain groups of voters.

If this Court permits the enforcement of the Ballot Receipt Deadline and Signature Match Requirement, a disproportionate number of Texas voters will be effectively disenfranchised on the basis of geography, disability, and age. This means that Texas will not satisfy "the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" to vote. *Bush*, 531 U.S. at 105-06.

3.      **The Signature Match Requirement violates Plaintiffs' right to due process.**

The Signature Match Requirement also deprives Texas voters, including Plaintiffs, of their liberty interest in voting without adequate procedural safeguards. The Due Process Clause prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. In determining whether a state has provided adequate process, courts must consider "the private interest at stake, the risk of erroneous deprivations under existing procedures in light of available alternative or additional procedures, and the government's interest." *Jauch v. Choctaw Cty.*, 874 F.3d 425, 431 (5th Cir. 2017); *see also Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). These factors weigh heavily in Plaintiffs' favor.

*First*, the nature of the private interest here—voting and having one's ballot counted—is a liberty interest that cannot be withheld without due process. *See Reynolds*, 377 U.S. at 555 (citation and quotation omitted). This interest extends to voting by mail, which Texas has statutorily conferred upon some of its citizens. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (finding state-created right requires adequate process); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990) ("In this instance, the court has identified the important fundamental interest in voting, but notes that voting absentee, is a privilege and a convenience for those unable to vote in person. . . . Yet, such a privilege is deserving of due process."). Such due process is not provided when the election procedures do not give some form of post-deprivation notice to the affected individual so that any defect in eligibility can be cured and the individual is not continually and repeatedly denied so fundamental a right. *Second*, the risk of erroneous deprivation from the Signature Match Requirement is extraordinarily high. This risk is neither hypothetical nor speculative: public data

from Texas establishes that many voters' mail-in ballots have been rejected for this reason every election with no opportunity to cure. *See* Ex. C ¶ 136. As the Sixth Circuit found, "[t]o disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair." *Hunter*, 635 F.3d at 243.

Texas's Signature Match Requirement therefore deprives voters of having their ballot counted because of the standardless process of signature verification conducted by untrained laypersons. *See* Ex. W ¶ 42. It is neither a fair nor reliable way to administer voting by mail. And a state's elections system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1185 (11th Cir. 2008) (Barkett, J., concurring and dissenting in part).

Worse still, once a voter's ballot is wrongly rejected for signature mismatch based on an election official's mistake and their liberty interest is deprived, "the election procedures do not give some form of post-deprivation notice to the affected individual so that any defect in eligibility can be cured and the individual is not continually and repeatedly denied so fundamental a right." *Raetzel*, 762 F. Supp. at 1358. This is unconstitutional. *See NEOCH*, 696 F.3d at 591 ("[T]he unreasonableness and fundamental unfairness of disqualifying wrong-precinct ballots caused by poll-worker error" is a "likely constitutional violation[ ] . . . requiring injunctive relief."). Texas's failure to provide voters with an opportunity to remedy the erroneous determination that their signature did not "match" a previous signature on file stands in stark contrast to the many states that provide just that remedy. *See supra* at II.B.3.

The Secretary will undoubtedly claim that the Signature Match Requirement prevents voter fraud, but as explained above with regard to Plaintiffs' undue burden claim, the state has no valid interest in a standardless process that does not provide voters with an opportunity to cure. And any administrative cost of providing voters an opportunity to cure perceived signature mismatch pales in comparison to voters' total disenfranchisement if they have no opportunity to cure.

Having conferred the right to vote by mail, Texas must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. *Cf. Saucedo*, 335 F. Supp. 3d at 217. Because the Signature Match Requirement is inadequate in each of those respects and Texas can institute a substitute procedure which would protect voters' rights with minimal burden to the state, that requirement violates Texas voters' procedural due process rights.

### 4.      The Postage Tax is an unconstitutional poll tax.

Plaintiffs are likely to succeed on their claim that the Postage Tax is a poll tax in violation of the Fourteenth and Twenty-Fourth Amendments. The Twenty-Fourth Amendment provides that the right to vote "shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax," U.S. Const. amend. XXIV, § 1; *see also Harman v. Forssenius*, 380 U.S. 528 (1965); *Jones v. DeSantis*, 410 F. Supp. 3d 1284, 1305 (N.D. Fla. 2019), *aff'd sub nom. Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) (holding Twenty-Fourth Amendment "applies not just to any poll tax but also to any 'other tax'"). The Fourteenth Amendment similarly prohibits the imposition of fees on the franchise. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966).

The Supreme Court has made clear that "voting cannot hinge on ability to pay . . . for it is a 'fundamental political right . . . preservative of all rights.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 124 n.14 (1996) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This analysis is the same regardless of whether a voter is able to pay or not. *See Harper*, 383 U.S. at 668 (finding imposition

of a fee unconstitutional "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all"). Texas does what *Harper* prohibits: it conditions casting a mail ballot on paying a fee (i.e., postage). Of course, voters may incur some costs incidental to voting. That is not what is at issue here. Postage is *required* to cast a ballot by mail. It is the difference between the gas money used to reach a polling place (incidental) and a tax to enter the polling booth (a poll tax).

Fees imposed in the voting process violate the Twenty-Fourth Amendment if they otherwise function as taxes, *see Jones*, 410 F. Supp. 3d at 1306, and courts must use a "functional approach" to determining whether a fee is a "tax," *see id.* (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-66 (2012)). The "essential feature of any tax" is that "i[t] produces at least some revenue for the Government." *Id.* Stamps are one of the primary streams of revenue for the USPS, raising billions of dollars for the agency each year. While such a fee is unconstitutional under any circumstance, during the present pandemic paying for postage has become a prerequisite for voting for thousands of Texas voters—particularly older and disabled voters, who are especially vulnerable to COVID-19—forcing them to pay "a price for the privilege of exercising the franchise." *Harman*, 380 U.S. at 539; *see also See* Ex. K ¶ 7; Ex. L ¶ 6; Ex. M ¶ 7; Ex. N ¶ 5; Ex. O ¶ 6. The Postage Tax therefore violates both the Twenty-Fourth and Fourteenth Amendments.[8]

---

[8] The Secretary will likely cite to *Black Voters Matter Fund v. Raffensperger*, No. 1:20-CV-01489-AT, 2020 WL 2079240, at *3-5 (N.D. Ga. Apr. 30, 2020), in opposition to the motion to enjoin the poll tax; however, that order is inapposite. There, a Georgia district court judge, without considering the likelihood of the plaintiff's success in arguing that the state's failure to provide prepaid postage for voting by mail is an unconstitutional poll tax, denied a motion for preliminary injunction. The court did so on balance-of-equities grounds because the plaintiff sought prepaid postage for the June primary, for which over 200,000 mail-in ballots had already been sent out without prepaid postage. In part, the State argued in its opposition to the motion that sending the remaining ballots out with prepaid postage when those 200,000 ballots did not come with prepaid postage would violate *Bush v. Gore*.

**B.      Plaintiffs will suffer irreparable injury absent an injunction.**

Plaintiffs will suffer irreparable harm in the absence of the requested injunctive relief. *First*, the Challenged Provisions put the individual Plaintiffs and countless other voters at significant risk of severe burden to their fundamental right to vote—up to and including disenfranchisement. If "constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also TDP*, 2020 WL 2541971, at *32 ("Voting is a constitutional right for those that are eligible, and the violation of constitutional rights for even a minimal period of time constitutes irreparable injury justifying the grant of a preliminary injunction"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Detzner*, 314 F. Supp. at 1223. Once the election comes and goes, "there can be no do-over and no redress." *LOWV NC*, 769 F.3d at 247.

*Second*, the Challenged Provisions inhibit the Organizational Plaintiffs—Voto Latino, NAACP, and TARA—from participating in other election-related activities, such as registering voters and getting out the vote, *see* Ex. M ¶ 9; Ex. N ¶ 7; Ex. O ¶ 9, which courts routinely recognize as irreparable harm. *See Browning*, 863 F. Supp. 2d at 1167 (holding plaintiffs' lost opportunity to register voters was irreparable harm) (Hinkle, J.); *Kemp*, 208 F. Supp. 3d at 1350.

*Third*, if the Challenged Provisions are in effect, the organizational Plaintiffs must divert resources from other mission-critical efforts to help their members and constituencies overcome the burdens imposed by the law. *See* Ex. M ¶ 9; Ex. N ¶ 7; Ex. O ¶ 9. This, too, constitutes irreparable harm. *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 1268 (N.D. Ga. 2018) (finding irreparable harm where "[p]laintiffs' organizational missions . . . will continue to be frustrated and organization resources will be diverted to [address the challenged law]" and "[s]uch mobilization opportunities cannot be remedied once lost").

**C.**     **The balance of the equities and the public interest favor an injunction.**

The balance of the equities favors Plaintiffs. While Plaintiffs face infringement of core constitutional rights, the only state interest at play here is administrative inconvenience. But "administrative convenience" cannot justify practices that impinge upon fundamental rights. *Taylor*, 419 U.S. at 535; *see also Barrett v. Roberts*, 551 F.2d 662, 666 (5th Cir. 1977) (deprivation of due process "outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens"); *Kemp*, 347 F. Supp. 3d at 1268 (holding increased administrative burden on election officials "minimal compared to the potential loss of a right to vote"). And "it is 'always' in the public interest to prevent violations of individuals' constitutional rights." *TDP*, 2020 WL 2541971, at *33 (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)); *see also Detzner*, 314 F. Supp. at 1224 ("[A]llowing for easier and more accessible voting for all segments of society serves the public interest.").[9]

Also significant to the analysis is the context of this lawsuit. The public interest is served by mitigating the spread of COVID-19. Encouraging voters to cast mail ballots rather than stand in line and press into crowded polling places serves that interest. By imposing barriers to mail-in voting, the Challenged Provisions compel voters to vote in person if at all possible, thereby threatening the health of themselves, other voters, poll workers, and their community. That risk of danger to public health is substantial, imminent, and ongoing. Issuing an injunction would give

---

[9] The Secretary will undoubtedly assert that the Signature Match Requirement also serves the state's interest in preventing fraud to protect the integrity of the election. But it has not, and cannot, explain how improperly rejecting thousands of valid votes serves the integrity of the election. And, in fact, the Requirement does exactly the opposite: it leaves voters doubting whether their wholly proper and valid votes were counted. *See, e.g.*, Ex. K ¶¶ 8-9; Ex. X ¶ 9.

Texas voters confidence that their right to vote is preserved even in these unprecedented times, and that they will be able to safely and successfully exercise the franchise, without undue burden.

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction: (1) requiring the State to provide prepaid postage on ballot carrier envelopes used to return marked mail-in ballots to counties in the November election; (2) enjoining the State from rejecting mail-in ballots if those ballots are postmarked by 7:00 p.m. on election day and received by the county election administrator before it canvases the election in the November election; (3) enjoining the State from rejecting mail-in ballots on signature verification grounds *or* requiring the State to provide voters the opportunity to cure any issues with signature verification before their ballots are rejected in the November election; and (4) enjoining the State from enforcing the ban on the assistance of voters in returning their marked mail-in ballots in the November election.

Dated:  June 22, 2020                                Respectfully submitted,

                                                     */s/ Skyler M. Howton*
                                                     _____
                                                     Skyler M. Howton, TX# 24077907
                                                     PERKINS COIE LLP
                                                     500 North Akard St., Suite 3300
                                                     Dallas, TX 75201-3347
                                                     Telephone: (214) 965-7700
                                                     Facsimile: (214) 965-7799
                                                     showton@perkinscoie.com

                                                     Marc E. Elias*
                                                     Aria C. Branch*
                                                     PERKINS COIE LLP
                                                     700 Thirteenth Street, N.W., Suite 800
                                                     Washington, D.C. 20005-3960
                                                     Telephone: (202) 654-6200
                                                     Facsimile: (202) 654-6211
                                                     melias@perkinscoie.com
                                                     abranch@perkinscoie.com

Kevin J. Hamilton*
William B. Stafford*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
khamilton@perkinscoie.com
wstafford@perkinscoie.com

Gillian Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Century City, California 90067
Telephone: (310) 788-9900
Facsimile: (310) 788-3399
gkuhlmann@perkinscoie.com

Sarah Langberg Schirack*
PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
Telephone: (907) 279-8561
Facsimile: (907) 276-3108
sschirack@perkinscoie.com

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 22, 2020, and that all counsel of record were served by CM/ECF.

/s/ *Skyler M. Howton*
Skyler M. Howton