UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LINDA JANN LEWIS, MADISON LEE,** | § | |
| **ELLEN SWEETS, BENNY** | § | |
| **ALEXANDER, GEORGE MORGAN,** | § | |
| **VOTO LATINO, TEXAS STATE** | § | |
| **CONFERENCE OF THE NATIONAL** | § | **Civil Action No. 5:20-cv-00577-OLG** |
| **ASSOCIATION FOR THE** | § | |
| **ADVANCEMENT OF COLORED** | § | |
| **PEOPLE; and TEXAS ALLIANCE FOR** | § | |
| **RETIRED AMERICANS,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| *v.* | § | |
| | § | |
| **RUTH HUGHS, in her official capacity as** | § | |
| **the Texas Secretary of State,** | § | |
| *Defendant.* | § | |

## ORDER

On this day, the Court considered The Texas Secretary of State's Motion to Dismiss or, in the alternative, for a More Definite Statement (docket no. 17) (the "Motion"). Having reviewed the Motion and the record, the Court finds that it should be DENIED.

## BACKGROUND

Plaintiffs are four individuals—Linda Jann Lewis, Madison Lee, Ellen Sweets, Benny Alexander, George "Eddie" Morgan ("Individual Plaintiffs")—and three organizations—Voto Latino, Texas State Conference of the National Association for the Advancement of Colored People ("NAACP"), Texas Alliance for Retired Americans (the "Alliance") ("Organizational Plaintiffs"). *See* docket no. 1. Defendant Ruth Hughs is the Texas Secretary of State (the "Secretary") and is sued in her official capacity as the State's chief election officer. *Id.* (citing Tex. Elec. Code § 31.001(a)).

Plaintiffs bring this lawsuit against the Secretary challenging four provisions governing mail-in voting in Texas. *See* docket no. 1. First, Plaintiffs challenge Section 86.002 of the Texas Election Code's failure to provide prepaid postage for mail-in voters. *Id.;* Tex. Elec. Code § 86.002 ("Postage Tax"). Second, Plaintiffs challenge the requirement mail-in ballots be postmarked by 7:00 p.m. on election day and then received by the county no later than 5:00 p.m. on the day after the election in order to be counted. *See* Tex. Elec. Code § 86.007 ("Ballot Receipt Deadline"). Third, Plaintiffs challenge the requirement that voters must submit two signature samples that "match," according to local election officials, in order to have their early voting ballots counted. *Id.* § 87.027 ("Signature Match Requirement"). Fourth, Plaintiffs challenge the criminalization of a person assisting a voter in returning a marked mail ballot. *Id.* § 86.006 ("Voter Assistance Ban").

## 1. The Challenged Restrictions

With respect to the Postage Tax, Plaintiffs allege that requiring voters to pay for their own postage "imposes a monetary cost on voters whose only option to vote safely is to cast a vote by mail." Docket no. 1 at ¶ 67. This monetary cost, Plaintiffs allege, is particularly burdensome considering the economic hardships brought on by the pandemic. *Id.* at ¶ 68. Even if they can afford postage, Plaintiffs allege that some voters do not have stamps at home, and thus must risk going to a store during the COVID-19 pandemic. *Id.* at ¶ 70. To illustrate these burdens, Plaintiffs cite the differences in voter turnout in King County, Washington, which saw a 10% and 6% increase in votes over two elections after it provided prepaid postage. *Id.* at ¶ 75. Without prepaid postage, Plaintiffs argue many Texans will not vote.

Similarly, Plaintiffs argue that the Ballot Receipt Deadline will also prevent voters from exercising their right to vote. They allege that even under normal circumstances, permitting

ballots to be postmarked by 7:00 p.m. on election day but requiring they be received by 5:00 p.m. the next day is confusing and relies on the near-perfect performance of the United States Postal Service. *Id.* at ¶¶ 77-79. Moreover, Plaintiffs allege that COVID-19 is causing more postal delays because of budgetary issues and reduced staff. *Id.* at ¶¶ 80-81. Plaintiffs submit that these issues could result in closing routes and processing centers. Indeed, these staff cuts combined with an unprecedented number of mailed ballots resulted in delayed and undelivered ballots in the recent Wisconsin election. *Id.* at ¶¶ 82-86. Plaintiffs contend that Texas has "no meaningful need for its day-after election day deadline," as "the Secretary advises county election administrators that they need not count these ballots until *six days after election day at the earliest*." *Id.* at ¶ 93. Indeed, ballots from overseas are not due until five days after the election. *Id.* In sum, Plaintiffs challenge this result: ballots properly mailed by the election day deadline but not received by the day after the election are rejected, even though they are received before they would otherwise be counted. *Id.* at ¶¶ 94-95.

The Signature Match Requirement, or Section 87.027 of the Texas Election Code, requires county officials to match the mail-in voter's signature with the voter's signature on the vote-by-mail application. Tex. Elec. Code § 87.027. Plaintiffs challenge this provision for several reasons. One, the local officials are untrained in forensic handwriting and are not given uniform standards by the State. *Id.* at ¶ 97. Plaintiffs cite the Secretary's guidance for the county officials to "use their best judgment . . . to verify if these signatures are the same." *Id.* at ¶ 98. Regardless of the lack of training, Plaintiffs note that signature matching is an inexact art, and voters, particularly those who are be disabled or elderly, may have a different signature because of "evolving physical abilities." *Id.* at ¶ 99. As a result, voters' ballots will go uncounted. Plaintiffs further allege an additional problem: "Texas provides voters with no opportunity to

cure election officials' mistaken determinations that two signatures do not 'match.'" *Id.* at ¶ 103. Instead, the county notifies the voter within 10 days after the election that their vote was not counted. *Id.* Again, this restriction, according to Plaintiffs, will result in mistakenly and arbitrarily rejected ballots without an opportunity to cure the error.

Finally, Plaintiffs challenge the Voter Assistance Ban, Section 86.006, which criminalizes third parties from assisting voters with mailing in their ballots, outside of narrow circumstances. Plaintiffs allege that this ban results in a heavier burden on poor, minority, rural, and elderly voters who have less access to postal services, personal transportation, and are less able to bear the cost, both economic and to their health, of waiting in long lines to vote or in returning their ballots in person. *Id.* at ¶¶ 107-108. With the potentially large number of voters casting their ballots by mail due to the pandemic, Plaintiffs allege that even more voters will need assistance delivering their ballots.

### 2. The COVID-19 Pandemic

According to Plaintiffs, the COVID-19 pandemic exacerbates the burdens imposed by these restrictions. Plaintiffs state that COVID-19 "will make it dangerous and more difficult for Texans to cast their ballots in person in November," and as a result, "many Texas will seek to vote by mail out of necessity." Docket no. 1 at ¶ 27. Plaintiffs cite concerns such as the election venues being unwilling to open their doors to the public as well as the health, safety, and ability to retain poll workers. *Id.* at ¶¶ 34-37. As a recent illustration of these struggles, Plaintiffs cite Wisconsin's presidential primary which resulted in closed polling locations, "crowds, long lines, and excessive wait times in the middle of a global pandemic whose abatement requires social distancing and spending as little time as possible outside of the home." *Id.* at ¶¶ 42-43. Plaintiffs

note the significant number of COVID-19 cases "who were infected with the disease while participating in April's election[,]" according to Wisconsin health officials. *Id.* at ¶ 43.

Plaintiffs warn these challenges will arise in Texas. For instance, in Bexar County, 131,705 people voted in person on election day in the 2018 general election. *Id.* at ¶ 45. If Bexar County must close polling locations due to the challenges outlined above, as seen in Wisconsin, Plaintiffs allege these voters will face an even greater risk of overcrowded polling locations. *Id.* at ¶¶ 36-37. Furthermore, they note that a "reported 14% of Bexar County adults are diabetic and 16% are family caregivers to elderly or disabled relatives[,]" individuals at heightened risk of severe outcomes resulting from COVID-19. *Id.* at ¶ 48. Given these conditions and the COVID-19 pandemic generally, Plaintiffs' premise is that for at least certain voters, the only way to vote safely is by mail. *See* docket no. 1 at ¶ 67. Accordingly, these challenged restrictions could result in a significantly higher number of uncounted ballots than previous years.

### 3. Plaintiffs' Claims for Relief

Plaintiffs state four causes of action, each brought pursuant to 42 U.S.C. § 1983. First, Plaintiffs allege that all four restrictions place an undue burden on the right to vote in violation of the First and Fourteenth Amendments. *Id.* at ¶¶ 112-121. Second, the Ballot Receipt Deadline and the Signature Match Requirement violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* at ¶¶ 122-124. Specifically, Plaintiffs allege that the Ballot Receipt Deadline treats voters differently based on where they live, as the rate of rejected ballots differs between counties. *Id.* at ¶ 123. Likewise, because the Signature Match Requirement does not have a uniform standard for counties to verify signatures, one person's vote is valued over another based on where they live. *Id.* at ¶ 124. Moreover, elderly and disabled voters are more likely to have varying signatures, and thus the requirement discriminates on the basis of age and

disability. *Id*. Third, in denying voters their right to vote without notice or an opportunity to be heard, the Signature Match Requirement violates voters' procedural due process rights provided by the Fourteenth Amendment. *Id*. at ¶¶ 125-127. Fourth, Plaintiffs allege that the Postage Tax is a poll tax in violation of the Fourteenth and Twenty-Fourth Amendments. *Id*. at ¶¶ 128-133. Plaintiffs seek a declaratory judgment that the challenged provisions are unconstitutional as well as preliminary and permanent injunctions against their enforcement.

### 4. The Secretary's Motion to Dismiss

Subsequently, the Secretary filed the present Motion, asserting that Plaintiffs' complaint should be dismissed under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).[1] *See* docket no. 17. With respect to the Court's jurisdiction, the Secretary argues that the Eleventh Amendment bars Plaintiffs' claims and that the Plaintiffs lack standing. Specifically, the Secretary argues that the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity does not apply, as she is not charged with enforcing any of the challenged restrictions. *Id*. at p. 2-4. That responsibility falls on local officials. For instance, local officials would be the persons providing prepaid postage, rejecting or accepting mail-in ballots received after the deadline, verifying the voters' signatures, and prosecuting the criminal offense of assisting voters. *Id*. The Secretary disputes that because she is the "chief election officer," that locally elected officials are bound by her orders. *Id*. Nor does the *Ex parte Young* exception authorize this Court to order a state official to take affirmative action such as providing prepaid postage,

---

[1] The Secretary does not mention either rule in her Motion, but the Court presumes that both the standing and Eleventh Amendment sovereign immunity arguments are jurisdictional, and thus brought under 12(b)(1). *See, e.g., Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (noting the proper vehicle to challenge Article III standing, i.e., a jurisdictional question, is a motion to dismiss under Rule 12(b)(1)). The Secretary also moves in the alternative for a more definite statement, but outside of a passing reference at the end of the Motion, she provides no support for her inability to respond to the complaint. Thus, the Court denies the Motion pursuant to Rule 12(e).

according to the Secretary. *Id.* Because *Ex parte Young* does not apply, the Secretary argues that sovereign immunity bars Plaintiffs' claims.

The Secretary also challenges Plaintiffs' standing. First, the Secretary argues that Plaintiffs do not meet the injury in fact requirement, as their injuries are speculative and possible rather than certainly impending. *Id.* at p. 4. The Secretary notes that mail-in ballots are rarely rejected, and thus Plaintiffs cannot say that their potential injury is likely to happen. *Id.* at p. 5. Moreover, the Organizational Plaintiffs do not have associational standing because they have not alleged that they have individual members suffering an injury in fact. *Id.* at p. 6. Nor do the Organizational Plaintiffs have direct organizational standing, according to the Secretary, because their interest in increasing voter turnout is insufficient to confer Article III standing. *Id.* at p. 7. The Secretary further argues that the Organizational Plaintiffs have not alleged that the restrictions make their missions "more difficult," or that there is a "direct conflict" between the restrictions and their missions. *Id.* at p. 8.

The Secretary also disputes that Plaintiffs have met the causation and redressability requirements. Again, the Secretary urges that local officials, not her, cause the Plaintiffs' purported injuries. *Id.* at p. 9. Relatedly, Plaintiffs' injuries cannot be redressed by an injunction against the Secretary as she does not enforce the challenged provisions. *Id.* Finally, the Secretary argues that the Organizational Plaintiffs lack statutory standing to bring a § 1983 claim on behalf of the rights of a third party—individual voters. *Id.* at p. 10. The asserted right is the right to vote, but organizations do not have the right to vote, and thus they do not have statutory standing to bring these claims. *Id.*

Beyond standing, the Secretary seeks dismissal of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Secretary challenges Plaintiffs'

Postage Tax claim for three reasons: (1) there is no postage tax; (2) this Court would lack jurisdiction to enjoin the postage tax; and (3) the tax does not abridge the right to vote. *Id.* at pp. 11-16. In disputing the existence of the Postage Tax, the Secretary reminds the Court that Texas law does not require anyone to pay postage, as voters can vote in person or return their mail-in ballots in person. *Id.* at p. 12. Additionally, the Secretary notes the USPS policy that absentee ballots "must never be returned to the voter for additional postage." *Id.* Nor is the Postage Tax imposed by the State. As for the jurisdiction to enjoin the Postage Tax, the Secretary points to the Tax Injunction Act, in which Congress limited federal courts from enjoining state taxes where there is an adequate alternative remedy, such as proceeding in state court. *Id.* at p. 13. Finally, the Secretary contends that declining to provide postage is a common practice and does not abridge the right to vote, particularly because the Constitution does not guarantee a right to vote by mail. *Id.* at pp. 13-14. Even if acquiring postage is a burden, the Secretary argues that it is *de minimis* and far outweighed by the State's budgetary interests. *Id.*

With respect to the Ballot Receipt Deadline, the Secretary argues that the State's deadline does not burden Plaintiffs' right to vote, noting that "nationwide, counting ballots that arrive after Election Day is relatively rare." *Id.* at p. 16. The Secretary disputes Plaintiffs' assertion that because the ballots are not counted until six days after election day, there is no reason for the current deadline. Rather, the Secretary states that local officials begin processing the ballots in that time, such as verifying voter registrations, and thus the State has a legitimate interest in setting the deadline. *Id.* at p. 17. The Secretary further asserts that Plaintiffs' concern that the two deadlines could lead to voter confusion is speculative and unfounded. *Id.* at p. 18. As for Plaintiffs' equal protection claim, the Secretary contends that at best this law results in

discrimination based on geography, triggering rational basis review which the Secretary contends the provision passes. *Id.* at p. 20.

The Secretary argues that the State's compelling interest in combatting voter fraud far outweighs the burdens imposed by the Signature Match Requirement. The Secretary disputes that ensuring a voter signed his or her ballot is a burden rising to the level of a constitutional violation, even disputing that local officials must be experts in forensic handwriting. *Id.* at p. 23. The Secretary also counters Plaintiffs' allegation that local officials are permitted to wait until 10 days after the election to notify the voter by pointing out that Texas law does not *require* local officials to wait that long. *Id.* Even without notice, the Secretary contends that the thorough review process does not impose a burden on the voter's right and requiring pre-election day notice could be unworkable for the State. *Id.* at p. 24. Nor does the Signature Match Requirement violate Plaintiffs' equal protection rights, as Plaintiffs do not allege a discriminatory intent and the State's interest in combatting voter fraud survive rational basis review. *Id.* at p. 24. Lastly, the Secretary disputes that the Signature Match Requirement violates Plaintiffs' procedural due process rights, as the State already imposes additional safeguards for ballots that are ultimately rejected. *Id.* at p. 25.

As for the Voter Assistance Ban, the Secretary argues that there is no constitutional right to having assistance in preparing a ballot. *Id.* Moreover, the State provides six exceptions to the Voter Assistance Ban: (1) a family member; (2) someone living in the same dwelling as the voter; (3) an early voting clerk; (4) an official assistant listed under Texas Election Code § 86.006; (5) a postal worker; and (6) a common or contract carrier. *Id.* at p. 26 (citing Tex. Elec. Code § 86.006(f)(1)-(6)). The Secretary urges that the Voter Assistance Ban also serves to combat against "ballot harvesting" and election fraud. *Id.* Regardless, the Secretary reiterates that

these restrictions do not infringe on Plaintiffs' right to vote, as voting by mail is not a protected right.

In response, Plaintiffs first dispute that sovereign immunity and standing doctrines strip this Court of jurisdiction over this case. With respect to sovereign immunity, Plaintiffs note that the *Ex parte Young* exception permits suits seeking prospective injunctive relief against a state actor with "some connection" to the challenged law's implementation and enforcement. *See* docket no. 19 at p. 3. Regardless of whether the Secretary personally provides postage or criminally enforces the Voter Assistance Ban, Section 31.003 of the Texas Election Code states that the Secretary "shall obtain and maintain uniformity in the application, operation, and interpretation of [the Election Code]," thus satisfying the connection required for the *Ex parte Young* exception. *Id.* at p. 4. Moreover, Plaintiffs dispute that injunctions directing affirmative action are not permitted under *Ex parte Young*.

As for standing, Plaintiffs argue that both the Individual Plaintiffs and the Organizational Plaintiffs have both alleged standing to challenge the restrictions. Indeed, the Individual Plaintiffs plead that they *will* vote by mail in the upcoming election, and, for instance, Ms. Lewis and Ms. Lee's signatures "continually change due to their respective vision disorder and rheumatoid arthritis." *Id.* at p. 6. Thus, the risk that their ballots may be rejected is not speculative. Plaintiffs plead that Mr. Morgan's poverty and health conditions will prevent him from going to buy a stamp, and thus the Postage Tax will cause him an injury in fact. *Id.* These burdens cannot be dismissed as *de minimis*.

Likewise, Plaintiffs argue that the Organizational Plaintiffs plead associational standing, as precedent only requires the allegation that the restrictions will burden the rights of their members. *Id.* at pp. 8-9. Moreover, they allege direct organizational injury, namely the diversion

of resources from their normal activities to lessen the harm to their missions caused by these restrictions. *Id.* at p. 9. Specifically, Voto Latino's mission to get out the vote and register voters will suffer from having to educate voters on how to navigate the restrictions. *Id.* Similarly, the NAACP must divert resources from its mission of securing political and other rights against race-based discrimination in order to educate its constituents on these restrictions and even ensure they are safely able to obtain postage. *Id.* A similar diversion is required of the Alliance. *Id.* at p. 10. Plaintiffs allege these diversions would not occur but for these restrictions. Finally, as for causation, redressability, and statutory standing, Plaintiffs cite recent Fifth Circuit decisions foreclosing each of the Secretary's arguments. *Id.* at pp. 11-14.

Plaintiffs also counter the Secretary's Rule 12(b)(6) arguments, pointing out that her Motion seeks to prematurely argue these claims on the merits. Instead, the Court must accept the well-pleaded allegations as true and view them in the light most favorable to Plaintiffs. For the undue burden claim, Plaintiffs contend that they sufficiently allege all four restrictions impose an undue burden on the right to vote, noting that when burdens are plausibly alleged, such claims survive motions to dismiss. *Id.* at p. 16-17. For instance, for the Postage Tax, Plaintiffs reiterate that they must pay to vote by mail, a burden heightened by the health risks of voting in person arising from the COVID-19 pandemic. *Id.* at pp. 17-18. The Ballot Receipt Deadline will result in certain voters' ballots not being counted, even though they mailed their ballots by the "send deadline." *Id.* at p. 18. And the Signature Match Requirement will also result in disenfranchisement without voters' "agency, knowledge, or any opportunity to cure any purported problems with their lawfully cast ballot." *Id.* With respect to the Voter Assistance Ban, Plaintiffs argue they plausibly allege that voters who have no family member or person living in their household will be disenfranchised, a burden also heightened by the pandemic. *Id.* at p. 19.

11

Plaintiffs allege that there is no state interest justifying each of these burdens. *Id.* These allegations, Plaintiffs argue, survive a Rule 12(b)(6) motion to dismiss.

As for the equal protection claims, Plaintiffs dispute that the Ballot Receipt Deadline will only be subject to rational basis review and that they must allege intentional discrimination to support their Signature Match challenge. Instead, Plaintiffs argue that *Anderson-Burdick* governs these equal protection claims, and thus their allegations that these requirements treat voters differently based on where they live are sufficient to survive a motion to dismiss. *Id.* at pp. 24-25.

Additionally, Plaintiffs argue their procedural due process claim against the Signature Match requirement is plausibly alleged. They contend that the right to vote and have it count is a protected interest that cannot be denied without due process. *Id.* at p. 26. Plaintiffs further argue that adjudicating a procedural due process claim is inappropriate at the motion to dismiss stage, as it requires weighing the parties' burdens, interests and justifications when the Court is required to accept the Plaintiffs' allegations as true. *Id.* at pp. 26-27. Finally, Plaintiffs argue that they sufficiently state a poll tax claim against the Postage Tax, as they allege that the COVID-19 pandemic will force many voters to vote by mail out of safety, and thus they will have an unavoidable monetary cost to cast their vote. *Id.* at p. 27. This allegation alone, Plaintiffs contend, is enough to state a claim for an unconstitutional poll tax.

In reply, the Secretary first opposes Plaintiffs' sovereign immunity arguments, restating their argument that the Court cannot issue an injunction ordering her to fulfill state-law obligations or act in her official capacity. *See* docket no. 26 at pp. 1-2. The Secretary also disputes that any Plaintiff has plausibly alleged standing, and even if one did, the Court should streamline the case by dismissing those that lack standing. *Id.* at p. 2. Again, the Secretary urges

that the less than 2% of mail-in ballots that were rejected in 2018 is insufficient to confer

standing. *Id.* at p. 3. As for the Organizational Plaintiffs, the Secretary reargues that they must

allege that individual members of their organizations will be harmed, and they must allege that

they would suffer another injury if they did not divert resources. *Id.* at p. 4. Mere frustration of

their organizational purpose is insufficient. *Id.* at p. 5. The Secretary then restates her Rule

12(b)(6) arguments. *See id.* at pp. 6-10.

### STANDARDS OF REVIEW

The Secretary moves to dismiss Plaintiffs' complaint under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). Rule 12(b)(1) provides for the dismissal of a case for lack of

subject-matter jurisdiction. Because subject-matter jurisdiction goes to the heart of the Court's

power to hear the case, the Court should consider the Rule 12(b)(1) challenges before addressing

the Rule 12(b)(6) challenge. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). In

considering a Rule 12(b)(1) motion, the Court may consider: (1) the complaint alone; (2) the

complaint supplemented by undisputed facts in the record; or (3) the complaint, undisputed facts,

and the Court's resolution of disputed facts. *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir.

2010). In other words, the Court may "weigh the evidence and satisfy itself" that subject matter

jurisdiction exists. *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir.

1992) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

Rule 12(b)(6) permits the Court dismiss a complaint for "failure to state a claim upon

which relief can be granted." In deciding a Rule 12(b)(6) motion, the Court assumes the

complaint's factual allegations, but not its legal conclusions, are true. *Ashcroft v. Iqbal*, 556 U.S.

662, 678, 680-81 (2009). The Court then determines if the complaint alleges "enough facts to

state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007). Facial plausibility requires enough facts to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6) limits the Court's review to the complaint, documents attached to the complaint, and documents attached to the motion that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court turns to the merits of the Motion.

## ANALYSIS

### I.    The Secretary's Rule 12(b)(1) Motion to Dismiss

As discussed above, the Court must first consider the Secretary's Rule 12(b)(1) arguments, which strike at the heart of this Court's jurisdiction.

### 1.    Sovereign Immunity

The Secretary's first Rule 12(b)(1) argument is that Eleventh Amendment sovereign immunity is a jurisdictional bar to Plaintiffs' claims. Generally, "Eleventh Amendment sovereign immunity bars private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). State agencies or officials acting in their official capacity also enjoy the Eleventh Amendment's protection. *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651, 663-69 (1974)). *Ex parte Young*, however, provides an exception. *See* 209 U.S. 123 (1908). This exception permits private parties to seek "injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). The state official must have "some connection" with the enforcement of the challenged act. *Air Evac EMC, Inc. v. Tex. Dep't. of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517-19 (5th Cir. 2017). The Court, therefore, need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly

characterized as prospective." *Verizon Md, Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). If the answer to both inquiries is yes, and the defendant state official has "some connection" to the challenged act, then the *Ex parte Young* exception applies.

As noted above, the Secretary makes two arguments that the *Ex parte Young* exception does not apply. First, the Secretary argues that she does not have the requisite connection to the enforcement of the challenged restrictions. *See* docket no. 17 at pp. 2-4. Instead, the Secretary contends that the local officials are the proper parties to this suit, as they are the ones that would mail the ballots with prepaid postage, collect and reject late ballots, match and verify voter signatures, and prosecute those who violate the Voter Assistance Ban. *Id.* (citing Tex. Elec. Code §§ 86.002(a), 86.011(a) & (c), 87.041(a), 87.0431(a), 87.027; and Tex. Gov't Code § 44.115). While acknowledging that Section 31.001(a) of the Texas Election Code names the Secretary as the "chief election officer," she argues that the local officials are independently elected, do not report to her, and are not bound by her advice. *Id.*

The Court rejects this argument. The Fifth Circuit recently stated that its "precedent suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to support standing." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) (citing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612-13 (5th Cir. 2017)). That connection, as noted by Plaintiffs, derives from Section 31.003, which states that the Secretary "shall obtain and maintain uniformity in the application, operation, and interpretation of [the Election Code] and of the election laws outside of th[e] code." Tex. Elec. Code § 31.003. The court in *Texas Democratic Party* further cited the Secretary's power under the Texas Election Code to "take appropriate action to protect" voting rights "from abuse by the authorities administering the state's electoral processes," a power that includes "order[ing] the

person to correct the offending conduct." 961 F.3d at 399 (quoting Tex. Elec. Code § 31.005(a)-(b)).

The Secretary attempts to distinguish *Texas Democratic Party* as a "tentative discussion" that was based on an "overly broad reading" of *OCA-Greater Houston. See* docket no. 26 at p. 1, n.1.  In *OCA-Greater Houston*, the Fifth Circuit held that the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State, who serves as the 'chief election officer' of the state." 867 F.3d at 613 (quoting Tex. Elec. Code § 31.001(a)). While *OCA-Greater Houston*'s holding addresses standing rather than sovereign immunity, the Fifth Circuit in *Texas Democratic Party* noted the "significant overlap" between standing and *Ex parte Young* analyses. *Texas Democratic Party*, 961 F.3d at 401 (citing *Air Evac*, 851 F.3d at 520). The Court sees no reason to stray from *Texas Democratic Party*'s reasoning, and thus finds that the Secretary has the requisite connection to the challenged restrictions for *Ex parte Young* to apply.

Even so, the Secretary argues that *Ex parte Young* does not empower a federal court to issue an injunction requiring a state official to take "affirmative action." Docket no. 17 at pp. 2-4. Plaintiffs counter that the case law repeatedly holds that *Ex parte Young* permits a federal court to "enjoin state officials *to conform their future conduct* to the requirements of federal law." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (emphasis added) (quoting *Quern v. Jordan*, 440 U.S. 332, 337 (1979)). Moreover, the Court is persuaded by the Supreme Court's simple dictate, often repeated by the Fifth Circuit: the Court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon*, 535 U.S. at 646 (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J.,

16

concurring in part and concurring in judgment)); *see also Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020). Here, Plaintiffs allege that the challenged restrictions are ongoing violations of federal law, and the relief they seek is prospective. Accordingly, the Court finds that the complaint falls under the *Ex parte Young* exception to sovereign immunity.

### 2. Standing

The Secretary also argues that Plaintiffs' complaint must be dismissed because both the Individual and Organizational Plaintiffs lack standing. Article III standing requires a plaintiff to show (1) an "injury in fact" (2) that is "fairly traceable" to the challenged conduct and (3) redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An entity seeking to establish "organizational" or "associational" standing must meet these same requirements, whether on behalf of itself—organizational—or on behalf of its members as individuals—associational. *See OCA-Greater Houston*, 867 F.3d at 609-10. In complaints seeking injunctive relief, such as this, only one plaintiff needs standing to satisfy Article III's case or controversy requirement. *Rumsfeld v. Forum of Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Texas v. United States*, 945 F.3d 355, 377-78 (5th Cir. 2019). With respect to the "injury in fact" requirement, the plaintiff must show that the threatened injury is "(1) potentially suffered by the plaintiff . . ., (2) concrete and particularized, not abstract, and (3) actual or imminent, not conjectural or hypothetical." *Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019) (quotation marks omitted). Imminence requires "at least a 'substantial risk' that the injury will occur." *Id.* at 722. However, the injury "need not be substantial" or anything more than an "identifiable trifle," as Article III's requirement is "qualitative, not quantitative in nature." *OCA-Greater Houston*, 867 F.3d at 612.

### A. Injury in Fact

The Secretary contends that Plaintiffs' injuries are too speculative to confer standing, arguing that Plaintiffs merely allege "they may have trouble voting," not that they "will be prevented from voting." Docket no. 17 at p. 4. However, this argument mischaracterizes the nature of Plaintiffs' allegations. Each Individual Plaintiff intends to vote by mail in November. Docket no. 1 at ¶¶ 13-19. They share the same concern that the mail's pandemic-related delays could prove fatal to their right to have their votes counted, given the Ballot Receipt Deadline. *Id.*

The Individual Plaintiffs also allege injuries caused by the three other requirements. For instance, Mr. Morgan suffers from serious health conditions that force him to be in "strict isolation by doctor's orders" during the COVID-19 pandemic. Docket no. 1 at ¶ 18. Mr. Morgan has applied to vote by mail, but he "cannot make a trip to the post office to buy stamps for fear of contracting COVID-19, and he does not currently have access to a reliable computer, so he would not be able to order postage online." *Id.* at ¶ 19. Even if he could safely travel to purchase stamps, he alleges that he cannot afford a book of stamps. *Id.* Likewise, Ms. Lewis suffers from medical conditions which impair her vision, which she alleges have "affected her signature over time," thus placing her at risk of her ballot being rejected as a result of the Signature Match Requirement. *Id.* at ¶ 13. She too has concerns about her ability to obtain postage in the middle of the pandemic. *Id.* As for Ms. Lee, her medical conditions also seriously impair her ability to write, subjecting her to the same risk with respect to her right to have her ballot counted. *Id.* at ¶ 14. Ms. Sweets, who, on doctor's orders, has not left her apartment since February and intends to remain isolated for the remainder of the pandemic alleges that her right to vote is harmed by the Voter Assistance Ban, as she lives alone and does not have family in her area. *Id.* at ¶ 15.

Accepting these allegations as true, as the Court must, the individual Plaintiffs adequately allege concrete, particularized, actual and imminent injuries.

Contrary to the Secretary's assertion, the Individual Plaintiffs need not show that their right to vote *will* be denied. Indeed, courts find standing for voters challenging state voting requirements such as the challenged restrictions at issue here, even in situations where those voters could still vote. *See People First of Alabama v. Merrill,* 2020 WL 3207824, at *6-7 (M.D. Ala. June 15, 2020) ("Simply put, a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote."); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) ("The inability of a voter to pay a poll tax . . . is not required to challenge a statute that imposes a tax on voting."). Indeed, as noted above, the Fifth Circuit has held that the injury requirement can be met by an "identifiable trifle." *OCA-Greater Houston*, 867 F.3d at 612. The Court therefore finds that the Individual Plaintiffs have adequately alleged injuries rising to this standard.

In addition, the Organizational Plaintiffs adequately allege both organizational and associational injury. An entity can show an organizational injury by alleging that it must divert resources from its usual activities in order to lessen the challenged restriction's harm to its mission. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Again, *OCA-Greater Houston* is instructive. In that case, OCA alleged that its mission of getting out the vote was harmed by the "additional time and effort spent explaining the [challenged] provisions at issue to limited English proficient voters," which "frustrate[d] and complicate[d] its routine community outreach activities." 867 F.3d at 610.

Here, each of the Organizational Plaintiffs alleges a similar harm to its mission. Voto Latino alleges that its mission is registering voters and getting out the vote, and it alleges that this

mission is frustrated by its need to divert funds to educate voters on the burdens imposed by the challenged restrictions. *See* docket no. 1 at ¶ 21. Likewise, NAACP alleges that it achieves its mission of securing "the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination" by "engag[ing] in voter education and registration activities." *Id.* at ¶ 23. It alleges that these efforts to fulfill its mission are frustrated by the need to "divert additional time and resources to educate its members and constituents" to ensure that their right to vote is not denied by the challenged restrictions. *Id.* at ¶ 24. Finally, the Alliance's voter registration, phone banking, and get out the vote efforts are equally frustrated by the need to divert its resources to educating voters about the challenged restrictions. *Id.* at ¶ 25. All three Organizational Plaintiffs allege that their members are uniquely harmed by the challenged provisions, requiring them to divert even greater resources than normal. *See id.* at ¶¶ 21-25. Given these allegations, the Court finds that the Organizational Plaintiffs adequately allege direct organizational standing.

Alternatively, the Court also finds that the Organizational Plaintiffs allege an associational injury on behalf of their members or constituents. Associational standing requires that the association's members "have standing and that the interests the association seeks to protect [are] germane to its purpose." *OCA-Greater Houston*, 867 F.3d at 610. Importantly, and contrary to the Secretary's assertion, the association need not "set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing." *Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012). Here, the Organizational Plaintiffs allege that they are membership organizations and that the challenged restrictions injure their membership's right to vote. *See* docket no. 1 at ¶¶ 20-

25. And, as noted above, getting out their membership's vote is germane to their purpose. Accordingly, the Organizational Plaintiffs adequately allege associational standing.[2]

### B. Traceability and Redressability

With respect to the final two elements of standing—traceability and redressability—the Secretary makes essentially the same argument rejected above in the sovereign immunity context. Specifically, the Secretary argues that the alleged injuries, such as the decision to reject ballots because of mismatched signatures, are traceable to the local election officials rather than the Secretary. *See* docket no. 17 at p. 9. Thus, the Secretary contends that a judgment in Plaintiffs' favor against the Secretary would not redress their injuries. *Id.* However, for the same reasons outlined above in the sovereign immunity context, this argument lacks merit. Indeed, the Fifth Circuit rejected this argument in *OCA-Greater Houston*: "The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" 867 F.3d at 613. Because the challenged restrictions are all found in the Texas election code, their invalidity is undoubtedly both fairly traceable to and redressable by the Secretary. Accordingly, Plaintiffs have alleged standing to pursue these claims.

### II.    The Secretary's Rule 12(b)(6) Motion to Dismiss

Having considered and rejected the Secretary's Rule 12(b)(1) arguments, the Court now turns to the Rule 12(b)(6) arguments. As explained above, Plaintiffs state four causes of action. First, they allege that all four restrictions impose an undue burden on their right to vote. Second,

---

[2] The Secretary also argues that the Organizational Plaintiffs do not have statutory standing, as § 1983 prohibits third parties from suing on behalf of others' rights. *See* docket no. 17. However, the Organizational Plaintiffs have sufficiently alleged that they have both direct organizational and associational standing to bring these claims. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (nonprofit membership organization had standing to bring § 1983 action on behalf of its members).

they claim that the Ballot Receipt Deadline and the Signature Match Requirement violate the Equal Protection Clause of the Fourteenth Amendment. Third, they claim that the Signature Match Requirement violates their procedural due process rights by failing to give them notice of and an opportunity to cure their ballot's rejection. And fourth, they allege that the Postage Tax is an unconstitutional poll tax.

As an initial matter, the parties disagree on the applicable standard for both the undue burden and equal protection claims. The Secretary argues that rational basis review must apply because of the Supreme Court's decision in *McDonald*, which she asserts stands for the distinction between the right to vote and the right to vote by mail. *See, e.g.*, docket no. 17 at pp. 19-20 (citing *McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802 (1969)). In her reply, the Secretary cites to *Texas Democratic Party*, the recent Fifth Circuit opinion which applied *McDonald* to a separate Texas Election Code provision limiting the right to vote by mail to those over 65. *See Texas Democratic Party*, 961 F.3d at 403-07. Plaintiffs, on the other hand, dispute that *McDonald* governs this case, arguing instead that the more recent *Anderson-Burdick* framework applies. *See, e.g.,* docket no. 19 at pp. 24-25.

A review of *McDonald* undermines the argument that it supports dismissal at the Rule 12(b)(6) stage. In *McDonald*, the Supreme Court decided an equal protection challenge brought by unsentenced inmates otherwise eligible to vote but not entitled to receive absentee ballots. *See* 394 U.S. at 803-04. The *McDonald* Court did not apply heightened scrutiny for two reasons: (1) the distinctions were not based on a suspect classification, and (2) there "was nothing in the record to indicate that the Illinois statutory scheme [had] an impact on [the inmates'] ability to exercise the fundamental right to vote." *Id.* at 807. The Court further cautioned that it could not "lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact

precluded [the inmates] from voting." *Id.* at 808. Indeed, the inmates agreed that nothing in the record indicated that Illinois would not provide them with an opportunity to vote through, for example, polling booths at the jails or guarded transportation to the polls. *Id.* at 808, n.6. Because there was no evidence that their right to vote would be burdened by the unavailability of absentee ballots, the Supreme Court applied rational basis review. *Id.* at 809.

The procedural posture and the record presented before this Court are entirely different.[3] The Court is required to accept the validity of Plaintiffs' factual allegations, and, unlike the inmates in *McDonald*, they do not admit that their complaint is "barren of any indication that the State might not" redress the alleged burdens on their right to vote. *Compare id.* at 808, n.6 *with* docket no. 1. Rather, Plaintiffs allege that the unique danger posed by the COVID-19 pandemic effectively eliminates their ability to safely vote in person. *See, e.g.*, docket no. 1 at ¶ 18. Driven to vote by mail by COVID-19, they allege that the challenged restrictions both severely burden their right to vote and deny them equal protection of the law.

The Court further finds *McDonald* inapplicable for another reason: Plaintiffs are not seeking to litigate their right to vote by mail. Both *McDonald* and *Texas Democratic Party* concern a certain class of voters' right to receive absentee ballots, be they pretrial detainees or persons under 65 years old. Here, Texas law already provides Plaintiffs with the right to vote by mail. Plaintiffs allege that they intend to exercise that right, particularly since they allege that the COVID-19 pandemic makes voting in person an unsafe and unviable option, an allegation we are required to accept as true. Thus, the question presented here is not whether Plaintiffs have a constitutional right to vote by mail contrary to Texas law, but rather, given that they already have

---

[3] The procedural posture here is also different from *Texas Democratic Party*, which weighed the likelihood of success on the merits at the preliminary injunction stage. *See* 961 F.3d at 403-07. The Fifth Circuit was not required to accept the plaintiffs' allegations as true, as we are here.

this right, whether these challenged restrictions present an undue burden, an equal protection

violation, a due process violation, or an unconstitutional poll tax. *See Martin v. Kemp*, 341 F.

Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("[O]nce the state creates an absentee voting regime, they

'must administer it in accordance with the Constitution.'" (quoting *Zessar v. Helander*, 2006 WL

642646, at * 6 (N.D. Ill. Mar. 13, 2006))). Given these distinctions, the Court declines to dismiss

this case under *McDonald*.

### 1. Plaintiffs' Undue Burden Claims

Instead, the Court will evaluate Plaintiffs' undue burden claims under the *Anderson-Burdick* test. Under this test, a court "must weigh 'the character and magnitude of the asserted

injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to

vindicate' against 'the precise interests put forward by the State as justification for the burden

imposed by its rule,' taking into consideration 'the extent to which those interests make it

necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)

(quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The level of scrutiny applied to the

State's justification varies based on the severity of the restrictions imposed on the right to vote.

*Burdick*, 504 U.S. at 434. When the restrictions on the right to vote are severe, the regulation

"must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting

*Norman v. Reed*, 502 U.S. 279, 289 (1992)). But when the restrictions are reasonable and

nondiscriminatory, "the State's important regulatory interests are generally sufficient to justify

the restrictions." *Burdick*, 504 U.S. at 434. To survive a Rule 12(b)(6) motion to dismiss,

Plaintiffs must plausibly allege that the restrictions burden their voting rights and are not justified

by any State interests. *See Miller v. Doe*, 422 F. Supp. 3d 1176, 1185-86 (W.D. Tex. 2019);

*League of Women Voters of Florida, Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1288 (N.D. Fla.

2018) ("It is sufficient for a 12(b)(6) motion that Plaintiffs have alleged [that the challenged laws] have burdened their voting rights."). In reviewing the complaint, the Court finds that Plaintiffs have met this standard for each restriction.

With respect to the Postage Tax, Plaintiffs allege that requiring voters to provide their own postage imposes a cost burden on their ability to vote. *See* docket no. 1 at ¶ 66-67. This burden is exacerbated, according to Plaintiffs, by the current COVID-19 pandemic, which makes it significantly less safe for some voters to both vote in person and to purchase stamps. *Id.* at ¶¶ 68-73. With more voters forced to vote by mail, the burden of buying postage will be more widespread. Moreover, some voters may be unable to afford postage, especially given the economic burdens caused by the COVID-19 pandemic. *Id.* at ¶¶ 73-75. The alleged burden of the Postage Tax is not speculative or conclusory, either. Rather, Plaintiffs cite numbers reflecting the increased turnout in elections with prepaid postage. *Id.* at ¶ 75.

Plaintiffs allege that this burden is severe. *Id.* at ¶ 114. Indeed, they allege that "[a]t best, it requires Texans—millions of whom are vulnerable to severe complications from COVID-19 or have vulnerable loved ones—to pay to vote by mail so that they can avoid exposing themselves to the virus," and at worst, "it disenfranchises the millions of Texans who cannot risk exposure to COVID-19 but who also cannot obtain postage to mail their ballots." *Id.* Finally, Plaintiffs allege that the Secretary "can offer no justification that outweighs the significance of the burden under the current circumstances." *Id.* at ¶ 115.

As explained above, the Secretary makes several arguments against these allegations. First, she disputes that there is a Postage Tax, pointing out that Plaintiffs and other voters are free to vote in person or return their absentee ballots in person. *See* docket no. 17 at pp. 11-13. She further argues that any alleged burden is *de minimis*, and that because several other states do not

provide prepaid postage with their mail-in ballots, Texas's failure to do so must not run afoul of the Constitution. *Id.* at p. 13. As for its interest, the Secretary cites the State's budget, which would be inflated by the need to pay 55 cents for every mail-in ballot. *Id.* at p. 14.

These arguments, however, require the Court to weigh the merits of Plaintiffs' claim, which is improper when deciding a Rule 12(b)(6) motion. Taking Plaintiffs' allegations as true, as the Court must, Plaintiffs sufficiently allege that voters will need to provide their own postage, imposing a substantial burden on at least some Texans considering the health risks and economic pressures caused by the COVID-19 pandemic. Accordingly, the Court denies the Secretary's Motion as to Plaintiffs' undue burden claim against the Postage Tax.

Likewise, Plaintiffs plausibly allege an undue burden claim with respect to the Ballot Receipt Deadline. They allege that even in normal times, the confusion caused by the two deadlines—ballots must be mailed by 7:00 p.m. on election day but also must be received by 5:00 p.m. the day after the election—results in voters meeting one deadline but being disenfranchised because the USPS is unable to meet the second deadline. *See* docket no. 1 at ¶¶ 77-79. More importantly, they allege that the COVID-19 pandemic worsens the risk that postal delays will result in disenfranchised voters, specifically by increasing the number of Texans voting by mail and the strain put on the USPS by the pandemic's challenges. *Id.* at ¶¶ 80-83, 116-117. Plaintiffs allege that the Secretary cannot offer a justification for the burden on the right to have timely mailed ballots counted, particularly considering that the State "instructs counties to wait until the sixth day after the election to count mail-in ballots along with overseas ballots." *Id.* at ¶ 117.

The Secretary disputes that the Ballot Receipt Deadline poses an unconstitutional burden with similar arguments as those made against the Postage Tax. For instance, she argues that other

states set election day as the deadline to receive mail-in ballots. *See* docket no. 17 at p. 16. She also contends that the deadline serves an important purpose: giving local officials time to process and count ballots. *Id.* The Secretary then attacks Plaintiffs' factual allegations as outlined above. *Id.* at pp. 17-19. However, the Court is not yet charged with weighing the merits of Plaintiffs' allegations. Indeed, the burdens imposed by the Ballot Receipt Deadline, and the merits of the State's proposed interest, will need to be developed during discovery. At this point, the Court must accept as true the factual allegations in Plaintiffs' complaint. In doing so, the Court finds they have sufficiently alleged that their right to vote is burdened by the Ballot Receipt Deadline.

As for the Signature Match Requirement, Plaintiffs allege that the unconstitutional burden on the right to vote arises from the arbitrary and error-prone matching process. *See* docket no. 1 at ¶ 118. They allege that Texas fails to set clear, uniform standards to determine the validity of the voter's signature, and then fails to give the voter the opportunity to cure this purportedly arbitrary decision. *Id.* And as described above in analyzing Plaintiffs' standing, multiple Plaintiffs in this case suffer from medical conditions that impede their ability to write, subjecting them to the risk that their signatures do not match. *See id.* at ¶¶ 14 & 19. Plaintiffs then claim that the State does not have an interest justifying its failure to provide voters with an opportunity to cure, and any claimed interest in protecting against voter fraud could be achieved without disenfranchising "countless Texas voters." *Id.* at ¶ 119; *see also Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019) ("[W]e have no trouble finding that Florida's [signature matching] scheme imposes at least a serious burden on the right to vote.").

In her Motion, the Secretary contends that the State has a compelling interest in combatting voter fraud, and signature verification is the "most common method to verify that

absentee ballots are coming from the intended voter." Docket no. 17 at p. 21. The Secretary disputes Plaintiffs' assertion that the local officials verifying the signatures need to be experts, and she contends that the review process for rejected signatures is enough and results in a minimal burden on the right to vote. *Id.* at pp. 22-24. Again, these arguments are improper at the Rule 12(b)(6) stage as they ask this Court to prematurely adopt the Secretary's interpretation of the facts. *See Iqbal*, 556 U.S. at 678. Both Plaintiffs' allegations and the Secretary's responses will be tested in discovery, but, at this stage, the Court is required to accept the complaint's allegations as true and read them in the light most favorable to Plaintiffs. With this standard in mind, the Court finds that Plaintiffs have alleged enough facts to state an undue burden claim with respect to the Signature Match Requirement.

Plaintiffs also state a plausible under burden claim as to the Voter Assistance Ban. As described above, Plaintiffs allege that the ban poses an even greater burden considering the COVID-19 pandemic, as more voters will need to vote by mail but will be unable to deliver their ballots in-person because of the health risks. *See* docket no. 1 at ¶ 120. The Voter Assistance Ban prevents any assistance in delivering ballots outside of a few exceptions, and will force voters to mail their ballots, exposing themselves to the other restrictions outlined above. *Id.* Plaintiffs allege that the State's interest in preventing voter fraud and ballot harvesting cannot justify the restriction, particularly because the restriction results in the disenfranchisement of some voters and the evil of voter fraud or undue influence is already criminalized by other Texas laws. *Id.*

The Court finds that these allegations are enough to survive the Rule 12(b)(6) stage. The Secretary urges that the State has a compelling interest in preventing ballot harvesting. She also argues that other states have similar bans. But both arguments involve an analysis of the merits.

Accordingly, Plaintiffs' undue burden claims are sufficiently alleged for all four challenged restrictions.

### 2.  **Plaintiffs' Equal Protection Claims**

Plaintiffs also assert that the Ballot Receipt Deadline and Signature Match Requirement are equal protection violations. *See* docket no. 1 at ¶¶ 122-24. Specifically, Plaintiffs claim that both restrictions treat Texans differently depending on where they live, relying on *Bush v. Gore*. *Id.* at ¶ 123 (citing *Bush v. Gore*, 531 U.S. 98 (2000)). With respect to the Ballot Receipt Deadline, Plaintiffs allege that the level of strictness with which counties enforce the deadline varies, thus leading to voters' ballots being treated differently based on their location. *Id.* at ¶ 124. Similarly, the Signature Match Requirement violates the Equal Protection Clause because it does not "require a uniform standard by which counties should verify signatures on mail-in ballots," leading to the same variance in strictness between counties. *Id.* Plaintiffs also allege that the Signature Match Requirement discriminates on the basis of age and disability, as these voters are more likely to have changing signatures. *Id.*

In addition to the already rejected argument that *McDonald* merits dismissal of these claims, the Secretary also argues that rational basis review should apply because discrimination based on geographic location is not subject to heightened scrutiny, and because Plaintiffs have not alleged any discriminatory intent. *See* docket no. 17 at pp. 19-20. In response, Plaintiffs argue that the *Anderson-Burdick* framework outlined above applies to equal protection claims in voting rights cases, and, under *Anderson-Burdick*, Plaintiffs need not allege either a suspect class or discriminatory intent. *See* docket no. 19 at pp. 24-25.

The Court agrees with Plaintiffs: the *Anderson-Burdick* test applies to equal protection claims in the voting context. *See Obama for America v. Husted*, 697 F.3d 423, 429-430 (6th Cir.

2012) ("However, when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies."); *see also Stringer v. Pablos*, 2020 WL 532937, at *7 (W.D. Tex. Jan. 30, 2020). And, contrary to the Secretary's assertion, *Anderson-Burdick* does not require Plaintiffs to allege discriminatory intent or a suspect classification. *See Burdick*, 504 U.S. at 434 (calling for courts to weigh the "character and magnitude" of the injury against the "precise interests put forward by the State as justifications for the" restriction's burdens).

Beyond disputing the applicable standard, the Secretary also attacks the sufficiency of the factual allegations. With respect to the Ballot Receipt Deadline, the Secretary argues that Plaintiffs' allegation that different counties have varying rejection rates could be because some counties' voters return ballots at a slower rate. *See* docket no. 17 at p. 20. However, the Court is in no position to determine which theory is correct before an adequate factual record is developed. The Court therefore rejects this argument.

The Secretary also argues that both the Ballot Receipt Deadline and the Signature Match Requirement claims should not stand because they rely on *Bush v. Gore*, and that case was limited to its specific facts. *Id.* (citing *Bush v. Gore*, 531 U.S. at 109 (2000) ("Our consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities.")). However, whether *Bush v. Gore* provides binding precedent over Plaintiffs' specific allegations is a different question than whether it was based on a sound interpretation of the Equal Protection Clause. 531 U.S. at 104-05 ("Equal protection applies [to the right to vote]," and "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). Whether the Ballot Receipt Deadline or the Signature Match Requirement similarly

violate the Equal Protection Clause is a question to be resolved on the merits. At this stage, Plaintiffs allege that both restrictions unequally burden the right to vote because of the State's failure to ensure uniform standards across all counties. *See* docket no. 1 at ¶¶ 122-24. Accordingly, the Court finds that Plaintiffs have adequately alleged their equal protection claims.

### 3. Plaintiffs' Due Process Claim

As for the Signature Match Requirement, Plaintiffs also allege that it violates their procedural due process rights. Specifically, Plaintiffs allege that the right to have their vote counted is a liberty interest. *See id.* at ¶ 126 (citing *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964)). Thus, before allegedly depriving an individual of that liberty interest, the State must provide notice and an opportunity to be heard. *Id.* (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972)). The Signature Match Requirement, according to Plaintiffs, violates this right "by threatening to set Texas voters' mail-in ballots aside, not to be counted . . . without providing voters notice of their signature mismatch and the opportunity to cure." *Id.* at ¶ 127. Plaintiffs then cite several recent district court cases finding that signature-verification laws violate due process. *Id.*; *see LULAC v. Pate*, 2019 WL 6358335, at *15-17 (Ia. Dist. Ct. Sept. 30, 2019); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338-40 (N.D. Ga. 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 218 (D.N.H. 2018).

These cases show that Plaintiffs have adequately alleged a due process claim against the Signature Match Requirement. The Secretary cites *Johnson v. Hood*, a Fifth Circuit opinion finding that there was no federal due process right to vote in a state election. 430 F.2d 610, 612 (5th Cir. 1970). The Secretary argues "the same reasoning applies to federal elections," docket no. 17 at p. 25, citing a Ninth Circuit case that actually reached the *opposite* conclusion: "Although regulations on the referendum process *implicate the fundamental right to vote*, the

state's important interests justify the minimal burden on plaintiffs' rights." *Lemons v. Bradbury*, 538 F.3d 1098, 1102 (9th Cir. 2008). Regardless *Lemons* is inapposite for at least two reasons. One, the Ninth Circuit weighed the plaintiffs' interests against those of the state, which is improper at the Rule 12(b)(6) stage. *See id.* And, two, *Lemons* concerned a signature-matching process for referendum petitions, expressly distinguishing its analysis from a mail-in ballot signature. *See id.* at 1104 ("The administrative burden of verifying a referendum petition signature is significantly greater than the burden associated with verifying a vote-by-mail election ballot signature . . . [and] fraudulent signatures are less likely in vote-by-mail elections.").

In sum, Plaintiffs cite case law finding a protected interest in the right to vote. Plaintiffs allege that the Signature Match Requirement results in the denial of that right without providing notice and an opportunity to cure. The Court therefore finds that Plaintiffs have plausibly alleged a procedural due process violation.

### 4. Plaintiffs' Poll Tax Claim

Finally, Plaintiffs claim that the Postage Tax is an unconstitutional poll tax pursuant to both the Fourteenth and Twenty-Fourth Amendments. *See* docket no. 1 at ¶¶ 128-133. The Twenty-Fourth Amendment provides: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." Both the Fourteenth and Twenty-Fourth Amendments prohibit poll taxes. *See Harman v. Forssenius*, 380 U.S. 528, 544 (1965) ("For federal elections the poll tax, regardless of the services it performs, was abolished by the Twenty-Fourth Amendment."); *Harper v. Va. State Bd. of Elect.*, 383 U.S.

663, 666 (1966) ("We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard."). The Twenty-Fourth Amendment further prohibits "impos[ing] a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Harman*, 380 U.S. at 541. Moreover, poll taxes are unconstitutional regardless of whether the voter can afford it. *See Harper*, 383 U.S. at 668.

Plaintiffs allege, again, that the COVID-19 pandemic means that voting by mail is the only safe option, and the Postage Tax results in voters' either buying postage or subjecting themselves to potential health risks by voting in person or returning their ballots in-person. *See* docket no. 1 at ¶¶ 67-72, 132. Plaintiffs specifically allege that the Postage Tax will burden the right to vote of Mr. Morgan and Ms. Lewis, as well as some members of the Organizational Plaintiffs, because they do not have access to stamps and cannot travel outside of their home because of the health risks. *See id.* at ¶¶ 132-33.

The Secretary argues that this claim should be dismissed because the State has not instituted the alleged tax. *See* docket no. 17 at p. 15. The State also does not receive the revenues from sold postage. *Id.* The Secretary also argues that willful intent is required for a cost to be considered an unconstitutional poll tax. *Id.* The Court declines to rely on these arguments at the 12(b)(6) stage. Instead, the Court finds that Plaintiffs have alleged that the cost of a stamp is a "fee" that they must either pay, or risk harming their health to vote in person. They further allege that they as well as other voters risk disenfranchisement as a result. Accordingly, the Court finds that Plaintiffs plausibly allege a poll tax claim under the Fourteenth and Twenty-Fourth Amendments.

Given that the Court finds that Plaintiffs have adequately alleged all four causes of action, the Court DENIES the Secretary's Motion to Dismiss.

<u>**CONCLUSION**</u>

**IT IS THEREFORE ORDERED** that The Texas Secretary of State's Motion to Dismiss, or alternatively, for a More Definite Statement (docket no. 17) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this ___28th___ day of July, 2020.

_____
ORLANDO L. GARCIA
CHIEF UNITED STATES DISTRICT JUDGE