FILED
APR - 7 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
FILED
March 16, 2022
Lyle W. Cayce
Clerk

No. 20-50654
Summary Calendar

---

Linda Jann Lewis; Madison Lee; Ellen Sweets; Benny Alexander; George Morgan; Voto Latino; Texas State Conference of the National Association for the Advancement of Colored People; Texas Alliance for Retired Americans,

*Plaintiffs—Appellees,*

versus

John Scott, *in his official capacity as Texas Secretary of State*,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-577-OLG

---

Before Higginbotham, Willett, and Duncan, *Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and the briefs on file.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is REVERSED, and the cause is REMANDED to the

No. 20-50654

District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that appellees pay to appellant the costs on appeal to be taxed by the Clerk of this Court.

Patrick E. Higginbotham, *Circuit Judge*, dissenting.



Certified as a true copy and issued
as the mandate on Apr 07, 2022

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
March 16, 2022
Lyle W. Cayce
Clerk

No. 20-50654

LINDA JANN LEWIS; MADISON LEE; ELLEN SWEETS; BENNY ALEXANDER; GEORGE MORGAN; VOTO LATINO; TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; TEXAS ALLIANCE FOR RETIRED AMERICANS,

*Plaintiffs—Appellees,*

*versus*

JOHN SCOTT, *in his official capacity as Texas Secretary of State*,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-577

---

Before HIGGINBOTHAM, WILLETT, and DUNCAN, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

Plaintiffs challenged as unconstitutional various provisions of the Texas Election Code regulating mail-in balloting and sued the Texas Secretary of State. We conclude that the Plaintiffs' suit is barred by sovereign immunity because the Secretary does not enforce the challenged provisions. We reverse and remand.

Case 5:20-cv-00577-OLG   Document 50   Filed 04/07/22   Page 4 of 16
Case: 20-50654   Document: 00516270838   Page: 2   Date Filed: 04/07/2022

No. 20-50654

I.

In May 2020, Plaintiffs[1] filed suit challenging four provisions of the Texas Election Code that regulate voting by mail in Texas. First, they challenged section 86.002 on the grounds that it requires voters to pay for postage to mail a ballot. *See* TEX. ELEC. CODE § 86.002.[2] Second, they challenged section 86.007, which requires mailed ballots be postmarked by 7:00 p.m. on election day and received by 5:00 p.m. on the day after election day. *See id.* § 86.007(a). Third, they challenged section 87.027, which requires a committee to verify that the voter's signature on the carrier envelope matches examples of the voter's signature on file with the county clerk or voter registrar. *See id.* § 87.027(i). Fourth, they challenged section 86.006, which criminalizes knowingly possessing another person's mail-in ballot or carrier envelope except in specified circumstances. *See id.* § 86.006(f). Plaintiffs claimed these provisions, especially in the context of the Covid-19 pandemic, unlawfully burdened the right to vote in violation of the First, Fourteenth, and Twenty-Fourth Amendments. They sought a declaratory judgment, as well as permanent and preliminary injunctive relief. The named defendant was the Secretary of State ("the Secretary"), in her official capacity.[3]

The Secretary moved to dismiss based on, *inter alia*, sovereign immunity, arguing she lacked the necessary connection to enforcing the challenged provisions under *Ex parte Young*, 209 U.S. 123 (1908). The district court denied the motion. It found the requisite connection in two provisions of the Texas Election Code: (1) the Secretary's duty in section 31.003 to

---

[1] Plaintiffs are five individuals—Linda Jann Lewis, Madison Lee, Ellen Sweets, Benny Alexander, and George "Eddie" Morgan—and three organizations—Voto Latino, the Texas State Conference of the NAACP, and the Texas Alliance for Retired Americans.

[2] All references to statutory sections in this opinion are to the Texas Election Code as effective at the time of the district court's order.

[3] Ruth Hughs, the Secretary when suit was filed, has been replaced by John Scott.

Case 5:20-cv-00577-OLG   Document 50   Filed 04/07/22   Page 5 of 16
Case: 20-50654      Document: 00516270838      Page: 3      Date Filed: 04/07/2022

No. 20-50654

"obtain and maintain uniformity in the application, operation, and interpretation of [this code] and of the election laws outside [this code]"; and (2) the Secretary's authority in section 31.005 to "take appropriate action to protect voting rights from abuse by the authorities administering the state's electoral processes." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 610 (W.D. Tex. 2020) (cleaned up); *see* TEX. ELEC. CODE §§ 31.003; 31.005(a)-(b).

The Secretary immediately appealed the denial of sovereign immunity under the collateral order doctrine. *See Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (per curiam) (citing *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993)). A panel of this court initially granted Plaintiffs' motion to summarily affirm, based on its view that "no substantial question exists . . . with respect to whether the Texas Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to satisfy *Ex parte Young*'s 'some connection' requirement." *Lewis v. Hughs*, No. 20-50654, 2020 WL 5511881 (5th Cir. Sept. 4, 2020) (per curiam) (citing *Young*, 209 U.S. at 157; *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) (per curiam)). After the Secretary moved for rehearing en banc, the panel (over a dissent) withdrew its order, denied Plaintiffs' motions to summarily affirm or to dismiss the appeal as frivolous, and routed the appeal to a merits panel. *See Lewis v. Hughs*, No. 20-50654, 2020 WL 6066178 (5th Cir. Oct. 2, 2020). The court later denied the Secretary's en banc petition.

## II.

"We review the district court's jurisdictional determination of sovereign immunity *de novo*." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019), *cert. denied* --- U.S. ---, 141 S. Ct. 1047 (2021).

## III.

As an exception to the general rule of state sovereign immunity, *Ex parte Young* permits plaintiffs to sue a state officer in his official capacity for

3

an injunction to stop ongoing violations of federal law. 209 U.S. at 155–56; *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). The officer sued must have "some connection with the enforcement of the [challenged] act." *Young*, 209 U.S. at 157. Although our circuit has struggled to define this "connection" requirement,[4] this principle is settled: "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends." *City of Austin*, 943 F.3d at 998 (citing *Morris v. Livingston*, 739 F.3d 740, 742 (5th Cir. 2014)); *see also Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. 2021); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020). Applying that principle, we conclude that the Secretary is not the proper defendant here.

First, Plaintiffs challenge what they call the "requirement" in section 86.002 that voters pay postage to mail early ballots.[5] But the statute specifies that "*[t]he early voting clerk* shall provide an official ballot envelope and carrier envelope with each ballot provided to a voter." *Id.* § 86.002(a) (emphasis added). And, if "the clerk" determines these materials will weigh more than one ounce, "the clerk shall include . . . a notice of the amount of first class postage that will be required for the return by mail of the carrier envelope and enclosed materials." *Id.* § 86.002(e). The only role the Secretary plays in this process is to "prescribe instructions to be printed on the balloting materials for the execution and return of a statement of residence." *Id.* § 86.002(d). That duty has nothing to do with enforcing any postage requirement on early ballots.

---

[4] We discuss some of these struggles in another decision issued today. *See Tex. All. for Retired Ams. v. Scott*, No. 20-40643, --- F.4th ---, slip op. at 4–5 (5th Cir. March 16, 2022).

[5] This a generous reading of Plaintiffs' claim. In reality, it is the United States Postal Service, not any Texas law or official, that "requires" paying postage to mail early ballots or anything else. *See* 39 U.S.C. § 404.

4

The same reasoning applies to the other provisions targeted by Plaintiffs. It is "[t]he early voting clerk," not the Secretary, who assesses whether mailed ballots are timely under the postmark-and-receipt requirements. *Id.* § 86.011(a).[6] It is local election officials, not the Secretary, who verify voters' signatures and notify voters of a mismatch. *See id.* § 87.041(a) (providing "early voting ballot board" shall open and assess early voting ballots).[7] And it is local prosecutors, not the Secretary, who are specifically charged with enforcement of the criminal prohibition on possessing a voter's mail-in ballot. *See id.* § 86.006(i) (establishing standards for "the prosecution of an offense under Subsection (f)" by "the prosecuting attorney"). So, the statutes themselves refute any notion that the Secretary enforces them. *City of Austin*, 943 F.3d at 998.[8]

Finally, Plaintiffs rely on the Secretary's "general duties" in enforcing election laws—such as his role as "chief election officer," Tex. Elec. Code § 31.001, his duty to "obtain and maintain uniformity" in the laws' application, *id.* § 31.003, his duty to "assist and advise" election officials, *id.* § 31.004, and his authority to "take appropriate action to protect" voting rights, *id.* § 31.005. None of these creates the relevant connection between the Secretary and any of the challenged provisions. The Secretary's general duties "fail to make [him] the enforcer of specific election code provisions." *See Tex. All. for Retired Ams. v. Scott*, No. 20-

---

[6] *See also id.* § 86.011(c) (noting "the clerk['s]" duty to log and preserve untimely ballots); *id.* § 86.007(b) (providing presumption for time of early ballot arrival "[i]f the early voting clerk cannot determine whether a ballot arrived before the deadline").

[7] *See also id.* § 87.0431(a) (specifying process for "the presiding judge of the early voting ballot board" to notify voters of rejection of ballots); *id.* § 87.027 (providing duties of "[t]he early voting clerk" to appoint a "signature verification committee").

[8] Plaintiffs suggest the Secretary has demonstrated a "willingness to enforce" the receipt deadline by advising county officials of two recent changes to the deadlines for domestic and overseas ballots. Even assuming "willingness to enforce" is a distinct *Ex parte Young* requirement, *see City of Austin*, 943 F.3d at 1000, the actions cited by Plaintiffs fail to show enforcement of any of the *challenged* provisions.

Case 5:20-cv-00577-OLG   Document 50   Filed 04/07/22   Page 8 of 16
Case: 20-50654      Document: 00516270838      Page: 6      Date Filed: 04/07/2022

No. 20-50654

40643, --- F.4th ---, slip op. at 8 (5th Cir. March 16, 2022) (citing TEX. ELEC. CODE §§ 31.003–.005).[9] More is needed—namely, a showing of the Secretary's "connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Tex. Democratic Party v. Abbott* (*TDP*), 978 F.3d 168, 179 (5th Cir. 2020); *see also City of Austin*, 943 F.3d at 999–1000 (distinguishing "general duty" to implement state law from "particular duty to enforce the statute in question" (quoting *Morris*, 739 F.3d at 746)). "Th[at] is especially true here because the Texas Election Code delineates between the authority of the Secretary of State and local officials." *TDP*, 978 F.3d at 179. The district court erred by basing its *Young* reasoning on these general duties.[10]

In sum, the district court erred in finding the Secretary was a proper defendant under *Ex parte Young*.

IV.

We REVERSE the district court's judgment and REMAND with instructions to dismiss Plaintiffs' claims.

---

[9] *See also Bullock v. Calvert*, 480 S.W.2d 367, 371–72 (Tex. 1972) (Reavley, J.) (rejecting argument that Secretary's role as "chief election officer" or his duty to "maintain uniformity" in application of election laws is "a delegation of authority to care for any breakdown in the election process"); *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020) (Blacklock, J., concurring) (same).

[10] For those reasons, we must respectfully disagree with our esteemed colleague's erudite dissenting opinion. *See post*, at 2.

No. 20-50654

Patrick E. Higginbotham, *Circuit Judge*, dissenting:

I must dissent with this case as well as its companion cases.[1] None present an issue of sovereign immunity, as the Eleventh Amendment does not bar these claims under the Fourteenth Amendment. Our issue is rather the antecedent question of Article III standing, turning on injury and redressability.

## I.

I write to remind failing memories of the signal role of *Ex parte Young* in directly policing the path of cases and controversies to the Supreme Court from our state and federal courts and warn against its further diminution.[2] As I explained over twenty years ago in *Okpalobi v. Foster*, "*Ex parte Young* poses no threat to the Eleventh Amendment or to the fundamental tenets of federalism. To the contrary, it is a powerful implementation of federalism necessary to the Supremacy Clause, a stellar companion to *Marbury* and *Martin v. Hunter's Lessee*."[3] Just as then, "the destination of the majority's trek today is inevitably a narrowing of the doctrine of *Ex parte Young* . . . I decline passage on that voyage. I decline because I am persuaded that familiar principles of standing are better suited to answer these questions with less risk to the vital role of *Ex parte Young*."[4]

---

[1] *Tex. Alliance for Retired Americans v. Scott*, No. 20-40643, --- F.4th ---, (5th Cir. March 16, 2022); *Richardson v. Scott*, No. 20-50774, --- F. 4th ---, (5th Cir. March 16, 2022).

[2] 209 U.S. 123 (1908).

[3] *Okpalobi v. Foster*, 244 F.3d 405, 432 (5th Cir. 2001) (Higginbotham, J. concurring).

[4] Id.

No. 20-50654

The majority continues this Court's effort to shrink the role of *Ex parte Young*, by overly narrow readings of the state officer's duty to enforce Texas's election laws. Unlike in *Okpalobi* "where the defendants had no enforcement connection with the challenged statute,"[5] the Texas Secretary of State is the "chief election officer of the state" and is directly instructed by statute to "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code."[6] Moreover, the Secretary is charged to "take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes" and "to correct offending conduct."[7] Although recent decisions by this Court have split hairs regarding the level of enforcement authority required to satisfy *Ex parte Young*,[8] the Secretary is charged to interpret both the Texas Election Code and the election laws outside the Code, including federal law, to gain uniformity, tasks it is clearly bound to do.[9] The allegation in these cases is that the Secretary is failing in that duty. This charge should satisfy our *Ex parte Young* inquiry.

---

[5] *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017).

[6] Tex. Elec. Code § 31.001(a) and Tex. Elec. Code § 31.003.

[7] Tex. Elec. Code § 31.005(a), (b).

[8] *Compare Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020); *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) *with Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020); *OCA-Greater Houston*, 867 F.3d at 613–14.

[9] *See Texas Democratic Party*, 961 F.3d at 401; *City of Austin*, 943 F.3d at 1002.

No. 20-50654

## II.

None other than the inimitable Charles Alan Wright saw *Ex parte Young* as "indispensable to the establishment of constitutional government and the rule of law."[10] Professor Wright's views, drawn as they were from a lifetime of disciplined study stand on their own, gaining their strength from years of recording judicial performance and the currency of our system by the teachings of the Constitutional Convention and the acts of our first Congress. This is the wisdom of a scholar and practitioner, here grounded by the reality that *Ex parte Young* brings the axis necessary for the courts to harness the power vested in them by the Constitutional Convention of 1787—the direction of the flow to the Supreme Court of challenges to the validity of state action, a function essential to the splitting of the atom of sovereignty in a sovereign nation of sovereign states in a young republic and today.

The three-judge district courts, with direct appeal to the Supreme Court, were quickly established as a needed counter to the reach of *Ex parte Young*.[11] And with this concern faded by the creation of three-judge district courts, there came a list of seminal decisions protecting civil liberties, long and distinguished.[12] Recall that it was a three-judge district court, with its

---

[10] Charles Alan Wright & Mary Kay Kane, *Law of Federal Courts* 14 (6th ed. 2002).

[11] 36 Stat. 557; Michael E. Solimine, *The Strange Career of the Three-Judge District Court: Federalism and Civil Rights, 1956–76*, 72 CASE W. RES. L. REV. __, *4–5 (forthcoming); Barry Friedman, *The Story of* Ex parte Young, *in* FEDERAL COURTS STORIES 269–71 (Vicki C. Jackson and Judith Resnick ed., 2010).

[12] See e.g., Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510 (1925), aff'g Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary 296

No. 20-50654

injunctive power, that brought *Brown v. Board of Education* to the federal courts, sustaining the integration of public schools.[13]

### III.

Another strand of history completes the relevant frame for this state-federal tension. While the need for a Supreme Court was never an issue for the delegates at the Constitutional Convention, as its absence was a driving force for its convening, whether to create a tier of lower courts divided the delegates. The cornerstone Madisonian Compromise resolved the impasse—authorizing Congress to create the lower federal courts. And it did, over resistance born of a concern of potential federal court intrusion into state affairs, the work of its judiciary. That lingering concern of the Convention led the first Congress to enact the Anti-Injunction Act: providing that "a writ of injunction [shall not] be granted to stay proceedings in any court of a state," assuring direct review of state courts by the Supreme Court.[14] An exception clause later added: "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate

---

F. 928 (D. Ore. 1924); W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), aff'g Barnette v. W. Virginia State Bd. of Educ., 47 F. Supp. 251, 252 (S.D.W. Va. 1942); Baker v. Carr, 369 U.S. 186 (1962), rev'g Baker v. Carr, 179 F. Supp. 824 (M.D. Tenn. 1959); Younger v. Harris, 401 U.S. 37 (1971), rev'g Harris v. Younger, 281 F. Supp. 507, 508 (C.D. Cal. 1968); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973), rev'g Rodriguez v. San Antonio Indep. Sch. Dist., 337 F. Supp. 280, 281 (W.D. Tex. 1971); Roe v. Wade, 410 U.S. 113 (1973), aff'g Roe v. Wade, 314 F. Supp. 1217, 1219 (N.D. Tex. 1970).

[13] 347 U.S. 483 (1954); Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan., 98 F. Supp. 797 (D. Kan. 1951), rev'd sub nom. Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294 (1955). See also Briggs v. Elliot, 98 F. Supp. 529 (E.D.S.C. 1951) and Davis v. County School Bd., 103 F. Supp. 337 (E.D. Va. 1952).

[14] 1 Stat. 334 § 5 (1793).

Case 5:20-cv-00577-OLG   Document 50   Filed 04/07/22   Page 13 of 16
Case: 20-50654      Document: 00516270838     Page: 11     Date Filed: 04/07/2022

No. 20-50654

its judgments."[15] And there it rested, through the Civil War with its attending Constitutional amendments.

With the turn of the century, we entered the *Lochner* period, characterized by federal injunctions blocking state efforts to address social issues in the rising industrial world.[16] It is significant that from Reconstruction to the *Lochner* era, lawyers seldom reached for § 1983 given its inclusion of the language of the Privileges and Immunities Clause, language neutered in the *Slaughterhouse* cases.[17] In more recent times, § 1983 came to be a major pathway to the lower federal courts, prompting challenges to its injunctive power as violating the Anti-Injunction Act. The Supreme Court's response sheds light on the wielding and melding of federal injunctions and our federalism.

From these threads of history, the Supreme Court in *Mitchum v. Foster* laid bare the subtle relationship of the Anti-Injunction Act, § 1983, and *Ex parte Young*. The Court saw the then sixty-four-year-old *Ex parte Young* as a critical valve to direct the flow of cases from the state courts to the Supreme Court.[18] Justice Stewart explained that "Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century when the anti-injunction statute was enacted."[19] Congress was "concerned that state instrumentalities could not protect those

---

[15] 28 U.S.C.A. § 2283 (West).

[16] *Lochner v. New York*, 198 U.S. 45 (1905).

[17] 83 U.S. 36 (1872).

[18] *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

[19] *Id.*; 42. U.S.C. § 1983.

Case 5:20-cv-00577-OLG   Document 50   Filed 04/07/22   Page 14 of 16
Case: 20-50654   Document: 00516270838   Page: 12   Date Filed: 04/07/2022

No. 20-50654

rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts."[20] He continued:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."[21]

*Mitchum v. Foster* is itself a contemporary example of the on-going allocation of the flow of cases to the Supreme Court from the state courts and the Congressionally created lower federal courts, as well as the role of *Ex parte Young* in that cast.

In sum, *Ex parte Young*, birthed as a tool of the *Lochner* period, proved its effectiveness in sustaining challenges to state efforts to protect workers. *Mitchum v. Foster* presents as a parallel—protecting civil rights—giving to civil rights claimants a § 1983 with the power of the injunction, albeit not always a path around the Eleventh Amendment.

### IV.

Here however, as it was in *Okpalobi*, the threshold question is standing, the Article III door to the federal courthouse, which the majority stepped past. Standing doctrine was a product of the shift to the public law model. With its focus upon injury and redressability, it rejected an ombudsman role for the federal courts. Here, as all three of our cases bring claims of

---

[20] *Mitchum*, 407 U.S. at 242.

[21] *Id.* (quoting *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879)).

No. 20-50654

constitutional violation under § 1983, there is no immunity issue, no necessary role for *Ex parte Young*.[22] As the state has no immunity from enforcement of the Fourteenth Amendment here,[23] the remaining inquiry is standing—itself a constitutional demand of injury and redressability.[24]

Under a proper Article III analysis, these suits have a redressable injury because the Secretary is directed by the election laws of Texas to interpret and conform the election code to other election laws (as federal law is state law). Power to interpret to gain uniformity with state and federal law is power to enforce.[25] And "our precedent suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code . . . to support standing."[26] Again, the claim is that the Secretary failed to discharge that duty or has done so in an unconstitutional manner. These claims can proceed if there is standing with its requirement of injury and redressability.

In sum, I am persuaded that these cases ought not fail on standing or sovereign immunity grounds. Rather, we should have fully considered the

---

[22] These three cases also present claims under the Voting Rights Act and the Americans with Disabilities Acts, where Congress has specifically abrogated state sovereign immunity. *See e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 534 (2004); *Fusilier*, 963 F.3d at 455; *OCA-Greater Houston*, 867 F.3d at 614.

[23] *Reynolds v. Sims*, 377 U.S. 533, 537 (1964); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 454 (1976).

[24] E.g., Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

[25] Tex. Elec. Code § 31.001(a) and Tex. Elec. Code § 31.003. *See Testa v. Katt*, 330 U.S. 236 (1947).

[26] *Texas Democratic Party*, 961 F.3d at 401 (citing *OCA-Greater Hous.*, 867 F.3d at 613).

No. 20-50654

merits of the plaintiffs' arguments, especially where these cases also present claims under the Voting Rights Act and Americans with Disabilities Act, thin though they all may be.[27]

## V.

Even this quick glance back sheds light on threshold questions of the role of the Court in protecting the most vital Constitutional right of a democratic government: the right to vote. And so, I am troubled by this Court's narrowing of *Ex parte Young*. *Ex parte Young* is no culprit.[28]

About this we can agree, partisan views ought to prevail by persuading voters, not by denying their right to vote. With respect to my able colleagues, I must dissent.

---

[27] *See e.g.*, *Lane*, 541 U.S. at 534; *Fusilier*, 963 F.3d at 455; *OCA-Greater Houston*, 867 F.3d at 614.

[28] *Okpalobi*, 244 F.3d at 432.